**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| HILTON WORLDWIDE HOLDINGS INC., <br><br> Plaintiff, <br><br> v. <br><br> SAM HIRBOD, FMT SJ HOLDINGS LLC, AND EAGLE CANYON HOLDINGS, LLC, <br><br> Defendants. | Case No. _____ |

## COMPLAINT

Plaintiff Hilton Worldwide Holdings Inc. ("Hilton") brings this Complaint against Sam Hirbod ("Hirbod"), FMT SJ Holdings LLC ("FMT"), and Eagle Canyon Holdings, LLC ("ECH," and together with Hirbod and FMT, "Defendants") to recover more than $29.3 million. Hilton paid that amount to JPMorgan Chase Bank, N.A. ("JPMorgan"), and Defendants now owe that sum to Hilton pursuant to unambiguous reimbursement agreements. Defendants have refused to reimburse Hilton in plain violation of their express and unambiguous contractual obligations to do so. This is a textbook example of bad-faith breach of contract. Hilton brings this action to recover $29.3 million plus interest, attorneys' fees, costs, and expenses, and is entitled to swift judgment in its favor.

## PRELIMINARY STATEMENT

1. Defendant Hirbod is a real estate developer who, personally and through affiliated entities, borrowed approximately $173 million from a mortgage lender in 2018 to purchase a luxury hotel in California then known as the San Jose Fairmont. A few years later, in 2021, the Hirbod entities that owned the San Jose Fairmont declared bankruptcy. In connection with a court-

sanctioned Request For Proposal process in those bankruptcy proceedings, Hirbod selected Hilton to manage the hotel going forward and re-branded it as the Signia by Hilton San Jose.

2.    To facilitate the hotel's rebranding, Hirbod needed tens of millions of dollars in additional financing.  Hirbod and his entities thus sought a mezzanine loan from JPMorgan for $25 million.  JPMorgan agreed to extend the mezzanine loan to Hirbod, but only if Hilton agreed that, if Hirbod defaulted on the loan, Hilton would either purchase the mezzanine loan from JPMorgan or pay it off in full.

3.    Hilton, in turn, informed Hirbod that Hilton would guarantee the mezzanine loan only if it received ironclad contractual guarantees providing that Hirbod and his affiliates would assume ultimate financial responsibility for any amount Hilton paid to JP Morgan.  Hilton thus negotiated and secured contractual reimbursement obligations from Defendants.  Specifically, Defendants in written contracts guaranteed that they would (i) reimburse Hilton if Hilton were required to purchase the mezzanine loan or pay it off in full, and (ii) waive potential defenses so that Hilton could receive reimbursement without delay or undue legal process.  That way, if Hilton had to purchase the mezzanine loan or pay it off in full, Hilton would have unambiguous contracts through which it could speedily recover the full amount of the loan, plus interest, attorneys' fees, costs, and expenses.

4.    Defendants' reimbursement obligations are set forth in four separate contracts, each of which is clear and unambiguous.  *First*, Hilton executed a reimbursement agreement with FMT that required FMT to reimburse Hilton for any amount Hilton would tender to JPMorgan, plus interest, attorneys' fees, costs, and expenses ("FMT's Reimbursement Agreement").  *Second*, ECH executed a guaranty to pay Hilton for all amounts owed to Hilton under FMT's Reimbursement Agreement—including the mezzanine loan amount, interest, attorneys' fees, costs, and expenses

("ECH's Guaranty"). *Third*, Defendant Hirbod himself agreed that, if for any reason ECH refused to perform FMT's obligations to Hilton, then Hirbod personally would be liable for repaying Hilton the full amount of the loan—which originally was $25 million but, as discussed below, was ultimately increased to $29.3 million in 2023 ("Hirbod's Springing Guaranty"). *Fourth*, Defendant Hirbod executed a personal guaranty ("Hirbod's Personal Guaranty"). Defendant Hirbod provided his personal guaranty after Hirbod asked JPMorgan to increase the mezzanine loan amount by $4.3 million in July 2023. Hilton agreed to guarantee the full loan amount—now $29.3 million—but did so only on the condition that Hirbod provide to Hilton a Personal Guaranty for the additional $4.3 million. These four agreements, taken together (the "Agreements"), require Defendants to reimburse Hilton the full $29.3 million, plus interest, attorneys' fees, costs, and expenses, if Hilton paid JPMorgan the $29.3 million it lent to Hirbod.

5.      Less than one year after the increase of the loan amount to $29.3 million, the dominoes began to fall. In June 2024, the Hirbod entity that borrowed the mezzanine loan defaulted on the mezzanine loan. Hilton paid the full $29.3 million to JPMorgan, and Hilton promptly served notices demanding that Hirbod and his entities reimburse Hilton. But rather than comply with their contractual reimbursement obligations, Hirbod and his entities refused to honor them. They ignored the demand and default notices that Hilton served in June and July 2024 and refused to reimburse Hilton, inflicting more than $29.3 million of damage to Hilton in clear and material breach of Defendants' contractual commitments.

6.      Contractual obligations are not optional. Defendants agreed to reimburse Hilton if Hilton needed to purchase the mezzanine loan from JPMorgan due to Hirbod's default. Hilton did so, but Defendants have refused to reimburse Hilton. Defendants have never identified any basis for refusing to pay Hilton. Nor could they, as the Agreements clearly and unambiguously require

reimbursement and waive all defenses. Defendants must repay Hilton the loan amount plus interest, attorneys' fees, costs, and expenses.

## PARTIES

7.      Plaintiff Hilton Worldwide Holdings Inc. is a corporation incorporated in Delaware with a principal place of business at 7930 Jones Branch Drive, Suite 1100, McLean, Virginia 22012.

8.      Defendant Sam Hirbod is a natural person having an address at 340 South East 3rd Street, 3402, Miami, Florida 33131. He is the ultimate owner, President, and CEO of a network of limited liability companies that, among other things, buys and owns real estate properties, including gas stations, convenience stores, and hotels. On information and belief, Hirbod is the ultimate indirect owner of Defendants FMT and ECH, and non-parties SC SJ Holdings LLC, FMT SJ LLC, and RDNWD LLC.

9.      Defendant FMT SJ Holdings LLC is an unincorporated association having an address at 3223 Crow Canyon Road, Suite 300, San Ramon, California 94583. FMT is a citizen of Florida. FMT is ultimately indirectly owned by Defendant Sam Hirbod.

10.     Defendant Eagle Canyon Holdings, LLC is an unincorporated association having an address at 3223 Crow Canyon Road, Suite 300, San Ramon, California 94583. On information and belief, ECH is a citizen of Florida. ECH is ultimately indirectly owned by Defendant Sam Hirbod.

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over the Defendants because each Defendant contractually agreed in the Agreements to a forum selection clause providing that, "in a case involving diversity of citizenship, the United States District Court for the Eastern District of Virginia . . . shall have exclusive jurisdiction" over any action or proceeding "directly or indirectly

4

relating to" the Agreements. This case involves diversity of citizenship because Plaintiff Hilton is a citizen of Delaware and Virginia, and Defendants are all citizens of Florida.

12. Venue in this District is also proper under 28 U.S.C. § 1391(b)(2) because Defendants negotiated the Agreements and communicated throughout the parties' course of dealings with Hilton at its headquarters in this District.

13. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the parties are completely diverse. Plaintiff Hilton is a citizen of Delaware and Virginia, and Defendants are all citizens of Florida.

14. The Agreements provide that they shall be governed by, interpreted under, and enforced in accordance with the laws of the State of New York.

## FACTUAL BACKGROUND

### A. Defendant Hirbod and His Affiliated Entities Acquire the San Jose Fairmont Hotel and Then File for Bankruptcy

15. In early 2018, two entities ultimately owned by Hirbod, SC SJ Holdings LLC, and FMT SJ LLC (collectively, the "Hotel Owners") acquired the San Jose Fairmont hotel located at 170 South Market Street in San Jose, California. Hirbod and the Hotel Owners financed the transaction through an approximately $173 million mortgage loan that is not at issue here.

16. Less than two years after the Hotel Owners acquired the San Jose Fairmont, the Hotel Owners defaulted on their mortgage and filed voluntary Chapter 11 bankruptcy petitions in bankruptcy court in Delaware. The Defendants in this case—Hirbod, FMT, and ECH—are not parties in these bankruptcy proceedings; rather, those proceedings involve other Hirbod-affiliated LLCs that are not defendants here. Accordingly, the bankruptcy proceedings do not impact Hilton's ability to seek relief against, or recover from, the Defendants in this case.

5

17.    In the bankruptcy proceedings, companies like Hilton were able to submit bids to manage what was formerly known as the San Jose Fairmont once the hotel emerged from bankruptcy pursuant to an approved Chapter 11 plan.  After evaluating many bidders, Defendant Hirbod ultimately selected Hilton to manage the hotel, which rebranded as the Signia by Hilton San Jose.

**B.    Hilton Guarantees Defendants' Mezzanine Loan and Defendants Agree to Reimburse Hilton If a Default Occurs**

18.    After selecting Hilton to manage the hotel, Hirbod needed capital to facilitate the hotel's rebranding.  Hirbod and his affiliates sought a mezzanine loan from JPMorgan.

19.    JPMorgan agreed to provide the $25 million mezzanine loan (the "Mezzanine Loan") to Hirbod affiliate RDNWD LLC ("RDNWD").[1]  But JPMorgan would agree to provide the Mezzanine Loan only if Hilton guaranteed it.  Under the proposed guaranty, if RDNWD defaulted on the Mezzanine Loan, Hilton either had to purchase the Mezzanine Loan from JPMorgan or pay it off in full.

20.    Hilton stepped in to guarantee the Mezzanine Loan but only after securing contractual commitments from the Defendants to reimburse Hilton for any amount Hilton paid to JPMorgan under the guaranty.  The reimbursement obligations are simple and set forth in unambiguous contracts: If RDNWD defaulted, causing Hilton to purchase or repay the Mezzanine Loan, Defendants had to reimburse Hilton for the entire amount it paid to JPMorgan, plus interest, attorneys' fees, costs, and expenses.  The contracts do not include exceptions; to the contrary, Defendants waived defenses to reimbursement.

---

[1] RDNWD is not a defendant here.  RDNWD is a limited liability company whose sole owner is Defendant FMT and whose ultimate indirect owner is Defendant Sam Hirbod.

21.    Defendants' contractual commitments are set forth in four separate Agreements. The chart below summarizes each contract, the reimbursement obligation, and the event that triggered the reimbursement obligation to Hilton.

| Contract | Obligation | Triggering Event for Reimbursement |
|---|---|---|
| FMT's Reimbursement Agreement | To reimburse Hilton for the amount Hilton tendered to JPMorgan, plus interest, costs, expenses, and attorneys' fees | Hilton's June 21, 2024 purchase of the Mezzanine Loan from JPMorgan for $29,859,178.81[2] |
| ECH's Guaranty | To perform FMT's obligations under FMT's Reimbursement Agreement | Hilton's June 21, 2024 purchase of the Mezzanine Loan from JPMorgan for $29,859,178.81 |
| Hirbod's Springing Guaranty | To perform FMT's obligations under FMT's Reimbursement Agreement, if ECH opposes a payment demand from Hilton | ECH's rejection of Hilton's June 25, 2024 payment demand |
| Hirbod's Personal Guaranty | To perform FMT's obligations under FMT's Reimbursement Agreement, up to $4.3 million, plus interest, costs, expenses, and attorneys' fees | Hilton's June 21, 2024 purchase of the Mezzanine Loan from JPMorgan for $29,859,178.81 |

22.    Hilton and Defendants executed FMT's Reimbursement Agreement, ECH's Guaranty, and Hirbod's Springing Guaranty on November 8, 2021.

23.    Hirbod executed Hirbod's Personal Guaranty on July 9, 2023, to guarantee JPMorgan's increase of the Mezzanine Loan by $4.3 million.  On that same day, all parties reaffirmed their relevant guarantees and contractual agreements.

---

[2] The Mezzanine Loan purchase price of $29,859,178.81 comprised $29,300,000 in principal plus $559,178.81 in applicable accrued interest.

24.     By executing four separate contracts with reimbursement obligations, Hilton secured maximum protection if RDNWD defaulted on the Mezzanine Loan and Hilton paid JPMorgan.  In that scenario, Hilton could seek reimbursement under four contracts.  The specific reimbursement obligations in each contract are clear and unambiguous.

25.     *First,* FMT's Reimbursement Agreement includes an unambiguous reimbursement obligation:  If RDNWD defaulted, causing Hilton to pay or purchase the Mezzanine Loan, FMT "absolutely, irrevocably and unconditionally" agreed to reimburse Hilton for the Mezzanine Loan.

26.     Section 3 of FMT's Reimbursement Agreement states:

[FMT] hereby agrees to fully and promptly reimburse [Hilton] in United States Dollars for any and all Reimbursement Amounts. **If Hilton is called upon to pay and [Hilton] actually does pay any Reimbursement Amounts, then [FMT] hereby absolutely, irrevocably and unconditionally agrees to reimburse [Hilton] upon demand for any such amounts.**

27.     "Reimbursement Amounts" in FMT's Reimbursement Agreement is defined (as applicable here) to include "the amount tendered by [Hilton] to [JPMorgan] pursuant to the terms of the [Hilton] Mezzanine Guaranty . . . in order to complete the purchase of the Mezzanine Loan," less "any Principal Payment Amounts" made to Hilton after Hilton's Mezzanine Loan purchase,[3] plus interest at the Default Rate and all "expenses of . . . enforcement under this Agreement, including . . . reasonable attorneys' fees."

28.     *Second*, ECH's Guaranty includes an unambiguous reimbursement obligation: ECH "absolutely, irrevocably and unconditionally" "under any and all circumstances" guaranteed FMT's reimbursement obligation to Hilton under FMT's Reimbursement Agreement.  Thus, FMT

---

[3] Defendants never made any Principal Payment Amounts to Hilton.

becoming obligated to reimburse Hilton for the Mezzanine Loan under FMT's Reimbursement Agreement triggers ECH's Guaranty to reimburse Hilton for the Mezzanine Loan amount.

29.    Sections 1 and 3 of ECH's Guaranty state:

**[ECH] hereby absolutely, irrevocably and unconditionally guarantees to Hilton and its successors and assigns the prompt, unconditional, and complete (i) payment and performance of all obligations of [FMT] under the Reimbursement Agreement (including, without limitation, all "Reimbursement Amounts" under the Reimbursement Agreement)**, and (ii) payment or repayment to Hilton of any and all losses, damages, costs or expenses incurred by Hilton . . . in connection with any breach by [FMT] of its obligations under the Reimbursement Agreement . . . (collectively, the "Guaranteed Obligation").  [ECH] hereby irrevocably and unconditionally covenants and agrees that it is fully and personally liable for the Guaranteed Obligation as a primary obligor as set forth herein.

. . . .

It is expressly understood and agreed that this is a continuing guaranty and that the obligations of [ECH] hereunder are and **shall be absolute and unconditional under any and all circumstances**.  This is a guaranty of payment and performance and not of collection and upon any failure of [FMT] to fulfill the Guaranteed Obligation, Hilton may, at its option, proceed directly and at once, without notice, against [ECH] to collect and recover the full amount of the Guaranteed Obligation hereunder or any portion thereof, without proceeding against [FMT] or any other person."

30.    ECH guaranteed the "Reimbursement Amounts under [FMT's] Reimbursement Agreement."  ECH thus guaranteed not only the amount of the Mezzanine Loan but also any interest, attorneys' fees, costs, and expenses owed to Hilton under FMT's Reimbursement Agreement.

31.    *Third*, Hirbod's Springing Guaranty imposes obligations that become binding when there is a "springing recourse" event.  Under Section 1(c)(viii) of Hirbod's Springing Guaranty, a "Springing Recourse Event" includes:

"**[ECH]** contest[ing], **oppos[ing]** or rais[ing] any defenses to **any** claim or **demand by Hilton under [ECH's] Guaranty of [the] Reimbursement Agreement** . . . .

Thus, if ECH refuses to honor its obligations under FMT's Reimbursement Agreement, Hirbod's guaranty springs into effect.

32.    Hirbod's Springing Guaranty also sets out an unambiguous reimbursement obligation. Section 1 of Hirbod's Springing Guaranty provides:

> **[Hirbod] hereby absolutely, irrevocably and unconditionally guarantees to Hilton and its successors and assigns the prompt, unconditional, and complete performance of the Guaranteed Obligations**; provided that . . . [Hirbod] shall not have liability under this Guaranty for the Guaranteed Obligation at any time prior to the occurrence of a Springing Recourse Event.  Subject to the proviso in the preceding sentence (the "Springing Recourse Condition"), [Hirbod] hereby irrevocably and unconditionally covenants and agrees that it is fully and personally liable for the Guaranteed Obligation as a primary obligor as set forth herein.

33.    The "Guaranteed Obligation" in Hirbod's Springing Guaranty includes FMT's obligations under FMT's Reimbursement Agreement, including payment of the Reimbursement Amounts.

34.    *Fourth*, Hirbod's Personal Guaranty provides a final layer of protection for Hilton. Hilton and Hirbod executed Hirbod's Personal Guaranty the same day that JPMorgan increased the Mezzanine Loan by $4.3 million in July 2023.  The structure of Hirbod's Personal Guaranty is also straightforward and unambiguous:  Hirbod agreed to assume and promptly perform FMT's obligations under FMT's Reimbursement Agreement regardless of whether a Springing Recourse Event occurred—but Hirbod's Personal Guaranty capped payment at $4.3 million, plus interest, attorneys' fees, costs, expenses, and all Reimbursement Amounts that Hilton would not have incurred but for Hilton agreeing to guarantee the additional $4.3 million of the Mezzanine Loan.

35.    Section 1 of Hirbod's Personal Guaranty provides:

> **[Hirbod] hereby absolutely, irrevocably and unconditionally guarantees to Hilton and its successors and assigns the prompt, unconditional, and complete performance of the Guaranteed Obligation**.  [Hirbod] hereby irrevocably and unconditionally covenants and agrees that it is fully and personally liable for the Guaranteed Obligation as a primary obligor as set forth herein.

10

. . . .

[P]rovided, however, that [Hirbod's] aggregate liability for the Guaranteed Obligation under this Guaranty shall not exceed the greater of: . . . (i) the sum of . . . $4,300,000.00 plus . . . interest . . . plus . . . all of Hilton's actual, out-of-pocket costs and expenses of . . . enforcement under this Agreement, including without limitation, reasonable attorneys' fees, and (ii) all Reimbursement Amounts that Hilton would not have incurred but for the [$4.3 million loan upsize and Hilton's additional liability to JPMorgan therefor].

36.     The "Guaranteed Obligation" in Hirbod's Personal Guaranty includes FMT's obligations under FMT's Reimbursement Agreement, including payment of the Reimbursement Amounts.

37.     This reimbursement structure makes perfect sense: Because a Hirbod-owned entity received the Mezzanine Loan, Hirbod and his affiliates bear the financial risk from a default on the Mezzanine Loan.  JPMorgan determined that Hilton, an established, publicly traded company, would be a more creditworthy payment guarantor of the Mezzanine Loan, and therefore JPMorgan agreed to make the Mezzanine Loan only if Hilton were the guarantor.  Hilton and Defendants then agreed among themselves that the ultimate financial responsibility would belong to the Defendants.  Hilton did not agree—and never would have agreed—to guarantee the Mezzanine Loan that a Hirbod-owned entity received if Defendants did not agree to reimburse Hilton for any money it paid to JPMorgan under its guaranty of the Mezzanine Loan.

**C.     Defendants All Flouted Their Contractual Obligation to Reimburse Hilton**

38.     Each Defendant contractually agreed to reimburse Hilton if RDNWD defaulted on the Mezzanine Loan; and each Defendant flouted that obligation.

39.      On June 8, 2024, Hirbod's affiliate RDNWD defaulted on the Mezzanine Loan. Due to the default, the Signia by Hilton San Jose entered foreclosure and was auctioned to potential buyers.  The hotel was purchased out of foreclosure by an affiliate of BrightSpire, which was the

11

lender of the original $173 million mortgage loan.[4]  In an effort to forestall the foreclosure sale, Hirbod initiated bankruptcy proceedings in California (as opposed to in Delaware, where the original bankruptcy proceedings were pending).  Those subsequent petitions were transferred to Delaware and dismissed on January 30, 2025, with the U.S. Bankruptcy Court for the District of Delaware stating: "*the Second Bankruptcy Case must be dismissed as a filing made in bad faith*."[5] Hirbod has appealed this dismissal to the District of Delaware, where briefing was completed on November 5, 2025.[6]

40.    It is undisputed that RDNWD's default on the Mezzanine Loan in June 2024 triggered Hilton's guaranty in favor of JPMorgan.  Hilton honored its contractual guarantee to JPMorgan and elected to purchase the Mezzanine Loan, paying $29,859,178.81 to JPMorgan for the assignment of the Mezzanine Loan on June 21, 2024.

41.    Hilton's purchase of the Mezzanine Loan in turn triggered Defendants' contractual obligations to reimburse Hilton.  Accordingly, Hilton immediately sought reimbursement from FMT, ECH, and Hirbod himself.  Yet each Defendant has refused to reimburse Hilton.

42.    **FMT's Reimbursement Agreement**.  Hilton's purchase of the Mezzanine Loan on June 21, 2024, triggered FMT's obligation to reimburse Hilton under FMT's Reimbursement

---

[4] The Agreements at issue here—and Defendants' obligations to Hilton thereunder—are excepted from subordination to the senior mortgage loan.

[5] *In re SC SJ Holdings LLC, et al.*, No. 21-10549 (JTD) (Bankr. D. Del. Jan. 30, 2025), D.I. 1312, at 16.

[6] *In re SC SJ Holdings LLC, et al.*, No. 1:25-cv-00150-MN (D. Del.).

Agreement. Hilton diligently sought reimbursement from FMT after purchasing the Mezzanine Loan.

43.     On June 25, 2024—just four days after Hilton purchased the Mezzanine Loan— Hilton sent a notice to FMT demanding that FMT reimburse Hilton for Hilton's purchase of the Mezzanine Loan. FMT never responded to Hilton's demand.

44.     Given FMT's failure to reimburse Hilton—or respond to Hilton's demand—on July 11, 2024, Hilton sent FMT a default notice. Again, FMT did not respond, much less reimburse Hilton.

45.     More than one year has passed since Hilton sent FMT a default notice, and FMT has still not paid Hilton anything.

46.     **ECH's Guaranty.** Hilton's purchase of the Mezzanine Loan on June 21, 2024, not only triggered FMT's obligation to reimburse Hilton under FMT's Reimbursement Agreement, but it also triggered ECH's obligation to reimburse Hilton under its Guaranty of FMT's obligations under FMT's Reimbursement Agreement. Hilton also diligently sought reimbursement from ECH after purchasing the Mezzanine Loan.

47.     On June 25, 2024—just four days after Hilton purchased the Mezzanine Loan— Hilton sent a notice to ECH demanding that ECH honor its Guaranty of FMT's Reimbursement Agreement and pay Hilton the Mezzanine Loan amount. ECH (like FMT) never responded to Hilton's demand.

48.     Given ECH's failure to reimburse Hilton—or respond to Hilton's demand—on July 11, 2024, Hilton sent ECH a default notice. Again, ECH did not respond, much less reimburse Hilton.

13

49.     More than one year has passed since Hilton sent ECH a default notice, and ECH has still not paid Hilton anything.

50.     **Hirbod's Personal Guaranty.**   When Hilton purchased the Mezzanine Loan and triggered FMT's obligation to reimburse Hilton for the Mezzanine Loan amount, this also triggered Hirbod's obligation to reimburse Hilton under Hirbod's Personal Guaranty (up to $4.3 million, plus interest, attorneys' fees, costs, and expenses).   Hilton also diligently sought reimbursement from Hirbod under Hirbod's Personal Guaranty.

51.     On June 25, 2024—just four days after Hilton purchased the Mezzanine Loan— Hilton sent a notice to Hirbod demanding that he reimburse Hilton $4.3 million under Hirbod's Personal Guaranty.   Defendant Hirbod (like FMT and EMT) never responded to Hilton's demand.

52.     Given Hirbod's failure to reimburse Hilton—or respond to Hilton's demand—on July 11, 2024, Hilton sent Hirbod a default notice.   Hirbod did not respond, much less reimburse Hilton.

53.     More than one year has passed since Hilton sent Hirbod a default notice, and Hirbod has still not paid Hilton anything.

54.     **Hirbod's Springing Guaranty**.   In addition to Hirbod's Personal Guaranty, Hirbod's Springing Guaranty required Hirbod to reimburse Hilton for the full amount of the Mezzanine Loan, plus interest, attorneys' fees, costs, and expenses, if a Springing Recourse Event occurred.

55.     Among other things, ECH opposing a demand for payment from Hilton constitutes a Springing Recourse Event.   In particular, ECH's refusal to pay Hilton after Hilton sent ECH a demand for payment on June 25, 2024, and a default notice on July 11, 2024, constitutes a Springing Recourse Event.   When this Springing Recourse Event occurred, Hirbod personally

14

assumed *all* of FMT's obligations under FMT's Reimbursement Agreement—including reimbursing Hilton for the Mezzanine Loan amount.

56.     Hirbod has refused to pay Hilton anything under Hirbod's Springing Guaranty, despite the fact that a Springing Recourse Event has occurred.

**D.     Defendants Are Jointly and Severally Liable for Reimbursing Hilton**

57.     Each Defendant—FMT, ECH, and Hirbod—is contractually required to reimburse Hilton for the Mezzanine Loan amount, plus interest, attorneys' fees, costs, and expenses. Each Defendant materially breached that obligation and refused to reimburse Hilton. Each Defendant thus caused the same injury to Hilton, and the Court should hold each Defendant jointly and severally liable for the damage inflicted on Hilton.

58.     The Agreements specifically contemplate joint and several contractual obligations and, in turn, joint and several liabilities for breaches of contract.

59.     Hilton is expressly permitted to sue any (or all) Defendants for the amounts owed to Hilton—without being required to proceed first against principal obligor FMT. Section 3 of ECH's Guaranty, Section 2 of Hirbod's Springing Guaranty, and Section 2 of Hirbod's Personal Guaranty provide: "[U]pon any failure of [FMT] to fulfill the Guaranteed Obligation, Hilton may, at its option, proceed directly and at once, without notice, against Guarantor to collect and recover the full amount of the Guaranteed Obligation hereunder or any portion thereof, without proceeding against [FMT] or any other person."

60.     In addition, Section 20 of ECH's Guaranty, Section 19 of Hirbod's Springing Guaranty, and Section 19 of Hirbod's Personal Guaranty each provide: "If Guarantor consists of more than one person or entity, the obligations of each such person or entity under this Guaranty are joint and several." Each Defendant is a "Guarantor" to Hilton and thus subject to joint and several obligations (and liabilities) to Hilton.

### E.      Defendants Have Not Identified (and Cannot Identify) Any Defenses to Excuse Their Failure to Reimburse Hilton

61.      More than one year has passed since Hilton purchased the Mezzanine Loan and triggered Defendants' reimbursement obligations, yet Defendants have never identified any legitimate defense that could excuse their refusal to reimburse Hilton.  Nor could they, as Defendants violated their clear and unambiguous contractual obligations with no justification whatsoever.

62.      Indeed, in ECH's Guaranty (§ 11), Hirbod's Springing Guaranty (§ 10), and Hirbod's Personal Guaranty (§ 10), Hirbod and ECH waived all defenses—except only the defense of payment—and all counterclaims "to the fullest extent permitted by law."  Specifically, Hirbod and ECH waived, among other things:

- "demand for payment, . . . or any and all notice of non-payment, . . . or notice or demand, whereby to charge Guarantor therefor;"

- "any defense arising by reason of any disability or the cessation from any cause whatsoever (including any act or omission of Hilton) of the liability of [FMT];"

- "any defense based on any claim that [Hirbod's and ECH's] obligations exceed or are more burdensome than those of [FMT];"

- "any right to require Hilton to proceed against [FMT] . . . or [to] pursue any other remedy in Hilton's power whatsoever;"

- "any defense based on . . . any claim that the obligations of [FMT under FMT's Reimbursement Agreement] are unenforceable or invalid or are otherwise not effective for any reason;"

- "any other circumstance or any existence of or reliance on any representation by Hilton that might . . . otherwise operate as a defense;" and

- all possible "counterclaims with respect to the Guaranteed Obligation."

16

63.     Defendants also waived "any right [they] may have to a trial by jury," and agreed that Hilton, in any action brought to enforce its contractual rights, shall be entitled to recover its attorneys' fees, costs, and expenses.

## CLAIMS FOR RELIEF

### COUNT I
### (Against Defendant FMT SJ Holdings LLC)
### (Breach of Contract—FMT's Reimbursement Agreement)

64.     Hilton incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

65.     Hilton and FMT entered into a valid and enforceable contractual agreement, FMT's Reimbursement Agreement.

66.     In consideration of Hilton guaranteeing RDNWD's Mezzanine Loan in favor of JPMorgan, FMT agreed to reimburse Hilton for any payment Hilton made to JPMorgan pursuant to Hilton's guaranty in favor of JPMorgan.

67.     As detailed above, FMT's Reimbursement Agreement unambiguously provides: "[FMT] hereby agrees to fully and promptly reimburse [Hilton] in United States Dollars for any and all Reimbursement Amounts.  If Hilton is called upon to pay and [Hilton] actually does pay any Reimbursement Amounts, then [FMT] hereby absolutely, irrevocably and unconditionally agrees to reimburse [Hilton] upon demand for any such amounts."

68.     Hilton was called upon and actually did pay the Reimbursement Amounts, paying $29,859,178.81 to JPMorgan when Hilton purchased the Mezzanine Loan on June 21, 2024. Hilton's purchase of the Mezzanine Loan triggered FMT's obligation to reimburse Hilton under FMT's Reimbursement Agreement.

17

69.     On June 25, 2024, four days after Hilton purchased the Mezzanine Loan from JPMorgan, Hilton sent a demand notice to FMT demanding payment under FMT's Reimbursement Agreement.

70.     On July 11, 2024, Hilton sent FMT a default notice due to its failure to reimburse Hilton under FMT's Reimbursement Agreement.

71.     As of this filing, FMT has not responded to Hilton's 2024 demand and default notices, and FMT has not paid Hilton any portion of the Reimbursement Amounts due under FMT's Reimbursement Agreement or its associated guarantees.

72.     FMT has materially breached FMT's Reimbursement Agreement by failing to reimburse Hilton for its purchase of the Mezzanine Loan.

73.     FMT's material breach was not excused.

74.     There is no viable defense to FMT's material breach.

75.     FMT's material breach caused Hilton to suffer damages at least in the amount of $29,859,178.81, plus interest, attorneys' fees, costs, and expenses.

76.     Under FMT's Reimbursement Agreement, FMT is jointly liable, together with ECH and Hirbod, to Hilton for Hilton's damages at least in the amount of $29,859,178.81, plus interest, attorneys' fees, costs, and expenses.

## COUNT II
### (Against Defendant Eagle Canyon Holdings, LLC)
### (Breach of Contract—ECH's Guaranty)

77.     Hilton incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

78.     Hilton and ECH entered into a valid and enforceable contractual agreement, ECH's Guaranty.

79.     In consideration of Hilton guaranteeing RDNWD's Mezzanine Loan in favor of JPMorgan, ECH guaranteed—absolutely, irrevocably, and unconditionally—to perform FMT's obligations under FMT's Reimbursement Agreement, including FMT's obligation to reimburse Hilton for any payment Hilton made to JPMorgan pursuant to Hilton's guaranty in favor of JPMorgan.

80.     ECH's Guaranty unambiguously provides: "[ECH] hereby absolutely, irrevocably and unconditionally guarantees to Hilton and its successors and assigns the prompt, unconditional, and complete (i) payment and performance of all obligations of [FMT] under the Reimbursement Agreement (including, without limitation, all 'Reimbursement Amounts' under the Reimbursement Agreement), and (ii) payment or repayment to Hilton of any and all losses, damages, costs or expenses incurred by Hilton . . . in connection with any breach by [FMT] of its obligations under the Reimbursement Agreement . . . (collectively, the 'Guaranteed Obligation'). [ECH] hereby irrevocably and unconditionally covenants and agrees that it is fully and personally liable for the Guaranteed Obligation as a primary obligor as set forth herein."  ECH's guaranty is "absolute and unconditional under any and all circumstances."

81.     FMT has defaulted on its obligations under and has materially breached FMT's Reimbursement Agreement, triggering ECH's obligations under ECH's Guaranty of FMT's Reimbursement Agreement.

82.     On June 25, 2024, four days after it purchased the Mezzanine Loan from JPMorgan, Hilton sent a demand notice to ECH demanding payment under ECH's Guaranty.

83.     On July 11, 2024, Hilton sent ECH a default notice due to its failure to reimburse Hilton under ECH's Guaranty.

84.     As of this filing, ECH has not responded to Hilton's 2024 demand and default notices, and ECH has not paid Hilton any portion of the reimbursement amount due under ECH's Guaranty.

85.     ECH has materially breached ECH's Guaranty by failing to reimburse Hilton for its purchase of the Mezzanine Loan.

86.     ECH's material breach was not excused.

87.     ECH waived all defenses and all counterclaims "to the fullest extent permitted by law" (except for the defense of payment), including but not limited to "demand for payment," "any and all notice of non-payment," "any right to require Hilton to proceed against [FMT]," and "any defense based on . . . any claim that the obligations of [FMT under FMT's Reimbursement Agreement] are unenforceable or invalid or are otherwise not effective for any reason."  Even if ECH had not waived every defense except for payment to the fullest extent permitted by law, there is no viable defense to ECH's material breach.

88.     ECH's material breach caused Hilton to suffer damages at least in the amount of $29,859,178.81, plus interest, attorneys' fees, costs, and expenses.

89.     Under ECH's Guaranty of FMT's Reimbursement Agreement, ECH is jointly liable, together with FMT and Hirbod, to Hilton for Hilton's damages at least in the amount of $29,859,178.81, plus interest, attorneys' fees, costs, and expenses.

### COUNT III
### (Against Defendant Sam Hirbod)
### (Breach of Contract—Hirbod's Springing Guaranty)

90.     Hilton incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

91.     Hilton and Hirbod entered into a valid and enforceable contractual agreement, Hirbod's Springing Guaranty.

92.     In consideration of Hilton guaranteeing RDNWD's Mezzanine Loan in favor of JPMorgan, Hirbod guaranteed—absolutely, irrevocably, and unconditionally—to perform FMT's obligations under FMT's Reimbursement Agreement, including FMT's obligation to reimburse Hilton for any payment Hilton made to JPMorgan pursuant to Hilton's guaranty in favor of JPMorgan, if a "Springing Recourse Event" occurs.

93.     Hirbod's Springing Guaranty unambiguously provides: "[Hirbod] hereby absolutely, irrevocably and unconditionally guarantees to Hilton and its successors and assigns the prompt, unconditional, and complete performance of the Guaranteed Obligations; provided that . . . [Hirbod] shall not have liability under this Guaranty for the Guaranteed Obligation at any time prior to the occurrence of a Springing Recourse Event.  Subject to the proviso in the preceding sentence (the 'Springing Recourse Condition'), [Hirbod] hereby irrevocably and unconditionally covenants and agrees that it is fully and personally liable for the Guaranteed Obligation as a primary obligor as set forth herein."

94.     Hirbod's Springing Guaranty defines a "Springing Recourse Event"—the occurrence of which triggers Hirbod's Personal Guaranty of the entire Reimbursement Agreement—to include: "[ECH] contest[ing], oppos[ing] or rais[ing] any defenses to any claim or demand by Hilton under [ECH's] Guaranty of [FMT's] Reimbursement Agreement Obligations on any basis related to or in connection with the invalidity, illegality or unenforceability of all or any part of the 'Guaranteed Obligation' thereunder . . . ."

95.     If a Springing Recourse Event occurs, Hirbod's Springing Guaranty is "absolute and unconditional under any and all circumstances."

96.     Hirbod's Springing Guaranty is "a guaranty of payment and performance and not of collection and, subject to the Springing Recourse Condition, upon any failure of [FMT] to fulfill

the Guaranteed Obligation, Hilton may, at its option, proceed directly and at once, without notice, against [Hirbod] to collect and recover the full amount of the Guaranteed Obligation hereunder or any portion thereof, without proceeding against [FMT] or any other person."

97.    FMT has defaulted on its obligations under and has materially breached FMT's Reimbursement Agreement, and ECH has opposed Hilton's demand for payment.  These events triggered Hirbod's obligations under Hirbod's Springing Guaranty.

98.    As of this filing, Hirbod has not paid Hilton any portion of the reimbursement amount due under Hirbod's Springing Guaranty.

99.    Hirbod has materially breached Hirbod's Springing Guaranty of FMT's Reimbursement Agreement by failing to pay Hilton for any portion of the reimbursement amount due under Hirbod's Springing Guaranty.

100.    Hirbod's material breach was not excused.

101.    Hirbod waived all defenses and all counterclaims "to the fullest extent permitted by law" (except for the defense of payment), including but not limited to "demand for payment," "any and all notice of non-payment," "any right to require Hilton to proceed against [FMT]," and "any defense based on . . . any claim that the obligations of [FMT under FMT's Reimbursement Agreement] are unenforceable or invalid or are otherwise not effective for any reason."  Even if Hirbod had not waived every defense except for payment to the fullest extent permitted by law, there is no viable defense to Hirbod's material breach.

102.    Hirbod's material breach caused Hilton to suffer damages at least in the amount of $29,859,178.81, plus interest, attorneys' fees, costs, and expenses.

103.   Under Hirbod's Springing Guaranty, Hirbod is jointly liable, together with FMT and ECH, to Hilton for Hilton's damages at least in the amount of $29,859,178.81, plus interest, attorneys' fees, costs, and expenses.

### COUNT IV
### (Against Defendant Sam Hirbod)
### (Breach of Contract—Hirbod's Personal Guaranty)

104.   Hilton incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.   Hilton and Hirbod entered into a valid and enforceable contractual agreement, Hirbod's Personal Guaranty.

106.   In consideration of Hilton reaffirming its guaranty of RDNWD's Mezzanine Loan in favor of JPMorgan after JPMorgan increased the principal amount of the Mezzanine Loan from $25 million to $29.3 million on July 9, 2023, Hirbod guaranteed—absolutely, irrevocably, and unconditionally—to perform FMT's obligations under FMT's Reimbursement Agreement, including FMT's obligation to reimburse Hilton for any payment Hilton made to JPMorgan pursuant to Hilton's guaranty in favor of JPMorgan, up to a limit of $4.3 million, plus interest, attorneys' fees, costs, and expenses.

107.   Hirbod's liability under Hirbod's Personal Guaranty is separate, distinct, and in addition to Hirbod's liability under Hirbod's Springing Guaranty.

108.   As detailed above, Hirbod's Personal Guaranty unambiguously provides: "[Hirbod] hereby absolutely, irrevocably and unconditionally guarantees to Hilton and its successors and assigns the prompt, unconditional, and complete performance of the Guaranteed Obligation. [Hirbod] hereby irrevocably and unconditionally covenants and agrees that it is fully and personally liable for the Guaranteed Obligation as a primary obligor as set forth herein. . . . [P]rovided, however, that [Hirbod's] aggregate liability for the Guaranteed Obligation under this

23

Guaranty shall not exceed the greater of: . . . (i) the sum of . . . $4,300,000.00 plus . . . interest . . . plus . . . all of Hilton's actual, out-of-pocket costs and expenses of . . . enforcement under this Agreement, including without limitation, reasonable attorneys' fees, and (ii) all Reimbursement Amounts that Hilton would not have incurred but for the [$4.3 million loan upsize and Hilton's additional liability to JPMorgan therefor]."

109.    Hirbod's Personal Guaranty is "absolute and unconditional under any and all circumstances."

110.    Hirbod's Personal Guaranty is "a guaranty of payment and performance and not of collection and upon any failure of [FMT] to fulfill the Guaranteed Obligation, Hilton may, at its option, proceed directly and at once, without notice, against [Hirbod] to collect and recover the full amount of the Guaranteed Obligation hereunder or any portion thereof, without proceeding against [FMT] or any other person."

111.    FMT has defaulted on its obligations under and has materially breached FMT's Reimbursement Agreement, triggering Hirbod's obligations under Hirbod's Personal Guaranty.

112.    On June 25, 2024, four days after Hilton purchased the Mezzanine Loan from JPMorgan, Hilton sent a demand notice to Hirbod demanding payment under Hirbod's Personal Guaranty.

113.    On July 11, 2024, Hilton sent Hirbod a default notice due to his failure to reimburse Hilton under Hirbod's Personal Guaranty.

114.    As of this filing, despite receiving a demand for payment and a default notice, Hirbod has not paid Hilton any portion of the reimbursement amount due under Hirbod's Personal Guaranty.

24

115. Hirbod has materially breached Hirbod's Personal Guaranty by failing to pay Hilton $4.3 million, plus interest, attorneys' fees, costs, and expenses, under Hirbod's Personal Guaranty.

116. Hirbod's material breach was not excused.

117. Hirbod waived all defenses and all counterclaims "to the fullest extent permitted by law" (except for the defense of payment), including but not limited to "demand for payment," "any and all notice of non-payment," "any right to require Hilton to proceed against [FMT]," and "any defense based on . . . any claim that the obligations of [FMT under FMT's Reimbursement Agreement] are unenforceable or invalid or are otherwise not effective for any reason." Even if Hirbod had not waived every defense except for payment to the fullest extent permitted by law, there is no viable defense to Hirbod's material breach.

118. Hirbod's material breach caused Hilton to suffer damages at least in the amount of $4.3 million, plus interest, attorneys' fees, costs, and expenses.

119. Under Hirbod's Personal Guaranty, Hirbod is liable to Hilton for Hilton's damages at least in the amount of $4.3 million, plus interest, attorneys' fees, costs, and expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Hilton Worldwide Holdings Inc. respectfully requests that this Court enter:

A. An order awarding Hilton its damages from Defendants' material breaches of contract, including an order directing Defendants to pay to Hilton the sum of $29,859,178.81, plus interest, attorneys' fees, costs, and expenses;

B. An order awarding Hilton pre- and post-judgment interest on Hilton's damages;

C. An order awarding Hilton any and all available damages and further relief that the Court deems just and proper.

Dated: November 19, 2025                    Respectfully submitted,

                                            By: */s/ Craig C. Reilly*

                                            Craig C. Reilly
                                            VSB # 20942
                                            429 N. St. Asaph Street
                                            Alexandria, VA 22314
                                            Telephone:  (703) 549-5354
                                            Fax:  (703) 549-5355
                                            Email:  craig.reilly@ccreillylaw.com

                                            Andrew S. Tulumello (*pro hac vice forthcoming*)
                                            Chantale Fiebig (*pro hac vice forthcoming*)
                                            WEIL, GOTSHAL & MANGES LLP
                                            2001 M Street NW, Suite 600
                                            Washington, DC 20036
                                            Telephone:  (202) 682-7000
                                            Facsimile:  (202) 857-0940
                                            Email:  drew.tulumello@weil.com
                                            Email:  chantale.fiebig@weil.com

                                            *Counsel for Plaintiff*
                                            *Hilton Worldwide Holdings Inc.*