# Exhibit A



# Branding and Management Agreement

relating to the

conversion of the former Fairmont San Jose

to the

Signia by Hilton San Jose

170 S Market Street

San Jose, CA 95113

US_Active\118580889\V-9

**INDEX OF CONTENTS**

**Table of Contents**

**Page**

PART A:  DEFINITIONS ........................................................................................................... 1

PART B:  OPENING AND OPERATION OF THE HOTEL ........................................................ 18

1.    TERM AND EXTENSIONS.......................................................................................... 18

    1.1    Term ............................................................................................................. 18

2.    OWNERSHIP AND DEVELOPMENT OF THE HOTEL; KEY MONEY............................ 18

    2.1    Ownership of the Hotel................................................................................ 18

    2.2    Renovation of the Hotel............................................................................... 19

    2.3    Key Money/Credit Enhancement................................................................. 21

    2.4    Brand Conversion Option............................................................................. 22

3.    OPENING THE HOTEL ............................................................................................. 22

    3.1    Re-Launch and Initial Working Capital......................................................... 22

    3.2    Re-Launch Account ...................................................................................... 23

    3.3    Full Opening of the Hotel............................................................................. 23

    3.4    Prior Operations........................................................................................... 24

4.    HOTEL OPERATIONS............................................................................................... 25

    4.1    Appointment of Manager ........................................................................... 25

    4.2    Standard of Operation ................................................................................. 25

    4.3    Specific Authorizations................................................................................ 26

    4.4    Operating Accounts ..................................................................................... 27

    4.5    FF&E Account ............................................................................................... 28

    4.6    Payment of Operating and Other Expenses................................................. 28

    4.7    Mandatory Guest Fees................................................................................. 28

    4.8    Employees and General Manager................................................................. 28

    4.9    No Partnership ............................................................................................. 30

    4.10   Third Party Areas.......................................................................................... 30

5.    MANAGER FEES, CHARGES AND TAXES .................................................................. 31

    5.1    Fees and Charges ......................................................................................... 31

    5.2    Payment of Fees and Charges...................................................................... 32

i

5.3   Taxes ..................................................................................................................... 32

5.4   Reimbursement to Manager .................................................................................. 33

6.   SERVICES AND CENTRALIZED PURCHASING ............................................................... 33

6.1   Services .................................................................................................................. 33

6.2   Centralized Purchasing .......................................................................................... 33

7.   BRAND STANDARDS ................................................................................................... 33

7.1   Compliance ............................................................................................................ 34

7.2   Changes .................................................................................................................. 34

7.3   No Singling Out ...................................................................................................... 34

7.4   Access .................................................................................................................... 34

8.   REPAIRS, MAINTENANCE AND CAPITAL EXPENDITURES ............................................ 34

8.1   Ordinary Repairs and Maintenance ...................................................................... 34

8.2   Works Requiring FF&E Expenditures ..................................................................... 34

8.3   Works Requiring Major Capital Expenditures ....................................................... 34

9.   HOTEL FINANCES AND OWNER DISTRIBUTIONS ....................................................... 36

9.1   Books and Records ................................................................................................ 36

9.2   Working Capital ..................................................................................................... 37

9.3   Owner Distributions .............................................................................................. 37

9.4   Budgets .................................................................................................................. 37

9.5   Budgets and Projections ....................................................................................... 40

9.6   Reports and Meetings ........................................................................................... 40

10.   INSURANCE AND INDEMNITIES ................................................................................ 41

10.1   Required Insurance. ............................................................................................ 41

10.2   Indemnities ......................................................................................................... 43

11.   INTELLECTUAL PROPERTY ........................................................................................ 44

11.1   Hotel Name ......................................................................................................... 44

11.2   Manager's Intellectual Property ........................................................................ 44

12.   RIGHT TO PERFORM ................................................................................................. 46

12.1   Right to Perform .................................................................................................. 46

PART C:  TRANSFERS AND ASSIGNMENTS ...................................................................... 46

13.   TRANSFERS/ASSIGNMENTS ...................................................................................... 46

13.1   Assignment by Manager ..................................................................................... 46

ii

13.2    Assignment and Borrowings by Owner...................................................................47

13.3    Successors ...............................................................................................................51

13.4    Ownership Structure ...............................................................................................51

PART D:  DEFAULTS AND TERMINATION...............................................................................51

14.    DEFAULTS .......................................................................................................................51

14.1    Events of Default.....................................................................................................51

14.2    Procedure................................................................................................................52

14.3    Employee Termination Notice Requirements.........................................................52

15.    PERFORMANCE TEST .....................................................................................................53

15.1    Performance Test.....................................................................................................53

16.    DAMAGE AND DESTRUCTION .......................................................................................55

16.1    Repair ......................................................................................................................55

16.2    Termination and Reinstatement.............................................................................55

17.    EMINENT DOMAIN.........................................................................................................56

17.1    Whole of the Hotel..................................................................................................56

17.2    Part of the Hotel......................................................................................................56

17.3    Owner's Priority of Recoupment ............................................................................56

18.    ACTIONS AT THE END OF THE AGREEMENT .................................................................56

18.1    Books and Records...................................................................................................57

18.2    Reconciliation of Accounts......................................................................................57

18.3    Obligations under Contracts ...................................................................................57

18.4    De-Identification and Disconnection ......................................................................57

PART E:  GENERAL PROVISIONS ..........................................................................................58

19.    DISPUTE RESOLUTION....................................................................................................58

19.1    Determination by an Expert....................................................................................58

19.2    Mediation................................................................................................................60

19.3    Legal Proceedings ...................................................................................................61

19.4    Venue and Jurisdiction............................................................................................61

20.    FORCE MAJEURE ............................................................................................................61

20.1    Excuse from Performance........................................................................................62

20.2    Hotel Closure...........................................................................................................62

21.    COMPLIANCE..................................................................................................................62

US_Active\118580889\V-9

21.1    Manager Representations.................................................................................................62

21.2    Owner Representations ....................................................................................................62

21.3    Anti-Corruption and Trade Restrictions............................................................................63

22.    MISCELLANEOUS .............................................................................................................65

22.1    Notices ............................................................................................................................65

22.2    Governing Law .................................................................................................................65

22.3    Confidentiality..................................................................................................................65

22.4    Partial Invalidity ..............................................................................................................66

22.5    Entire Agreement.............................................................................................................67

22.6    Cumulative Remedies ......................................................................................................67

22.7    Duplicate Originals, Counterparts; Electronic Copies ......................................................67

22.8    Further Assurances ..........................................................................................................67

22.9    No Third Party Rights .......................................................................................................67

22.10    Survival...........................................................................................................................67

22.11    Approvals and Consents..................................................................................................67

22.12    Performance by Manager's Affiliates...............................................................................68

22.13    Relationship of Parties and Limitations on Fiduciary Duties ...........................................68

22.14    Limitation on Remedies ..................................................................................................69

22.15    Rules of Interpretation.....................................................................................................70

23.    RESTRAINT OF TRADE......................................................................................................71

23.1    No Other Hotel................................................................................................................71

23.2    Permitted Activities..........................................................................................................71

**Schedule 1 – Renovation of the Hotel**

**APPENDIX A – INTENTIONALLY OMITTED**

**APPENDIX B – PROPERTY IMPROVEMENT PLAN**

**APPENDIX C – TECHNICAL SERVICES**

**APPENDIX D – OWNERSHIP STRUCTURE**

**APPENDIX E -- EXCLUSION FROM RESTRICTIVE TERRITORY**

iv

**BRANDING AND MANAGEMENT AGREEMENT**

**THIS AGREEMENT** is entered into on the Execution Date by and between Owner and Manager who agree as follows:

**PART A:  DEFINITIONS**

The following words and expressions in this Agreement have the meanings set out below (except where a different interpretation is necessary in the context):

| | |
|---|---|
| **AC&R (Architectural, Construction & Renovation) Brand Standards** | the Brand Standards relating to the design, construction, furnishing, equipping, fit out and decorating of the Brand hotels. |
| **Affiliates** | any person or entity which, directly or indirectly, controls, is controlled by, or is under common control with, the subject entity.  For the purposes of this definition, "control" means direct or indirect possession of the power to direct or cause the direction of the management and policies of the entity, or the power to veto major policy decisions of the entity, whether through the ownership of voting securities, by contract, or otherwise. |
| **Annual Financial Statement** | a financial statement showing the results of Hotel operations during an Operating Year reflecting the revenues and expenses and profit or loss. |
| **Anti-Corruption Laws** | all applicable anti-corruption, anti-bribery, anti-money laundering, books and records and internal controls Laws of the United States, the United Kingdom and a Party's country of incorporation, including the United States Foreign Corrupt Practices Act and the United Kingdom Bribery Act 2010. |
| **Approvals** | decrees, acts, orders, consents, licenses, permits, permissions, approvals, certificates, registrations, filings and the like (and any required amendments and replacements to such items) required by Law or any document of title relating to the Site. |
| **Auditors** | an independent firm of public accountants retained by Owner as part of Owner's ordinary annual audit procedures required by law. |
| **Base Fee** | the following percentage of Total Operating Revenue: |

| Full Operating Year | Percentage of Total Operating Revenue |
|---|---|
| First (and the preceding Operating Year between the Opening Date and | 1.0% |

1

US_Active\118580889\V-9

| | |
|---|---|
| | December 31 of the same Operating Year)<br><br>Second and Third                          2.0%<br>Fourth and thereafter                     3.0% |
| **Brand** | "Signia by Hilton", as that name is used to identify the chain of hotels operated under the Brand Standards. The Brand does not mean Hilton Worldwide Holdings Inc., its Affiliates, or any other brands, product lines or chains of hotels that include the words "Signia" or "Hilton" as any part of their brand name. |
| **Brand Insurance Requirements** | as defined in clause 10.1.1. |
| **Brand Services** | the mandatory programs and services provided by Manager and its Affiliates to substantially all hotels (whether owned, operated, leased or franchised) operating under the Brand and which are paid for by the Brand Services Charge. |
| **Brand Services Charge** | the charges payable for the Brand Services provided by Manager or its Affiliates from time to time.  As of the Execution Date, the Brand Services Charge is equal to four percent (4.0%) of Gross Rooms Revenue; provided, however, such charge or method of calculation may be modified by Manager or its Affiliates during the Term to the extent the same: (i) is disclosed in the public Franchise Disclosure Document (to the extent the Brand has a then-current Franchise Disclosure Document for the United States), (ii) is implemented on a system-wide basis for the Brand, (iii) is included in the annual Budget process, and (iv) is to account for a change in the Brand Services (or the costs thereof) provided to substantially all hotels (including the Hotel) operating under the Brand. |
| **Brand Standards** | the written specifications, standards and requirements issued and amended or supplemented from time to time by Manager or its Affiliates for the design, construction, furnishing, equipping, fit out, decorating, supplying, operating, maintaining and marketing of Brand hotels and any related branded ancillary operations associated with Manager or its Affiliates, including the Standard Practices. |
| **Budget** | collectively, the Operating Budget and the Capital Budget. |
| **Building** | the hotel building(s) on the Site and associated areas and facilities, including approximately 805 guest rooms, approximately 51,210 square feet of meeting space and ballroom space, a spa, a fitness facility, a pool, restaurant and other food and beverage facilities (including the Arca Lobby Lounge, The |

2

| | |
|---|---|
| | Fountain, and Gazebo Pool Bar), a Club Signia lounge, public and back of house areas and other features, facilities and installations as are necessary or desirable to operate the Hotel according to Brand Standards, including the installation of Manager's Information System. |
| **Building Systems** | all the mechanical, electrical, plumbing, heating, ventilating, air conditioning, sanitation, water treatment, sewer treatment and disposal, life safety systems, elevator, and other similar systems and items of equipment installed in or upon, and affixed to the Hotel. |
| **Capital Budget** | as defined in clause 9.4.7. |
| **Capital Expenditures** | any expenses properly categorized under generally accepted accounting principles as capital in nature, for any alterations, improvements, replacements and additions to the Hotel, the Building, the Building Systems or FF&E. |
| **Chain Transaction** | any transaction or series of transactions involving four (4) or more hotels where one (1) hotel is located in the Restrictive Territory, including agreements in relation to the: <br><br>(a)    ownership, operation, lease, management or franchise of such hotels; <br><br>(b)    acquisition of assets; or <br><br>(c)    acquisition of shares or other ownership interests. |
| **Claims** | any and all penalties, fines, damages, losses, judgments, liabilities, costs and expenses (including without limitation the cost of defense, settlement, appeal, reasonable attorneys' fees and expenses (including but not limited electronic discovery charges and expert's fees)) incurred by Owner or Manager or their respective Related Parties, and any other amounts required to be paid to unaffiliated third parties, which in all cases arise out of or relate to any unaffiliated third party claims (whether in contract or in tort), demands, suits or actions (including but not limited to enforcement proceedings initiated by any government agency) against a party or its Related Parties. |
| **Competitive Set** | at any given point in time, the Hotel and those hotels agreed or determined in accordance with clause 15.1.7. The initial Competitive Set shall consist of the following hotels (subject to change in accordance with clause 15.1.7): <br><br>DoubleTree San Jose <br>Hotel Valencia Santana Row |

3

|  | Westin San Jose |
|  | Hilton San Jose |
|  | Marriott San Jose |
| **Competitive Set RevPAR** | as defined in clause 15.1.1. |
| **Competitor** | a person engaged (or who has publicly announced its intent to engage), directly or indirectly through an Affiliate, in the business of owning, operating, licensing (as licensor), franchising (as franchisor), or managing a hotel brand or lodging system of hotels as a material component of its business activities that are competitive with Brand hotels as reasonably determined by Manager. |
| **Confidential Information** | all information that is made known or obtained in confidence in connection with this Agreement or its negotiation relating to the business, plans, or internal affairs of a Party or its Affiliates, including the terms of this Agreement, all know-how, trade secrets, products, operations, processes, product information and unpublished information relating to a Party's or its Affiliates' Intellectual Property, and any other commercial, financial or technical information relating to the business or prospective business of a Party. |
| **Consequential Damages** | as defined in clause 22.14. |
| **Corporate Personnel** | any personnel from the corporate offices of Manager or its Affiliates who perform services under this Agreement. |
| **Credit Enhancement** | means the transactions entered into in connection with this Agreement whereby, among other things, Manager or its Affiliate is the guarantor of a portion of the Mezzanine Loan. |
| **Critical Brand Standard Changes** | those changes to the Brand Standards that concern information technology, Brand identity and graphics, fire, health, life, safety and/or security, or compliance with Laws. |
| **Cure Amount** | the difference between the GOP Performance Test Percentage of the budgeted Gross Operating Profit and the actual Gross Operating Profit achieved for the relevant Fiscal Year, less the Management Fee that would have been earned by Manager on that difference. |
| **De-identification Actions** | (a)  remove all distinctive features of the Hotel as a Brand hotel and any of the Marks, including signage, stationery, Operating Equipment and Operating |

4

| | |
|---|---|
| | Supplies, internet sites, email addresses, brochures and other promotional material at or in connection with the Hotel or otherwise; |
| | (b) cease holding out the Hotel to the public as managed (or formerly managed) by Manager or having any connection (or formerly having any connection) with Manager, its Affiliates, or the Marks; |
| | (c) cease using the Marks in the name of the Hotel and/or the Site; |
| | (d) permit Manager and its agents to remove all Manager Proprietary IT from the Hotel; and |
| | (e) take all other actions necessary to preclude confusion by the public that the Hotel is managed by or otherwise has any connection with Manager, its Affiliates or the Marks. |
| **EBITDA Less Replacement Reserve** | as defined by the Uniform System. |
| **Emergency Requirement Expenditures** | means those expenditures in connection with any of the following facts, events or circumstances: (i) an emergency threatening the Hotel or the life, health, safety, security or property of Hotel guests, invitees or employees; (ii) compliance with Laws; or (iii) a condition which, if remedial action is not taken, may subject Manager, Owner, their Affiliates or any of their respective directors, officers or employees to civil or criminal liability. |
| **Eminent Domain** | any eminent domain, condemnation, public taking, compulsory purchase or similar proceeding by a competent authority. |
| **Employee Liabilities** | all liabilities to employees of the Existing Hotel for the period of their employment in the Existing Hotel including salary and/or bonus entitlement, accrued holiday pay, accrued service benefits, severance and seniority entitlements or accruals and any other labor or pension benefits or liabilities. |
| **Employee Termination Notice Requirements** | any obligation under federal, state or local law to give advance notice of employment termination, including obligations under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2101 et seq., as amended, and any similar federal or state statute. |
| **Employment Costs** | the compensation and benefits paid to, payable to, or accrued for the benefit of any individual, including: (a) contributions required pursuant to any applicable Laws; (b) employment taxes; (c) pension fund contributions and liabilities; (d) group life, accident and health insurance premiums; (e) profit sharing; (f) retirement benefits; (g) disability benefits; and (h) recruitment and relocation expenses. |
| **Execution Date** | as stated on the Parties' signature page. |

US_Active\118580889\V-9

| | |
|---|---|
| **Existing Hotel** | the Hotel known as the Fairmont San Jose located at the Site, the Building, the Building Systems, the FF&E and the Operating Equipment as on the calendar day immediately preceding the Opening Date. |
| **Existing Hotel Costs** | all claims, suits, actions, proceedings or allegations (whether actual or threatened), demands, obligations, awards, losses, damages, costs, liabilities, fines, penalties, interest or expenses (including legal costs and expenses) arising out of the Existing Hotel (including the Employee Liabilities and the Existing Hotel Liabilities). |
| **Existing Hotel Liabilities** | liabilities or obligations of the business of the Existing Hotel including agreements, leases, licenses, contracts, concession agreements, insurance policies, future bookings, marketing and advertising agreements or arrangements. |
| **Expert** | a person appointed in accordance with clause 19. |
| **Expiration Date** | 11.59 pm, local time at the Hotel, on December 31 of the thirtieth (30th) Full Operating Year after the Opening Date (i.e., December 31, 2051). |
| **Extension Term** | as defined in clause 1.1.3 |
| **FF&E** | all furniture, furnishings, lose or removable fixtures, equipment, and other personal property used in, or held in storage for use in the operation of the Hotel other than Operating Equipment. |
| **FF&E Account** | the bank account(s) into which the FF&E Reserve Amount is paid. |
| **FF&E Expenditure** | any Capital Expenditure pertaining to FF&E. |
| **FF&E Reserve Amount** | in each Operating Year, an amount equal to the percentage of Total Operating Revenue set forth below or such other amount determined in accordance with clause 4.5: |

| Full Operating Year | Percentage of Total Operating Revenue |
|---|---|
| First (and the preceding Operating Year between the Opening Date and December 31 of the same Operating Year) | 1.0% |
| Second | 2.0% |
| Third through Fifth | 3.0% |
| Sixth and thereafter | 4.0% |

The foregoing amounts are minimum and do not represent the amounts which may be necessary to operate and maintain the Hotel according to the Brand Standards, and the Capital Budgets may call for expenditures in excess of the amounts being reserved.

US_Active\118580889\V-9

| | |
|---|---|
| **Force Majeure Event** | any event, series of events, crisis, trend or state of affairs whatsoever, in any part of the world, which is or are beyond the reasonable control of the affected Party, including war, hostilities, terrorism, sabotage, vandalism, riot, insurrection, revolution or other civil unrest, political crisis or tension, economic or financial disruption, explosion, labor disputes, work stoppages or slowdowns, epidemic or quarantine restrictions, inability to obtain labor or materials, fire, flood, storm, earthquake, drought, disease, other acts of God, accident, disruption in airline or other transportation systems, travel advisories or alerts issued by any Government authority or international agency, Government restrictions or provisions and anything that leads to a general disinclination to travel.  The inability of a Party to meet its financial obligations for any reason is not a Force Majeure Event. |
| **Full Operating Year** | an Operating Year consisting of twelve full calendar months. |
| **GAAP** | generally accepted accounting principles consistently applied. |
| **GOP Performance Test Percentage** | 90% |
| **Government or Government Entity** | any: (i) agency, instrumentality, subdivision or other body of any national, regional, local or other government; (ii) commercial or similar entities owned or controlled by such government, including any state-owned and state-operated companies; (iii) political party; or (iv) public international organization. |
| **Government Official** | means: (i) officers and employees of any Government; (ii) officers and employees of companies in which a Government owns an interest; (iii) any private person acting in an official capacity for or on behalf of any Government or Government Entity (such as a consultant retained by a government agency); (iv) candidates for political office at any level; (v) political parties and their officials; or (vi) officers, employees, or official representatives of public (quasi-governmental) international organizations (such as the United Nations, World Bank, or International Monetary Fund). |
| **Gross Operating Profit** | as defined by the Uniform System. |
| **Gross Rooms Revenue** | all revenues derived from the sale or rental of guest rooms (both transient and permanent) of the Hotel, including revenue derived from the redemption of points or rewards under the loyalty programs in which the Hotel participates, amounts attributable to breakfast (where the guest room rate includes breakfast), Mandatory Guest Fees, late cancellation fees, and guaranteed no-show revenue and credit transactions, whether or not collected, at the actual |

7

| | |
|---|---|
| | rates charged, less allowances for any guest room rebates and overcharges, and will not include taxes collected directly from patrons or guests. Group booking rebates, if any, paid to third-party groups for group stays must be included in, and not deducted from, the calculation of Gross Rooms Revenue. This definition may be amended from time to time by the Brand Standards. |
| **Hotel** | during the period (a) prior to the Opening Date the Existing Hotel; and (b) on and from the Opening Date, the Site, the Building, the Building Systems, the FF&E and the Operating Equipment and any extensions, alterations, additions and improvements to any of these including the PIP Works. |
| **Hotel Accounts** | collectively, the Operating Accounts and the FF&E Account. |
| **Hotel Guest Data** | as defined in clause 9.1.4. |
| **Hotel Name** | "Signia by Hilton San Jose" or any other name chosen by Manager that includes the word "Signia". |
| **Hotel Lease** | that certain lease, entered into contemporaneously herewith, by and between Lessor and Owner, pursuant to which Owner is granted a leasehold estate in, and the right to occupy and utilize, the Site and the Hotel, and any replacement thereof. |
| **Hotel Personnel** | all employees (other than Corporate Personnel) performing services at the Hotel who are employed by Manager or its Affiliates. |
| **Improper Payment** | (a) any payment, offer, gift or promise to pay or authorization of the payment or transfer of other things of value, including any portion of the compensation, fees or reimbursements received under this Agreement or the provision of any service, gift or entertainment, directly or indirectly to: <br><br> (i) a Government Official; <br><br> (ii) any director, officer, employee or commercial partner of a Party or its Affiliates; or <br><br> (iii) any other person at the suggestion, request or direction or for the benefit of any of the above-described persons and entities, <br><br> for the purpose of obtaining or influencing official actions or decisions or securing any improper advantage in order to obtain, retain or direct business; <br><br> (b) payments made and expenses incurred in connection with the performance of any obligations under this Agreement that are not made and recorded with sufficient accuracy, detail, and control to meet the standards set out in Anti-Corruption Laws; or |

8

US_Active\118580889\V-9

| | |
|---|---|
| | (c)   any other transaction in violation of Anti-Corruption Laws. |
| **Incentive Fee** | Twenty percent (20%) of Incentive Income. |
| **Incentive Hurdle** | with respect to each Operating Year, the sum of: (i) fifteen million dollars ($15,000,000), plus (ii) ten percent (10%) per annum of Owner's Additional Investment (non-cumulative and non-compounded), calculated on a monthly basis. <br><br> *(For illustration purposes only, if the cumulative amount of all Owner's Additional Investment is $7,000,000, then the Incentive Hurdle for the applicable Operating Year would be $15,700,000.)* <br><br> The Incentive Hurdle shall be reduced on a pro rata (per-key) basis to account for any permanent reduction to Hotel inventory (with any such reduction being subject to Manager's approval). Additionally, the Incentive Hurdle shall be equitably reduced to account for (a) any days during which the Hotel was closed and/or (b) any temporary material reduction to Hotel inventory resulting from renovation, casualty, Force Majeure Event, or other cause. |
| **Incentive Income** | with respect to each Operating Year, the excess (if any) of: (a) EBITDA Less Replacement Reserve (after reversing any deductions made for Incentive Fee and for any rent payable under the Hotel Lease or any other lease) for such Operating Year, less (b) the Incentive Hurdle for such Operating Year. |
| **Indemnify, Indemnity and Indemnification (or any variation)** | collectively, to indemnify, hold harmless and defend. |
| **Index** | the Consumer Price Index for All Urban Consumers for the U.S. City Average for All Items or any other successor index which may replace the same. |
| **Information System** | means, collectively, the software, equipment and IT systems made available by Hilton Systems Solutions, LLC, its successors and assigns and their Affiliates for Customer's access, use or benefit, including the OnQ® technology. |
| **Information Technology System Agreement** | the agreement governing access to, use of and support for, the Information System. |
| **Insolvency Event** | the occurrence of any of the following: (a) a Party enters into any arrangement or composition for the benefit of the Party's creditors or convenes a meeting of the Party's creditors (or a nominee calls such a meeting); (b) a Party is the subject of an order or a resolution for the winding up of that Party; (c) an order |

9

| | |
|---|---|
| | is made for the appointment of a receiver, trustee, administrator or liquidator to manage the business affairs, business and property of a Party; (d) a Party becomes subject to the insolvency or bankruptcy Laws of the country in which it is resident or incorporated; (e) a Party suffers any execution to be levied on any of its assets or becomes unable to pay its debts as and when they become due; or (f) comparable proceedings or events to those specified in paragraphs (a) through (e) occur in relation to a Party. |
| **Intellectual Property** | all present and future rights granted by statute, common law, equity or any corresponding law in or in relation to copyrights, trademarks, designs, patents, circuit layouts, plant varieties, business and domain names, inventions, know-how, trade secrets, confidential information and other results of intellectual activity in the industrial, commercial, scientific, literary or artistic fields whether or not registered, capable of being registered or patentable, including: <br><br> (a) all rights in all applications to register these rights; <br><br> (b) all renewals and extensions of these rights; <br><br> (c) all rights in the nature of these rights, such as moral rights and database rights; and <br><br> (d) all rights to sue for infringement or passing-off of these rights. |
| **Key Money** | Fifteen Million and No/100 United States Dollars (US$15,000,000) |
| **Key Money Period** | the period from the date of payment of the Key Money through to the Expiration Date. |
| **Key Personnel** | the positions of General Manager, Director of Finance, Director of Sales & Marketing, Director of Revenue Management, Chief Engineer, and Director of Food & Beverage. |
| **Laws** | any applicable common, statutory, civil and criminal laws, decrees, orders, regulations, ordinances, and regulatory codes of practice issued by any Government Entity with jurisdiction over the Hotel or any Party. |
| **Lessor** | SC SJ Holdings LLC |
| **Loan to Value Ratio** | the ratio between: (a) the aggregate amount of indebtedness secured by a Mortgage and all other indebtedness secured by the liens against the Hotel or secured by liens against interests in Owner; and (b) the then-appraised value of the Hotel as determined by the holder of the Mortgage in connection with its underwriting of the loan secured by such Mortgage. |
| **Major Capital Expenditures** | Any Capital Expenditures pertaining to the Building or Building Systems. |

10

US_Active\118580889\V-9

| Management Fees | the Base Fee and the Incentive Fee. |
|---|---|
| Manager | Signia Hotel Management LLC, a Delaware limited liability company |
| Manager-Owned Hotel Names | as defined in clause 11.1. |
| Manager Proprietary IT | all computer software, hardware and computer programs (in both source and object code form), related documentation, and enhancements, modifications or substitutions of these items that are proprietary to or licensed from Manager or its Affiliates. |
| Manager's Grossly Negligent or Willful Acts | any gross negligence, willful misconduct or fraud committed by Manager or its Affiliates or the Corporate Personnel in the performance of Manager's duties under this Agreement.  The acts or omissions of Owner or Hotel Personnel will not be imputed to Manager or its Affiliates, or to the Corporate Personnel, nor be deemed to constitute Manager's Grossly Negligent or Willful Acts. |
| Manager's Intellectual Property | the Marks, the Hotel Name, the Manager-Owned Hotel Names, the Manager Proprietary IT, and all other Intellectual Property owned or licensed by Manager or its Affiliates (including, without limitation, all trade secrets, know-how and other proprietary information relating to the operating methods, procedures and policies distinctive to Other Managed Hotels). |
| Mandatory Guest Fees | any separate fee that a patron or guest is charged for in addition to the base room rate for a guest room, including but not limited to resort fees, facility fees, destination fees, amenity fees, urban destination fees, or any other similar fee.  Mandatory Guest Fees do not include employee gratuities, state or local mandatory taxes, and other tax-like fees and assessments that are levied on a stay, as determined by Manager, that are passed through to a third party (such as tourism public improvement district fees, tourism or improvement assessments, and convention center fees). |
| Mandatory Guest Fee Proceeding | an inquiry, investigation, suit, action, or proceeding by any Government or Government Entity arising out of or in connection with any Mandatory Guest Fees charged at the Hotel. |
| Marks | the name "Signia by Hilton" and all other product and service marks, insignia, emblems, symbols, slogans, distinguishing characteristics, trade names, domain names and all other service marks, trademarks or characteristics associated or used with, or in connection with, Manager or its Affiliates or with hotels operated under a brand owned by Manager or its Affiliates. |

11

| | |
|---|---|
| **Material Interest** | either (i) a 50% or more direct or indirect legal or beneficial interest in an entity or (ii) the right to materially influence, directly or indirectly, the affairs of an entity by contract, ownership, or otherwise. |
| **Mezzanine Loan** | that certain mezzanine loan of up to $25,000,000 made in connection with the entering into of this Agreement. |
| **Monthly Financial Statement** | a statement generally consistent with the form and content provided to other Brand hotels managed by Manager, showing the results of Hotel operations for the preceding month and the current Operating Year to date, including: <br><br>(a) a balance sheet; <br><br>(b) a profit and loss statement, including a comparison to the Operating Budget and the previous year's Operating Budget, a re-forecast of the current Operating Year, and the computation of the Management Fee for such month; <br><br>(c) a statement of cash flows, as well as a projection of cash flows reflecting expected Working Capital needs during the upcoming months; and <br><br>(d) a statement of departmental operations <br><br>(e) those items and other information or materials that Owner may reasonably request. |
| **Mortgage** | any mortgage, deed of trust, trust deed, pledge or encumbrance of, or other security interest in, the Hotel, the Site, the Hotel Accounts, this Agreement, and/or the ownership interests in Owner. |
| **Notice Address** | For Owner: <br>3223 Crow Canyon Road <br>Suite 300 <br>San Ramon, California 94583 <br>Attention:Sam Hirbod <br><br>For Manager: <br>Signia Hotel Management LLC <br>7930 Jones Branch Drive <br>McLean, Virginia  22102 <br>Attention: General Counsel <br><br>with a copy of any notice sent to Manager also being sent to: <br>Signia by Hilton San Jose <br>170 S Market Street |

12

|  | San Jose, CA 95113<br>Attention: General Manager |
| --- | --- |
| **Opening Date** | the date determined in accordance with clause 3.3.1. |
| **Operating Accounts** | the bank and deposit accounts relating to the operation of the Hotel. |
| **Operating Brand Standards** | all of the Brand Standards that are not AC&R Brand Standards. |
| **Operating Budget** | as defined in clause 9.4.7. |
| **Operating Equipment** | linen, china, glassware, silverware and the like, tools, utensils, uniforms and other miscellaneous items. |
| **Operating Expenses** | all expenses, fees and charges included in the calculation of Gross Operating Profit under the Uniform System and in accordance with GAAP except where otherwise specified in this Agreement. |
| **Operating Supplies** | as defined by the Uniform System. |
| **Operating Term** | as defined in clause 1.1.2. |
| **Operating Year** | each calendar year during the Operating Term, except that: (a) the first Operating Year (if not commencing on January 1) will be the period from the Opening Date through December 31 of such calendar year; and (b) the last Operating Year will be the period from January 1 of the year in which this Agreement is terminated through the date of termination. |
| **Other Business** | any other business of any nature, including a hotel (except for a hotel under the Brand), inn, conference center, time share property, lodging facility or similar business. |
| **Other Managed Hotels** | hotels within the United States other than the Hotel which are operated by Manager or its Affiliates under the Brand. |
| **Owner** | NEX SJ LLC, a Delaware limited liability company. |
| **Owner Agreement** | as defined in clause 2.1.4 |
| **Owner's Additional Investment** | following the full completion of the PIP Works, amounts spent by Owner on Capital Expenditures for improving the Hotel, which amounts are from sources other than the FF&E Account and the Mezzanine Loan and which are in excess of the amounts required to be contributed to the FF&E Account pursuant to clause 4.5.   4.5Owner's Additional Investment excludes any amounts: (i) |

13

| | |
|---|---|
| | sourced from the FF&E Account or the Mezzanine Loan, (ii) spent to complete the PIP Works, or (iii) spent to convert any portion of the Hotel to non-Hotel use.<br><br>The process for determining Owner's Additional Investment shall be as follows: If Owner makes Capital Expenditures that it believes qualify as Owner's Additional Investment, Owner will provide Manager with a calculation of such Owner's Additional Investment within 60 days after substantial completion of such work, with sufficient detail for Manager to review and confirm its accuracy.  On or about June 30th of each Operating Year, Owner will provide to Manager, for informational purposes only, a summary of all Owner's Additional Investment, along with an estimate of anticipated Owner's Additional Investment during the remainder of such Operating Year.  On or before the date that is 5 business days prior to January 15th of each Operating Year, Owner will provide to Manager a summary (along with reasonable supporting evidence and details) of all Owner's Additional Investment during the previous Operating Year, for purposes of including such amounts in the calculation of the Incentive Hurdle for the current Operating Year. Manager may audit the relevant books, records and invoices of Owner for the purpose of verifying such increases to Owner's Additional Investment. |
| **Party** | a party to this Agreement. |
| **Performance Period** | Commencing (a) January 1 of the later of: (i) the 5th Full Operating Year of the Operating Term, (ii) the Full Operating Year following completion of the PIP, and (iii) the Full Operating Year following termination/expiration of Manager's Affiliate's obligations under the Hilton credit enhancement (with Manager's affiliate having been made whole for any payments made thereunder); and ending on (b) the Termination Date. |
| **Performance Termination Notice** | as defined in clause 15.1.2. |
| **PIP** | property improvement plan described on Appendix B, including the installation of the Information System. |
| **PIP Works** | the Pre-Opening Works and the Post-Opening Works. |
| **Plans** | the plans, designs, specifications, schedules, drawings, layouts and sample materials and prototypes for the works to be carried out by Owner under the PIP, and for other works to be carried out by Owner pursuant to this Agreement, as amended, to the extent and in the detail required by the Brand Standards. |

14

US_Active\118580889\V-9

| | |
|---|---|
| **Post-Opening Works** | the works identified in the PIP to be carried out and completed after the Opening Date. |
| **Post-Opening Works Completion Date** | October 31, 2023 |
| **Pre-Opening Works** | The works identified in the PIP to be carried out and completed prior to the Opening Date. |
| **Pre-Opening Works Completion Date** | January 15, 2022 |
| **Prior Agreement** | collectively, the one or more agreements between Prior Manager and Owner (and/or its Affiliates, including the prior operating lessee entity) relating to the prior branding and operation of the Existing Hotel, including any "owner agreement" with Lessor or other fee owner entity. |
| **Prior Manager** | the applicable entity or entities that previously managed the Existing Hotel, and their Affiliates. |
| **Professional Team** | qualified, reputable and experienced architects, engineers, interior designers, landscape architects, FF&E procurement agents, and similar consultants and advisers. |
| **Prohibited Person** | (a) a person who is likely to jeopardize a gaming license of, or an application for a gaming license by, Manager or its Affiliates; or<br><br>(b) a Competitor. |
| **Project** | the design, construction, furnishing, equipping, fit out and decorating of the Hotel and the purchase and installation of all FF&E and all Operating Equipment in accordance with this Agreement. |
| **Related Parties** | a Party's respective Affiliates and its and their respective directors, partners, members, managers, officers and employees. |
| **Re-Launch Activities** | those activities to be undertaken on or before the Opening Date under the Brand, including:<br><br>(a) pre-operational staffing and recruitment, training, operations and organization;<br><br>(b) advertising, promotion, travel and business entertainment; and<br><br>(c) opening celebrations and ceremonies (whether held before or after the Opening Date). |

15

| | The foregoing may include an allocation of expenses for Corporate Personnel assisting in such activities for the Hotel as well as corporate overhead relating to such activities and operations. |
|---|---|
| **Re-Launch Fund** | a fund provided by Owner in accordance with clause 3.1 to cover the costs and expenses incurred by Manager on behalf of Owner in carrying out the Re-Launch Activities. |
| **Restrictive Period** | the period of 60 months commencing from the Execution Date. |
| **Restrictive Territory** | a ten (10) mile radius from the Hotel, the center point of which is the front door of the Hotel, but specifically excluding the Excluded Site.<br><br>For purposes of this Agreement, the "Excluded Site" shall mean that certain site bound by Great America Parkway to the West, Southbay Freeway 237 on the northside continuing east until the Guadalupe River to the East, with the boundary continuing southeast along the Guadalupe River until Tasman Drive which continues west to Great America Parkway, which binds the site to the South, all as identified on the map attached hereto as APPENDIX E, which shall specifically be excluded from the "Restrictive Territory". |
| **RevPAR** | "Rooms RevPAR" as defined in the Uniform System and in accordance with GAAP; provided, however, that in the event of a conflict between the Uniform System and GAAP, then GAAP will govern. |
| **RevPAR Expert** | STR Global or its successors or assigns or, if no such entity exists, a recognized person or organization mutually acceptable to Owner and Manager with sufficient expertise and access to data to calculate the Competitive Set RevPAR. |
| **RevPAR Performance Test Percentage** | 90%. |
| **Sanctioned Person** | any person, entity, or Government, including those with a direct or indirect Material Interest in such persons or entities, or acting on behalf of such persons or entity, who is subject to Trade Restrictions that prohibit or restrict the Parties' performance of the Parties' obligations under this Agreement. |
| **Services** | collectively, the Brand Services and the Shared Hotel Services. |
| **Services Charges** | collectively, the Brand Services Charge and the Shared Hotel Services Charges. |
| **Shared Hotel Services** | collectively, (i) all mandatory and applicable optional programs and services provided (or offered, in the case of optional programs) to all or substantially all hotels managed by Manager under the Brand in the United States, and (ii) all mandatory and applicable optional programs and services provided by |

16

| | Manager or its Affiliates (or offered, in the case of optional programs) to substantially all hotels (whether owned, managed, leased or franchised) operating under the Brand in the United States (other than the Brand Services). |
|---|---|
| **Shared Hotel Services Charges** | the charges payable for the Shared Hotel Services, as determined by Manager from time to time. |
| **Site** | The 805 room hotel comprised of two towers located at APNs 259-41-088 and 259-56-001 commonly known as 170 S Market Street, San Jose CA. |
| **Standard Practices** | the policies, practices and standards generally employed by Manager or its Affiliates in operating Other Managed Hotels and branded ancillary operations associated with Manager or its Affiliates, if applicable. |
| **Taxes** | all income, withholding, sales, use, excise, consumption, value added and other similar taxes, duties, levies, fees, and assessments. |
| **Technical Services** | those services set out in Appendix C. |
| **Technical Services Fee** | $100,000, plus all reasonable travel and other normal out-of-pocket costs and expenses of Manager in performing the Technical Services, net of all Taxes. |
| **Term** | as defined in clause 1.1.1. |
| **Termination Date** | the date on which this Agreement terminates, whether by expiration, earlier termination by either Owner or Manager, or otherwise. |
| **Termination Notice** | as defined in clause 14.2. |
| **Third Party Area** | As defined in clause 4.10. |
| **Total Operating Revenue** | as defined by the Uniform System and in accordance with GAAP; provided, however, that in the event of a conflict between the Uniform System and GAAP, then GAAP will govern. |
| **Trade Restrictions** | means trade, economic or investment sanctions, export controls, anti-terrorism, non-proliferation, anti-money laundering and similar restrictions in force from time to time pursuant to laws, rules and regulations imposed under Laws to which the Parties are subject. |
| **Unamortized Key Money Amount** | the proportion of the Key Money that has not been notionally amortized (without interest) based on the time period from the date of termination of this Agreement until the end of the Key Money Period. |
| **Uniform System** | the then current edition of the Uniform System of Accounts for the Lodging Industry (currently Eleventh Revised Edition, 2014) published by the American Hotel & Lodging Educational Institute, as revised from time to time except for |

17

| | |
|---|---|
| | purposes of calculating (a) the Base Fee and the Incentive Fee and (b) whether a right to terminate exists under clause 15 (and, if so, the Cure Amount), for which the Parties will rely on the Eleventh Revised Edition, 2014 and not the then current edition. |
| **Working Capital** | funds sufficient at any given time to ensure the uninterrupted and efficient operation of the Hotel, the timely payment of all current Hotel liabilities and the timely performance by Manager of all of its obligations under this Agreement. |

**PART B:  OPENING AND OPERATION OF THE HOTEL**
**1.        TERM AND EXTENSIONS**

1.1     **Term**.

1.1.1   *Term.*  This Agreement commences on the Execution Date and unless otherwise extended expires on the Expiration Date (the "**Term**").

1.1.2   *Operating Term.*  The operating term will commence on the Opening Date and, unless otherwise extended, expires at 11:59 pm, local time at the Hotel, on the Expiration Date (together with any Extension Term, the "**Operating Term**").

1.1.3   *Extension of the Operating Term.*  Manager may extend the initial Operating Term for one period of fifteen (15) years (the "**Extension Term**").  The Extension Term will commence upon expiration of the Initial Operating Term.  The initial Operating Term will be automatically extended unless Manager delivers written notice to Owner, on or before October 1 of the final Operating Year of the initial Operating Term, that the Operating Term will not be extended.

**2.        OWNERSHIP AND DEVELOPMENT OF THE HOTEL; KEY MONEY**

2.1     **Ownership of the Hotel**.

2.1.1   *Ownership.*  Owner will maintain full ownership of (or its leasehold interest in) the Hotel and the business conducted from the Hotel free and clear of any lien, mortgage, charge or any other security interest, except:

(a)     for interests that do not materially and adversely affect Manager's management of the Hotel; and

(b)     where a subordination and non-disturbance agreement is obtained under clause 13.2.13.

2.1.2   *Fixed Charges.*  Owner will pay the following fixed charges related to the Site or the Hotel when due:

18

(a)      rent, concession, and other related charges;

(b)      real estate and/or property taxes and similar payments, unless enforcement is stayed while contested by Owner; and

(c)      any Mortgage permitted under clause 2.1.1.

The above payments are not Operating Expenses.  Within 30 days after Manager's written request, Owner will provide copies of invoices and evidence of amounts paid.

2.1.3   *Undisturbed Management.*   Owner will use commercially reasonable judicial and other appropriate actions required to ensure Manager's undisturbed management of the Hotel and will not cause interference with such management.

2.1.4   *Owner Agreement*.  Owner will cause the Lessor to enter into an Owner Agreement in the form required by Manager (the "**Owner Agreement**").

2.2     **Renovation of the Hotel**.

2.2.1   From the revenues from the operation of the Hotel, or with funds provided by Owner or from proceeds of the Mezzanine Loan or the Key Money or the Chapter 11 plan, Owner agrees to complete the PIP Works on or before the date specified for such task in the PIP and will renovate the Hotel in accordance with the terms of the PIP and Schedule 1 attached hereto.  Without limiting the foregoing, Owner shall ensure that the PIP Works shall be fully completed no later than the Post-Opening Works Completion Date.

2.2.2   The Parties intend that the Hotel will remain open during the Post-Opening Works.

2.2.3   If Owner fails to complete the PIP Works on or before the Post-Opening Works Completion Date, then Manager shall have the right, upon written notice to Owner, to elect to operate the Hotel as an "affiliated" Hotel until all of the PIP Works are completed. In such event, the Hotel shall be managed by Manager under an alternative name or brand chosen by Manager, and the Hotel shall not be branded, operated, managed, marketed or advertised under the Brand. Manager's exercise of such right to operate the Hotel under an alternative brand of on an "affiliate" status shall not limit Manager's rights upon the occurrence of an event of default by Owner under ARTICLE 14. Additionally, if Owner fails to complete the PIP Works on or before the Post-Opening Works Completion Date, the Restrictive Period shall automatically expire and terminate as of the Post-Opening Works Completion Date.

2.2.4   The costs of carrying out the PIP Works are not Operating Expenses.  Owner shall ensure that there is sufficient funding for the PIP Works.

2.2.5   *PIP Reserve*.  In connection with the foregoing obligations, Manager is authorized to establish and control a reserve for funds designated solely to fund the PIP Works (the "**PIP Reserve**"), which

19

reserve may be held in the FF&E Account so long as such funds are separately tracked and accounted for. (For the avoidance of doubt, the PIP Reserve is exclusive of amounts that are deposited into the FF&E Account pursuant to clause 4.5 below.) Owner shall ensure that, on the date when the Mezzanine Loan and the Key Money are funded, the PIP Reserve will contain no less than Fifteen Million Dollars ($15,000,000.00), inclusive of the Key Money to be deposited by Manager in accordance with clause 2.3.1 below. Additionally, thereafter and annually until all of the PIP Works have been completed, (i) Owner, in coordination with its Professional Team, will propose, as part of the annual Capital Budget process, a sub-budget for the PIP Works to be performed during the following Operating Year, which sub-budget shall be subject to Manager's reasonable approval (as to whether the proposed PIP Works comply with the PIP and whether the proposed budget appears to be reasonably sufficient to complete such PIP Works) and (ii) Manager shall provide to Owner on or before January 1 of the subject Operating Year its reasonable estimate of any incremental funds (in addition to the PIP Reserve funds that are on-hand and not already designated for other specific PIP Work items) that are required to complete the PIP Works for such Operating Year, which amount shall be reasonably determined by Manager in its good faith discretion taking into account the then-current project budget and forecast (as such amount may change from time to time, the "**Minimum Annual PIP Reserve Amount**"). Owner shall ensure that the PIP Reserve is funded with the Minimum Annual PIP Reserve Amount on or before February 1 of such Operating Year (the "**Minimum Annual PIP Reserve Amount Deadline")**; provided for the avoidance of doubt, that satisfaction of the foregoing Minimum Annual PIP Reserve Amount obligation shall not relieve Owner from its general obligation to complete the PIP Works in accordance with the deadlines set forth in the PIP (regardless of whether Owner is able to complete the PIP Works within its budget). In furtherance of the foregoing, but subject to the terms of any subordination and non-disturbance agreement to which Manager is a party, in the event Owner does not deposit the Minimum Annual PIP Reserve Amount into the PIP Reserve on or before the Minimum Annual Pip Reserve Amount Deadline, Manager is authorized to deposit into the PIP Reserve any funds that Manager would otherwise remit to Owner (pursuant to clause 9.3) up to the Minimum Annual PIP Reserve Amount for such year.

2.2.6    *South Tower PIP Completion*. Notwithstanding anything contained in the PIP to the contrary, Owner is not obligated to commence any PIP Works in the south tower of the Hotel (the "**South Tower**") until December 31, 2022; provided, however, that Owner must complete all of the PIP Works on the South Tower by no later than December 31, 2023 (the "**South Tower PIP Outside Completion Date**"). If Owner fails to complete all PIP Works in the South Tower on or before the South Tower PIP Outside Completion Date, then in addition to any other rights or remedies that Manager may have at law or in equity, (i) Manager shall have the right to take the rooms in the South Tower out of the active Hotel inventory available for guest rental and occupancy, and (ii) Owner shall be obliged to repay to Manager one-third (1/3) of the Unamortized Key Money Amount within 15 days following the South Tower PIP Outside Completion Date.

20

2.3    **Key Money/Credit Enhancement**.

2.3.1    In consideration of Owner entering into this Agreement and Manager having the right to operate the Hotel during the entire Operating Term, Manager will deposit the Key Money into the PIP Reserve no later than the Opening Date.

2.3.2    Any payment of the Key Money by Manager to Owner will be inclusive of any Taxes and Owner will promptly pay these Taxes and which will not be additionally payable by Manager but will be regarded as included in the Key Money.

2.3.3    If this Agreement is terminated for any reason before the commencement of the Operating Term (or the payment of the Key Money, if earlier), Owner will not be entitled to any of the Key Money (and, if applicable, shall immediately refund any amounts that already have been funded).

2.3.4    The Key Money will be notionally amortized over the Key Money Period on a straight-line basis. If this Agreement is terminated for any reason at any time after the payment of the Key Money but before the end of the Key Money Period, Owner will repay the Unamortized Key Money Amount to Manager as a condition precedent to termination (with any such waiver being effective only as to the timing of the repayment obligation but not as to the underlying obligation itself).  Manager can waive this condition precedent in its sole discretion. If this Agreement terminates at any time after the Key Money Period, Manager will have no entitlement to be repaid the Key Money.

2.3.5    Any repayment of the Unamortized Key Money Amount by Owner to Manager pursuant to clause 2.3.3 will be exclusive of any Taxes.

2.3.6    Owner acknowledges and agrees that (i) the actions taken by Manager under this Agreement are independent from the actions taken by Manager or its Affiliate under the Credit Enhancement (the "**Hilton Guarantor**"), (ii) that the actions taken by the Hilton Guarantor in connection with the Credit Enhancement (whether or not Hilton Guarantor is the Manager or its Affiliate) are independent from the actions taken by Manager under this Agreement, (iii) no action by the Hilton Guarantor under the Credit Enhancement (whether or not the Hilton Guarantor is the Manager or its Affiliate) will be imputed to Manager under this Agreement, and vice versa, and (iv) Owner expressly waives any fiduciary duties (of agency or otherwise) that might be imposed, implied or imputed to Manager as a result of any actions taken by the Hilton Guarantor under the Credit Enhancement (whether or not the Hilton Guarantor is the Manager or its Affiliate) and acknowledges that the Hilton Guarantor (even if Manager) will, and is authorized to, act solely in its own best interest with respect to the Credit Enhancement and will have no duties whatsoever to Owner with respect to the Credit Enhancement.

In connection with this Agreement or the performance of its obligations under this Agreement, Owner will not use any portion of the Key Money to make, provide, offer to make, or authorize, directly or indirectly, an Improper Payment or engage in any acts or transactions otherwise violating any Anti-Corruption Laws.  If Manager has any basis for a reasonable belief that Owner has used the Key Money in

21

violation of any Anti-Corruption Laws, Manager will advise Owner of this belief and Owner will cooperate with any and all reasonable information and document requests, including requests for execution of certificates of compliance, and will permit inspection at all reasonable times and upon reasonable prior notice of its books and records relating to this Agreement.

2.4    **Brand Conversion Option**.  In the event that at least five (5) Brand hotels are not open and operating in the United States as of December 31, 2031 (with a temporary closure counting as open-and-operating), Owner may, by delivering notice during the calendar month of January 2032, exercise the option to rebrand the Hotel under any of Manager's Affiliates' brands that are available (i.e., unrestricted) in the local market, provided that the Hotel, following a brand conversion PIP funded by Owner, would comply with the brand standards for such other brand (subject to the foregoing conditions, the "**Brand Conversion Option**").  If the Brand Conversion Option is timely exercised (understanding that a failure to timely exercise constitutes a waiver), then the Parties will cooperate toward a rebranding that will take effect when Manager has determined that the Hotel can operate in compliance with the applicable brand standards.  The Brand Conversion Option is subject to the availability of another suitable brand, and the lack of such availability shall not constitute a default by Manager nor shall it give rise to a termination right on the part of Owner.

**3.    OPENING THE HOTEL**

3.1    **Re-Launch and Initial Working Capital**.

3.1.1    *Re-Launch Budget.*  Manager will prepare and submit for Owner's approval a budget for the Re-Launch Fund (the "**Re-Launch Budget**") to organize the Re-Launch Activities showing the anticipated cost of carrying out the Re-Launch Activities based upon the anticipated Opening Date of the Hotel under the Brand.  Manager will use commercially reasonable efforts not to exceed the Re-Launch Budget but may do so to the extent that there are changes in the scope, timing or other assumptions upon which the Re-Launch Budget was based.

3.1.2    *Re-Launch Fund.*    Unless otherwise provided in the Re-Launch Budget, Owner will deposit into the Re-Launch Account (i) 25% of the Re-Launch Fund prior to the Affiliation Date and prior to commencement of any Re-Launch Activities, and (ii) thereafter monthly, in advance, funds to pay anticipated costs and expenses as set forth in the Re-Launch Budget based on provided cash need forecasts to the extent not billed to and paid directly by Owner.  All re-launch costs and expenses will be borne by Owner.  Manager will use the Re-Launch Fund to pay for the costs and expenses of the Re-Launch Activities.

3.1.3    *Supplemental Funding.*  Manager will use commercially reasonable efforts not to exceed the Re-Launch Budget, but may do so to the extent that there are material changes in the scope, timing or other assumptions upon which the budget was based, or if the full opening of the Hotel to the public under the Brand is postponed beyond the anticipated Opening Date.  If, as a result of changes in the scope, timing or other assumptions upon which the budget was based, or

US_Active\118580889\V-9

postponement beyond the anticipated Opening Date of the Hotel under the Brand, the Re-Launch Fund is insufficient to pay for all of the costs and expenses of the Re-Launch Activities, then Owner will provide additional funds as Manager reasonably requires until the full opening of the Hotel under the Brand.

3.1.4   *Accounting.*  Following the start of the Re-Launch Activities, within 20 days of the end of each month and within 90 days after the Opening Date under the Brand, Manager will provide a report to Owner of all revenues, costs and expenses received and incurred in carrying out the Re-Launch Activities as compared to the Re-Launch Budget.  Upon completion of the Re-Launch Activities, any balance of the Re-Launch Fund and revenues received from partial operations not used or required to pay for the Re-Launch Activities will be held in the Operating Accounts and applied toward Working Capital.

3.1.5   *Initial Operating Supplies and Initial Working Capital.*  Manager will notify Owner in writing of the amount of funds required for the initial Operating Supplies and initial Working Capital.  To the extent not funded from the Mezzanine Loan or Key Money proceeds, Owner will deposit the requested amount in the Operating Accounts within 15 days of such request but not later than 30 days before the anticipated Opening Date. If, prior to the Opening Date, Manager determines that additional amounts for the initial Operating Supplies and initial Working Capital are required, Manager will notify Owner in writing of the additional amount of funds required and Owner will deposit the requested amount in the Hotel Accounts by no later than Opening Date.

3.1.6   *Access to Hotel Accounts*.  To the extent Manager or its Affiliate has paid for Re-Launch Activities, and has not been reimbursed by Owner (either from funds in the Re-Launch Fund or funds otherwise provided by Owner), Manager will be entitled, but not obligated, to payment of such amounts from funds in the Hotel Accounts.

3.1.7   *Information System*. Owner acknowledges that it has received a copy of the form of Information Technology System Agreement.  Upon request of Manager and not less than 30 Calendar Days before the anticipated Opening Date, Owner will sign the Information Technology System Agreement and other related agreements required for access to, use of and support for, the Information System.

3.2   **Re-Launch Account**.  Manager may establish a special bank account in the name of Owner, at a banking institution or institutions selected by Manager, from which all re-launch costs and expenses will be paid (the "**Re-Launch Account**").  Owner will deposit funds in the Re-Launch Account in the amounts and at the times set forth in the funding schedule attached to the Re-Launch Budget, or if no funding schedule is so attached, as set forth in clause 3.1.2.

3.3   **Full Opening of the Hotel**.

3.3.1   *Opening Date.*  As soon as practicable after completion of the Pre-Opening Works and the Re-Launch Activities, Manager will designate the date that the Hotel will open to the general public

under the Brand (the "**Opening Date**") which for the avoidance of doubt will not be earlier than the date that is 90 days after the Execution Date.  Manager may designate an earlier date as the Opening Date for the purposes of commencing operations of the Hotel but without limiting Owner's obligations under clause 3.3.2.

3.3.2   *Defects.*  The start of operations of the Hotel under the Brand does not relieve Owner of any of its liabilities or obligations to complete the PIP in accordance with this Agreement, and Manager will notify Owner as soon as reasonably practicable after becoming aware of any defects or deficiencies in the Hotel arising from the carrying out of the PIP (other than those defects and deficiencies which are contemplated by the PIP).  Owner will cure those defects and deficiencies to Manager's reasonable satisfaction as soon as reasonably practicable or if applicable, by the dates specified in the PIP, at times and in a manner approved by Manager so as to cause as little disturbance as possible to Hotel operations.  Costs and expenses incurred in curing defects and deficiencies are not Operating Expenses.

3.3.3   *Transition*.  In order to achieve an orderly transition of the operation of the Hotel, Owner will ensure that Manager and its Affiliates and their respective duly authorized personnel, officers, accountants, employees, agents, representatives and attorneys, have full access at all reasonable times to enter the Existing Hotel prior to the commencement of the Operating Term in order to prepare for the takeover of the operation of the Hotel by Manager.

3.4     **Prior Operations**.

3.4.1   *Acknowledgment*.  The Parties acknowledge that the Prior Manager was the manager of the operations of the Existing Hotel pursuant to one or more agreements with Owner (or its predecessor-in-interest), Lessor and/or their affiliates and that such agreements have terminated as a result of a court order in a bankruptcy proceeding involving Owner (or its predecessor-in-interest and Lessor.

3.4.2   *Representations.* Owner represents, warrants and undertakes to Manager that, as of the Execution Date:

(a)      the Prior Agreement has been unconditionally, lawfully, properly and effectively terminated;

(b)      the Existing Hotel has been de-flagged and de-branded; and

(c)      there is no other agreement in force and effect with any third party regarding the management, franchising, branding, marketing and/or operation of the Existing Hotel.

3.4.3   *Existing Hotel Costs.* Owner will be solely responsible for any Existing Hotel Costs. Owner agrees to, on demand, indemnify, defend and hold the Manager and its Related Parties free and harmless of, from and against, and to reimburse Manager and its Related Parties for, all Claims arising from or related to: (i) any Existing Hotel Costs, (ii) Owner's or Lessor's current or former vendors, contractors, operators, guests, employees, contractual counterparties (including, without limitation, any and all unsecured creditors in any insolvency proceeding relating to Owner (or its

24

predecessor-in-interest), Lessor or the Hotel), including any Claims made by any party to or participant in the Chapter 11 proceeding, or by any affiliates of the foregoing, that relate in any way whatsoever to the Existing Hotel, the Chapter 11 proceeding, the Prior Agreement, or this Agreement, (iii) the Chapter 11 proceeding (excluding Manager's or its Affiliate's costs related solely to negotiating and documenting this Agreement, the Owner Agreement, and the related subordination, non-disturbance and attornment agreement); and (iv) any breach of the representations in clause 3.4.2. Owner agrees that clause 10.2.2 will not apply with respect to any Claims related to the matters described above and agrees that Owner's obligations under this clause 3.4.3 (to indemnify or otherwise): (x) shall survive any termination or expiration of this Agreement for any reason, (y) shall survive regardless of whether Manager or any of its Related Parties is alleged to be liable or otherwise responsible, in whole or in part, under any theory of liability, and (z) are separate, distinct and in addition to any obligation that Owner may have under this Agreement any other agreement. Defense of Manager and its Related Parties shall be conducted by counsel chosen by Manager. Manager and its Related Parties shall be entitled to settle any claim with the consent of the indemnifying party, which consent will not be unreasonably withheld, conditioned or delayed. Any such settlement shall provide for the full and complete release of the indemnified party in connection with all matters relating to the proceeding.

3.4.4    *Employees of the Hotel Prior to the Opening Date.* Owner has provided, or will promptly provide, to Manager copies of any and all union/collective bargaining agreements that relate to the Hotel as well as reasonable access to all employment records pertaining to the employees of the Hotel prior to the Opening Date.

**4.    HOTEL OPERATIONS**

4.1    **Appointment of Manager**. Manager will have the sole and exclusive right and obligation to (subject to any Third Party Areas) operate the Hotel according to the Brand Standards and pursuant to the terms of this Agreement. Manager will have the sole authority and responsibility to: (a) determine operating policy, room rates and other Hotel fees and charges, standards of operation, quality of service, the maintenance and physical appearance of the Hotel and any other matters affecting operations and management; (b) supervise and direct all phases of advertising, sales, and business promotion for the Hotel; and (c) carry out all programs consistent with the Budgets; provided that Manager will be excused from its performance of any obligation under this Agreement to the extent prevented by Owner's failure to cooperate with Manager or to provide all resources necessary for Manager to operate the Hotel according to the Brand Standards or this Agreement.

4.2    **Standard of Operation**. Manager will have the sole and exclusive right and obligation to operate the Hotel in its professional judgment and discretion, free from interference by Owner or its representatives, subject to and in accordance with this Agreement. Manager will use the skill, effort, care and expertise reasonably expected of a prudent international hotel Manager and with

25

the intention of optimizing Gross Operating Profit over the Operating Term, subject to compliance with Brand Standards.  Manager may balance all relevant considerations, including short, medium and long term goals and objectives; standards of operation; quality and condition of the Hotel (including the Post-Opening Works to be carried out by Owner in accordance with this Agreement); compliance with Brand Standards; the goodwill and reputation of the Hotel and the Marks; compliance with Laws; requirements and recommendations of regulatory and similar bodies or of insurers; industry practice; ethical standards; and the balance of risk versus certainty.

4.3     **Specific Authorizations**.   In addition to the general grant of authority above, Manager is specifically authorized and directed to:

(a)     consummate leases for the commercial and office space, and concession or other arrangements for other space and facilities, in the Hotel in the name of and as agent for Owner, subject to Owner's approval for leases or concession with a term of more than one year and not terminable at will on thirty days' notice or less, and subject to the provisions set forth in clause 14.2 of the Owner Agreement;

(b)     enter into contracts for goods or services in the name of and as agent for Owner, subject to Owner's approval for any contract with a term of more than one year and not terminable at will on thirty days' notice or less; provided, however, Owner's approval will not be required for booking and other similar agreements entered into by Manager in the normal course of business;

(c)     subject to compliance with the applicable Capital Budget provisions of this Agreement, make all repairs, decorations, revisions, alterations and improvements as reasonably necessary to maintain the Hotel in good order, condition and repair;

(d)     purchase such Operating Equipment and Operating Supplies as reasonably necessary for the proper operation of the Hotel in the name of and as agent for Owner;

(e)     use its reasonable efforts to obtain and maintain all licenses and permits required for the operation and management of the Hotel, except that Manager will not be required to obtain and maintain alcoholic beverage licenses or related permits in the name of Manager, or on behalf of Owner, unless Manager is specifically required to do so pursuant to applicable Laws or regulations imposed by governing authorities.  Owner will execute and deliver any and all applications and other documents as reasonably required and will otherwise cooperate with Manager in applying for, obtaining and maintaining such licenses and permits;

(f)     use its reasonable efforts to comply with all Laws;

(g)     use its reasonable efforts to comply with the terms of all insurance policies;

(h)     retain and direct legal counsel for the Hotel in the name of and as agent for Owner with respect to any matter regarding the operation of the Hotel with respect to (i) uninsured claims, (ii) insured claims which are covered by Manager-purchased insurance programs and (iii) at Manager's option, insured claims which are not covered by Manager-purchased insurance programs; with respect to uninsured claims, Manager will obtain Owner's prior written approval (which shall be deemed given if Owner fails to respond within 5 days) for any matter for which aggregate legal fees are anticipated to exceed US$50,000;

(i)     notwithstanding any limits set forth in clause 4.3(h) above, control the legal proceedings, including settlement, of any legal action involving multiple hotels managed by Manager or its Affiliates (including without limitation any Mandatory Guest Fee Proceedings) or involving the business practices, reputation or goodwill of Manager or its Affiliates or the Brand applicable to multiple hotels, and, notwithstanding any limits set forth in clause 4.3(h) to the contrary, allocate the costs of defense, settlement, and liability to the Hotel in its reasonable and equitable discretion according to the relative legal risk faced by the Hotel;

(j)     collect on behalf of Owner and account for and remit to governmental authorities all taxes and assessments collectible by the Hotel directly from patrons or guests, or as part of the sales price of any goods, services or displays, including gross receipts, admissions or similar or equivalent taxes, duties, levies or charges;

(k)     collect all charges, rent and other amounts due from guests, lessees, concessionaires and other debtors of the Hotel; and

(l)     perform such other tasks as are customary and usual in the operation of a hotel of the class and standing of the Hotel.

Notwithstanding the foregoing grant of authority given to Manager under this clause 4 or any other provision of this Agreement, Manager shall not take any of the following actions without Owner's written approval, including, without limitation:  (i) acquire on behalf of Owner any land or any interest therein; (ii) sell, lease or otherwise transfer or convey any interest in the Hotel, except in the ordinary course of business in the operation of the Hotel pursuant to this Agreement (including without limitation sales of FF&E and dispositions of Operating Supplies and Operating Equipment each in the ordinary course of business); or (iii) enter into any financing arrangements or other arrangements encumbering the Hotel in any form or fashion other than equipment finance leases in the ordinary course of business.

4.4     **Operating Accounts**.  Manager will establish and maintain bank accounts in the name of Owner at a banking institution or institutions selected by Manager (collectively, the "**Operating Accounts**").  Manager will deposit in the applicable Operating Accounts all monies provided by Owner as Working Capital under clause 9.2 and all monies received from the operation of the Hotel, and will disburse the same for the purposes set forth in this Agreement.  Manager may

27

maintain such funds as it reasonably deems proper in house banks or in petty cash funds at the Hotel.  Manager's designees will be the only persons authorized to draw from the Hotel Accounts, and Manager may make deposits in all Operating Accounts, in accordance with the terms of this Agreement and Manager's standard accounting policies and practices.  Unless due to Manager's Grossly Negligent or Willful Acts, any loss suffered in the Operating Accounts, or in any investment of funds into any such account, will be borne by Owner, and Manager will have no liability or responsibility therefor.

4.5 **FF&E Account**.  From the revenues from the operation of the Hotel, or with funds provided by Owner under clause 9.2 or otherwise, Manager will establish and maintain the FF&E Account. Concurrently with the delivery of the monthly reports required under clause 9.6.1, Manager will deposit the FF&E Reserve Amount into the FF&E Account, it being acknowledged and agreed that the FF&E Reserve Amounts are minimum and do not represent the amounts which may be necessary to operate and maintain the FF&E according to the Brand Standards, and the Capital Budgets may call for expenditures in excess of the amounts being reserved in the FF&E Account. Any insufficiency of funds in the FF&E Account will not limit Owner's obligation to provide funds to replace or add FF&E required to maintain the Hotel in accordance with Brand Standards. Manager will maintain the FF&E Account in an interest-bearing account.  Interest earned on the FF&E Account will be added to the FF&E Account, but will not be credited against amounts required to be added thereto.  Any amounts remaining in the FF&E Account at the end of each Operating Year will be carried forward until fully expended, but will not be credited against required contributions to the FF&E Account for any subsequent Operating Year.

4.6 **Payment of Operating and Other Expenses**.  Manager is authorized to pay all expenses incurred in connection with the operation of the Hotel from the Hotel Accounts (or, if appropriate, from house banks or petty cash funds available at the Hotel), in such order of priority determined by Manager in its sole discretion.  Manager may also pay, from the Hotel Accounts, any unpaid or unreimbursed costs, expenses or compensation due and owing in connection with the Re-Launch Activities or the Technical Services.

4.7 **Mandatory Guest Fees**.  Before Manager assesses any Mandatory Guest Fees at the Hotel, Owner must execute an acknowledgment, in the form requested by Manager, authorizing and directing Manager to charge such Mandatory Guest Fees, in accordance with the Brand Standards. Notwithstanding any contrary provision of this Agreement including clause 22.14, Owner will reimburse Manager for and fully Indemnify Manager from any and all Claims asserted against or incurred by Manager or its Affiliates as a result of any Mandatory Guest Fee Proceedings.

4.8 **Employees and General Manager**

4.8.1 *Employees and Employment Costs.*  Manager or its Affiliate will be the employer, and will have sole discretion and authority over the hiring, firing, promotion, supervision, training and compensation, of the Hotel Personnel; provided, however, all Employment Costs of Hotel Personnel will be the responsibility of Owner.   Manager is the sole controller with respect to the

processing of personal data of Hotel Personnel in connection with these activities.  Manager is permitted to draw on the Operating Accounts in connection with the payment of Employment Costs to the Hotel Personnel.  To the extent there are insufficient available funds in the Operating Accounts, Owner will immediately reimburse Manager for the amount of such payments.

4.8.2    *Appointment of the Key Personnel.*  Manager will obtain Owner's prior written approval to the appointment of the permanent Key Personnel.  Manager will propose up to 3 qualified candidates with relevant experience for each Key Personnel position and Owner may meet with such candidates as it wishes until Owner makes a decision.  Owner's rejection of any candidate must be reasonable and Owner will provide Manager with written details of its reasons for rejection.  If Owner rejects all 3 candidates, then Manager may appoint a 4th qualified candidate with relevant experience as the permanent Key Personnel position in Manager's reasonable discretion.  Manager and Owner will meet to discuss their views regarding any candidates upon the other's reasonable request.  Manager may appoint any person that it reasonably considers appropriately qualified (with relevant experience) to serve as such Key Personnel position on an interim basis pending the appointment of a permanent person to such Key Personnel position, and Manager will endeavor to appoint a permanent person within ninety (90) days.  In the event that (i) Owner has paid for relocation expenses associated with the hiring of a Key Personnel in place at the Hotel and (ii) Manager elects to transfer such Key Personnel to another hotel operated by Manager or its Affiliates within two years of the Key Personnel's hiring date, then Manager shall reimburse 100% of such Key Personnel's relocation costs allocated to the Hotel in connection with such Key Personnel's hire; provided, however, that Manager will not be responsible for such costs in the event such transfer is implemented at the request of the Key Personnel or Owner.

4.8.3    *Labor Relations*.  Manager will have the exclusive authority to negotiate with any labor unions representing the Hotel Personnel, and will so negotiate for the best interests of Owner.  Any collective bargaining agreement or labor contract will be executed by Manager or its Affiliate as the employer.  With respect to labor negotiations not involving multi-employer bargaining arrangements applicable to the Hotel and other hotel properties not owned or operated by Manager, Manager will consult with Owner in advance of, and, to the extent practicable, during the course of, negotiations with any labor union. At Manager's request, Owner will execute, and will cause its immediate successor and any successor operator to execute, an owner's letter, assumption agreement and/or other agreements sufficient to, in Manager's reasonably judgment, cause Manager to be in full compliance with its successorship-related obligations under labor agreements applicable to Hotel Personnel.

4.8.4    *Manager Personnel*.  Manager may temporarily assign its (or its Affiliates') employees from other hotels or from its corporate offices to act as general manager, director of sales, director of finance, or other managerial positions of the Hotel.  Subject to the provisions relating to the Budget, Manager will allocate the Employment Costs of such personnel to the Hotel in proportion to the time and services rendered to the Hotel by the personnel.

4.8.5    *Employment Costs and Reimbursement*.  Owner will reimburse Manager for the Employment Costs paid by Manager or its Affiliates in connection with the Hotel Personnel, including without limitation, (i) Employment Costs of Hotel Personnel during the pre-opening period, (ii) the Employment Costs payable to all employees of Manager and its Affiliates while working on an assignment for the specific benefit of the Hotel, Owner or its Affiliates; and (iii) the reasonable business, travel and entertainment expenses of all employees of Manager and its Affiliates incurred in performing Manager's duties hereunder in connection with the operation of the Hotel in accordance with the Standard Practices and the policies of Manager then in effect.  To the extent that any Employment Costs or other expense payable by Owner or reimbursable to Manager or its Affiliates is not incurred solely for the benefit of the Hotel, Manager will allocate such amount or expense accordingly.

4.8.6    *Benefits Plans*.

(a)    Manager will have the right to provide eligible Hotel Personnel who are not covered by collective bargaining or similar arrangements with benefits of:  (i) incentive plans; (ii) pension, profit sharing or other employee retirement plans; and (iii) disability, health, welfare or other benefit plans now or hereafter applicable to employees of Other Managed Hotels.  Manager will charge the Hotel with the Hotel's pro rata share of the costs and expenses of such plans allocated to the Hotel on the same basis as allocated to participating Other Managed Hotels.

(b)    Manager may (but will not be required to) provide benefits and allow participation in such plans on whatever modified basis as it may determine appropriate under the circumstances, and may waive any waiting period or any preconditions to coverage or participation otherwise applicable to such employees.  No statement, promise, representation or warranty regarding the terms of such plans or the participation or coverage of employees will be enforceable, binding or effective in any way unless made in writing and signed by an authorized representative of Manager.

4.8.7    *Non-Solicitation*.  Owner, its Affiliates, and Owner's representatives, and their respective successors and assigns shall not solicit the employment of the general manager, the director of sales, the director of finance or other managerial positions of the Hotel at any time during the Term or within 12 Calendar Months following termination or expiration of this Agreement without Manager's prior written approval; provided, however, that in the event this Agreement is terminated due to a default of Manager (as finally determined in accordance with clause 19), then such restriction shall not apply.

4.9    **No Partnership**. This Agreement does not constitute or create a partnership or joint venture between Owner and Manager.

4.10    **Third Party Areas**. Manager will operate all parts of the Hotel under the Brand unless the Parties mutually agree (in their sole discretion) that any part of the Hotel (for example, a restaurant, bar,

spa or gift shop, if any) will be operated by a third party under a lease, operating or similar agreement between Owner and the third party with employees who are not Hotel Personnel, in which case Hotel Personnel shall not provide services to such area and Manager's obligations under this Agreement shall not apply to such area. The identity of such third party, the concept, and name of the area and the terms of any agreement with such third party, and changes to any of the foregoing, shall be subject to the approval of Owner and Manager. The Parties may mutually agree (in their sole discretion) to designate certain of such areas as "**Third Party Areas**", and hereby agree to designate the leased outlets currently known as "The Grill on the Alley," "Bijan Wine Bar," and "Pagoda Restaurant & Lounge" as Third Party Areas; it being further acknowledged and agreed, however, that any change to the identity of such third party, the concept, or the name of any such Third Party Areas and the terms of any agreement with such third party, shall be subject to the prior approval of Manager. Owner does not have the right to designate any additional areas of the Hotel as Third Party Areas without Manager's consent, which consent may be withheld in Manager's sole discretion and which may only be effected in a formal amendment to this Agreement. The revenues and expenses attributable to any Third Party Area shall be excluded from the calculation of Management Fees, Services Charges, and whether a right to terminate exists under ARTICLE 15.

**5.    MANAGER FEES, CHARGES AND TAXES**

5.1    **Fees and Charges**.

5.1.1    *Management Fees.*  During the Operating Term, Owner will pay and Manager will charge and retain the Base Fee and the Incentive Fee. The aggregate of the Base Fee and the Incentive Fee shall not exceed five percent (5.0%) of Total Operating Revenue during any Operating Year.

5.1.2    *Technical Services Fee.*  Owner will pay Manager the Technical Services Fee to the bank account designated by Manager within 5 days following the Execution Date.

5.1.3    *Services Charges.*  During the Operating Term, Owner will pay and Manager (or its Affiliates) will charge and retain the Services Charges. The costs and expenses related to the provision of Services to Brand name hotels will be charged on a fair and equitable basis considering the factors that Manager or its Affiliate deems most relevant, including the nature of the Services provided, the benefit received, competitive forces and the marginal cost of providing the Services to different classes of hotels (recognizing that one or more of such hotels may have unique characteristics or circumstances justifying a different basis). The Services Charges may include amounts reasonably calculated to cover the overhead and other costs incurred by Manager or its Affiliate, including: (i) recovery of development costs and promotion costs for such Services; (ii) costs of equipment employed in providing the Services; (iii) costs of operating, maintaining and upgrading the Services; (iv) the costs for the installation and maintenance of any equipment and technology systems at the Hotel used in connection with the Services; and (v) compensation and employee benefits of Corporate Personnel involved in providing the Services. Manager represents and warrants to Owner that Services Charges do not include a profit component (i.e.,

31

a mark-up in addition to the cost of the items provided as part of the Services).  Manager and its Affiliates may, from time to time, collect ancillary revenues related to the Services from parties other than Owner or owners of other Brand hotels, but payment of such ancillary revenues does not constitute payment of Services Charges.  Owner acknowledges that, from time to time, there might be a current surplus or current deficit of funds for any one or more Services and that any retention of funds for use at a later date (including interest earned thereon) will not constitute a profit.  Manager will provide to Owner, at least annually and in reasonable detail, a calculation of Shared Hotel Services Charges.  With respect to new Shared Hotel Services not in effect as of the Opening Date, Manager will not charge Services Charges for new Shared Hotel Services that replace services that were provided without charge in the ordinary course of business by Corporate Personnel as of the Opening Date; provided, that Manager may charge Services Charges for new or modified Shared Hotel Services that (a) replace services that were previously provided to the Hotel through Hotel Personnel; and/or (b) are not provided as of the Opening Date at the Hotel.

5.2     **Payment of Fees and Charges**.  Manager will withdraw and pay the Management Fees and the Services Charges from the Operating Accounts each month concurrently with the delivery of the monthly report under clause 9.6.1. Manager may deposit the Management Fees and the Services Charges in any bank account designated by Manager.  If on the payment date the year-to-date aggregate Management Fees and the Services Charges due to Manager are less than the aggregate amounts already withdrawn by Manager during that Operating Year, Manager may either (i) deposit the difference in the Operating Accounts within 30 days, or (ii) deduct the difference from the next monthly installment of the Management Fees or payment of the Services Charges.

5.3     **Taxes**.  All amounts will be paid to Manager in United States dollars, in immediately available funds, without reduction for any withholding tax, value-added tax and any other assessment, tax, duty, levy or charge required under the applicable Laws of any applicable jurisdiction.  If any gross receipts, sales, use, excise or similar tax that is based upon gross income or revenues is imposed upon Manager or any of its Affiliates for the receipt of any payments under this clause 5, then Owner will also pay Manager an amount equal to such tax.  If any gross receipts, sales, use, excise or similar tax that is based upon gross income or revenues is imposed upon the payment made pursuant to this clause 5, the amount due will be such that the net amount retained by Manager (or its Affiliate), after payment of such tax, equals the amount payable to Manager (or its Affiliate) under clause 5 as if no gross receipts, sales, use, excise or similar tax had been imposed upon Manager (or its Affiliate) for the receipts of any payments under this clause 5.

5.3.1   **Interest**.  To the extent that there are insufficient available funds in the Operating Accounts for Manager to pay itself the amounts due it under this clause 5, all unpaid amounts will bear interest at an annual rate of interest equal to the lesser of:  (a) the prevailing lending rate of Manager's principal bank for working capital loans to Manager plus 3%; and (b) the maximum amount permitted by applicable law.  Interest will accrue from the later of the date payment was first due

and the date on which Owner is required to deposit additional working funds into the Operating Accounts pursuant to clause 9.2 until either:  (i) there are sufficient funds in the Operating Accounts for Manager to pay itself the entire outstanding amount; or (ii) Owner otherwise pays Manager the entire outstanding amount.

5.4    **Reimbursement to Manager**.

5.4.1    Owner will pay or reimburse Manager for all expenditures which are authorized, permitted or required under the provisions of this Agreement which have been paid or funded by Manager on Owner's behalf, and all taxes and assessments levied against Manager on such reimbursed amounts.

**6.    SERVICES AND CENTRALIZED PURCHASING**

6.1    **Services**. Manager (or its Affiliates) will provide the Services.  Owner acknowledges that the Services are an integral part of Manager's marketing and operation of hotels and resorts under the Brand, and Manager requires the flexibility to modify the Services to respond to market trends, competitive conditions, customer demands, economic conditions, technological advances and other factors affecting the marketing and operation of hotels under the Brand (including the costs associated with maintaining and upgrading such Services), as they may change from time to time.  Accordingly, Owner agrees that Manager will have the right to:  (a) modify the structure, scope, delivery, fees, costs and terms of any Services; (b) add new, or discontinue existing Services; or (c) make mandatory Services optional, or make optional Services mandatory, as Manager deems advisable from time to time, each such change to be implemented upon no less than sixty days' notice to Owner.

6.2    **Centralized Purchasing**.  Manager will furnish centralized purchasing programs for goods, supplies, equipment and services for the Hotel, including Operating Supplies, Operating Equipment, insurance and long distance telephone services, to the same extent furnished to Other Managed Hotels.  Owner authorizes Manager to mark up its costs, and receive and retain remuneration and other benefits from vendors and service providers based on such purchases, provided that:  (a) the total cost of goods and services (including any mark up, fees and other remuneration) is generally on terms no less favorable to Owner than that which would be available through unrelated third party vendors in an arms-length transaction; and (b) Manager will, on an annual basis, remit to the Operating Accounts the proportionate share of the pre-tax profits earned by Manager and its Affiliates through such purchases by hotels participating in the purchasing programs, after deducting all operating expenses and capital costs attributable to providing such services.  For purposes of calculating Owner's proportionate share of such pre-tax profits, Manager will use a methodology that reasonably approximates the proportionate share of purchases made by the Hotel in relation to the total purchases made by all hotels participating in Manager's purchasing services.

**7.    BRAND STANDARDS**

33

7.1    **Compliance**.  Owner will ensure (and will provide all necessary funds to ensure) that the Hotel at all times is in compliance with the Brand Standards in accordance with and subject to the terms of this Agreement.

7.2    **Changes**.

7.2.1    *Notice.*  Following the start of the Operating Term, any change to the Brand Standards that would require Owner to incur any Capital Expenditures will be included in the Capital Budget, except that Manager may give Owner notice at any time of a requirement to comply with Critical Brand Standard Changes even if not included in the Capital Budget.

7.2.2    *Exceptions.*  Owner will not be required to implement a change to the Brand Standards that comes into effect after the Opening Date if the change would result in a material cost to Owner and would require:

(a)    an increase in the gross square footage of the Hotel;

(b)    a material change to the load bearing structure of the Hotel; or

(c)    a material change in standard guest room size or configuration.

The above exceptions do not apply to Brand Standard changes concerning fire, health, life or safety and/or security standards or compliance with Laws.

7.3    **No Singling Out**.  Manager will not make a change to the Brand Standards with the intent that it would apply solely to the Hotel and to no other Brand hotels but it is acknowledged that Brand Standards need not apply to all Brand hotels.

7.4    **Access**.  Owner acknowledges that it has seen or had access to the Brand Standards existing on or about the Execution Date.

8.    **REPAIRS, MAINTENANCE AND CAPITAL EXPENDITURES**

8.1    **Ordinary Repairs and Maintenance**.  Manager will carry out ordinary repairs and maintenance to keep the Hotel in good repair and condition (fair wear and tear excepted), including routine maintenance and servicing of the Building Systems.  The associated costs and expenses will be Operating Expenses.

8.2    **Works Requiring FF&E Expenditures**.  If provided in the Capital Budget (including any contingency line items), or otherwise permitted under clause 9.4.9, Manager may from time to time make FF&E Expenditures using the funds in the FF&E Account or otherwise provided by Owner to replace or add FF&E.

8.3    **Works Requiring Major Capital Expenditures**.

34

8.3.1   *Responsibility.*  Owner will, subject to the other clauses of this clause 8.3, carry out all alterations, additions or improvements to the Hotel requiring Major Capital Expenditures contemplated in the Capital Budget or that are otherwise required by Laws, required by insurers, are Emergency Requirement Expenditures or are Critical Brand Standards Changes.  Major Capital Expenditures will be undertaken by Manager only at the request of Owner or pursuant to clause 8.3.8 below, and thereafter, Manager is authorized to make such Major Capital Expenditures on Owner's behalf at Owner's expense.

8.3.2   *Coordination with Hotel Operations.*  Owner will perform the works pursuant to this clause 8.3 at times and in a manner approved by Manager and designed to minimize disruption to Hotel operations.  Manager will cooperate with Owner and allow Owner, and its employees and contractors, necessary access to the Hotel.

8.3.3   *Conditions and Procedure.*  In carrying out works pursuant to this clause 8.3, Owner will obtain all required Approvals and comply with all Laws. Owner will also retain a Professional Team appropriate to the work being carried out, subject to Manager's prior written approval.  Owner will keep Manager informed of the progress of the works.  Owner will provide copies of all Approvals, rejections, conditions, and other relevant information within 30 days of Manager's reasonable request.

8.3.4   *Plans.*   Owner will obtain Manager's prior written approval for all Plans before they are implemented. Within 90 days after the completion of the works, Owner will provide Manager with a complete and accurate set of the Plans as executed.

8.3.5   *Responding to Requests for Approval.*  Manager will respond to each written request for approval under this clause 8.3 as soon as reasonably possible and in any event within 30 days of receipt of each request.

8.3.6   *Manager Review.*  Manager's review or approval under this clause will not relieve Owner of its obligations under this Agreement or render Manager liable for the design of the works or any delay or cost overrun in their completion.

8.3.7   *Manager Oversight*. If Manager has the requisite expertise and Manager performs supervisory services to be agreed between Manager and Owner with respect to carrying out the works under this clause 8.3, then Manager will be paid a supervisory fee in connection therewith to be agreed between Owner and Manager.

8.3.8   *Manager Right to Perform*.  Notwithstanding the foregoing, if Owner does not carry out the works under this clause 8.3, then Manager may, but will not be required to, carry out such works and make such Major Capital Expenditures on Owner's behalf at Owner's expense.  Notwithstanding the above, except for Emergency Requirement Expenditures, prior to Manager performing or undertaking any Major Capital Expenditures as provided for pursuant to this clause 8.3.8, (i) Manager shall provide prior written notice to Owner and Owner shall have ten (10) days to

35

respond to any notice, and (ii) Manager will not perform any such works under this clause **Error! Reference source not found.** as to which there is a bona fide dispute that has been submitted for determination to an Expert or to arbitration in accordance with this Agreement.

**9.    HOTEL FINANCES AND OWNER DISTRIBUTIONS**

9.1    **Books and Records**.

9.1.1    *Maintenance.*  Manager will maintain the Hotel books and records in all material respects in accordance with its Standard Practices, its records management and retention policies, and the Uniform System, on an accrual basis in accordance with GAAP.  To the extent that the Uniform System is inconsistent with a specific term of this Agreement, this Agreement will prevail.  Owner will make available to Manager, or its representatives, all books and records, including contract documents, invoices and all other construction records pertaining to the PIP Works and any Major Capital Expenditures.

9.1.2    *Owner Inspection and Review.*  The books and records of the Hotel (including books of account, front office records and guest information) shall be kept at the Hotel or, if Manager maintains a centralized computer system serving the Hotel, at the location of such centralized computer system. Owner and its authorized representatives may examine or inspect the Hotel, examine or take extracts from the books and records of the Hotel, or enter for any other purpose that Owner deems reasonably necessary, during normal business hours.  Owner will give Manager reasonable prior notice and cooperate with Manager to minimize any disturbance to Hotel operations. Associated costs are not Operating Expenses. Owner and its representatives are not entitled to any permanent offices or space in the Hotel and they will not interfere with the operations of the Hotel**.**

9.1.3    *Manager Inspection and Review*. For six years after this Agreement expires or terminates, Manager and its authorized representatives may examine or take extracts from the books and records of the Hotel applicable to the Term, and will have reasonable access to the Hotel and the Hotel staff for such purposes.   This clause survives the expiration or termination of this Agreement.

9.1.4    *Hotel Guest Data.*  In addition to the Hotel books and records, Manager will maintain any guest profiles, contact information, histories and other information obtained by Manager from guests relating specifically to such guests' stay at the Hotel (the "**Hotel Guest Data**").  During and after the Operating Term, Manager will retain, use and otherwise process the Hotel Guest Data in accordance with its publicly posted privacy policy, as amended from time to time.  Owner will not be permitted to use the Hotel Guest Data during the Operating Term.  Upon the expiration or earlier termination of this Agreement, Manager will generate and provide to Owner a set of hotel termination reports that will, among other things, facilitate Owner's ability to honor all business confirmed for the Hotel with reservations dates after the Termination Date, with such data to be provided in an electronic form as may be reasonably requested by Owner.  During and after the

36

Operating Term, Owner will (a) comply with all Laws applicable to Hotel Guest Data, (b) comply with Manager's or its Affiliates' privacy policy applicable to Hotel Guest Data, (c) provide at least the same level of privacy protection as is required by the relevant US-EU Privacy Shield, located at https://www.commerce.gov/page/eu-us-privacy-shield, as they may be amended from time to time or superseded by new laws, rules, regulations or orders, with respect to Hotel Guest Data originating from the European Union or any other jurisdiction abiding by such requirements that Owner receives from Manager, and (d) refrain from any action or inaction that could cause Manager to breach any Law or the privacy policy of Manager or its Affiliates with respect to the Hotel Guest Data.  The foregoing obligations of Owner and Manager which are imposed both during and after the Term will survive the termination of this Agreement.

9.2     **Working Capital**.

9.2.1   *Funding Requirement*. Owner will provide sufficient Working Capital.  If at any time during the Operating Term Manager determines that the amount of Working Capital in the Operating Accounts is or will be insufficient, then (i) Manager will notify Owner in writing of the additional funds necessary together with an explanation in reasonable detail, and (ii) Owner will provide the requested funds within 10 days after the request.

9.2.2   *Failure to Fund*.  Manager will be excused from performance of any obligation under this Agreement and from any Claims to the extent prevented by Owner's failure to provide the Working Capital.  If Owner does not timely deposit the requested Working Capital, Manager may withdraw such funds from the FF&E Account for replenishment of the Operating Accounts.  In such event, Manager will notify Owner and Owner will immediately replenish the funds withdrawn from the FF&E Account.

9.2.3   *Manager Advance*.  In addition, Manager may (but is not obliged to) use or pledge its credit or advance its own funds to make ordinary and customary purchases of goods and payments for services for the Hotel on Owner's behalf, in which event (i) Owner will pay for such purchases when payment is due and will Indemnify Manager against all Claims that may be incurred by or asserted against Manager by reason of Owner's failure to pay for such purchases; and (ii) any advances by Manager will be due and payable on demand, together with interest at the rate specified in clause 5.3.1.

9.3     **Owner Distributions**.  Subject to the Working Capital requirements of clause 9.2.1, Manager will distribute excess funds from the Operating Accounts to Owner upon Owner's request but no more frequently than monthly.  Payments of such excess funds will only be made by check or electronic transfer to a bank account in the United States, details of which will be given by Owner to Manager in writing from time to time.

9.4     **Budgets**.

9.4.1    *Submission.*  At least 30 days before the Opening Date and on or before November 1st of each subsequent Operating Year, Manager will deliver to Owner the proposed Budget for the forthcoming Operating Year.

9.4.2    *Review.*  Within 15 days after delivery of the proposed Budget to Owner, Manager will make an appropriate representative available to review and discuss the proposed Budget.

9.4.3    *Objections.*  Subject to clause 9.4.4, Owner will either approve or disapprove each line item in the Budget, acting reasonably and exercising prudent business judgment within 30 days after the date when Manager submitted the proposed Budget to Owner.  Owner's notice must specify its objections and the reasons for each objection.  Any line items not specifically disapproved by Owner will be deemed approved.

9.4.4    *Required Approvals.*  Owner may not object to proposed Budget expenditures:

(a)    required by the Brand Standards;

(b)    concerning fire, health, life or safety/security standards;

(c)    specified by this Agreement, including the Management Fees and the Services Charges;

(d)    the Employment Costs; or

(e)    required to maintain the Hotel in accordance with all Laws.

provided, however, the foregoing shall not preclude Owner from challenging in good faith the assumption and/or predicate logic underlying a proposed expenditure from one of the foregoing categories (e.g., whether a particular expenditure, or the amount of such expenditure, or the timing of such expenditure, is, for example, actually necessary or an appropriate approach to comply with the Brand Standard or actually necessary or an appropriate approach to address an issue concerning fire, health, life or safety/security).

9.4.5    *Resolving Budget Disputes.* If Owner has provided written objection to the proposed Budget under clause 9.4.3, Owner and Manager will diligently attempt to resolve Owner's objections.  If any objections remain unresolved 14 days after Owner delivers its objections, Owner or Manager may submit the dispute for resolution by an Expert.

9.4.6    *Interim Budget Pending Resolution.* Until any dispute over the proposed Budget is resolved, Manager will operate the Hotel based on:

(a)    the proposed Budget for all categories not in dispute;

(b)    the proposed Budget for those categories that are in dispute where the Budget for the preceding Operating Year did not include any corresponding amount; and

38

(c)     the amount actually spent in the preceding Operating Year for all other categories in dispute, as adjusted by any corresponding increase in the Index over the previous Operating Year (except for the 1st Operating Year which will use the amount in the proposed Budget).

Notwithstanding the foregoing, pending the resolution of any dispute regarding any portion of the Capital Budget, Manager may not make any expenditures for disputed Capital Expenditures other than for ongoing Capital Expenditures from the prior Operating Year.

9.4.7   *Operating and Capital Budgets.*  The "**Capital Budget**" consists of all Capital Expenditures proposed for the following Operating Year (including Capital Expenditures required to maintain the Hotel in accordance with the Brand Standards and any general capital contingency reserve). The "**Operating Budget**" consists of a forecast of estimated monthly and annual profit and loss, cash flow, and departmental revenue and expenses for the following Operating Year.

9.4.8   *Adherence to the Operating Budget.*  Manager will use commercially reasonable efforts not to exceed the Operating Budget.  Owner acknowledges, however, that the Operating Budget is a forecast based on assumptions made at the time of preparation.  Accordingly, the Operating Budget will be automatically adjusted to incorporate the following:

(a)     variable costs resulting from actual or anticipated variances in occupancy, revenue, volume of business and/or use;

(b)     costs which are beyond Manager's reasonable control, including utility rates and charges, insurance premiums, license and permit fees, and changes in suppliers' prices, terms and conditions;

(c)     Emergency Requirement Expenditures;

(d)     expenditures required to comply with Laws or insurance requirements; and

(e)     expenditures authorized either by this Agreement (including expenditures required to comply with the Brand Standards) or in writing by Owner.

9.4.9   *Adherence to Capital Budget.*  Except as provided below, Manager may not exceed the Capital Budget for Capital Expenditures. Manager may reallocate expenditures between line items in the Capital Budget so long as (i) the reallocation does not increase any line item by more than ten percent (10%), and (ii) the total authorized expenditures are not exceeded. If Manager wishes to incur capital expenses for Capital Expenditures beyond those authorized in the Capital Budget, Manager will notify Owner in writing, providing the reasons for the increase.  Owner will either approve or disapprove the increase within 20 days or the increase will be deemed approved. If Owner disapproves the increase, it will concurrently provide a reasonably detailed explanation. If the increase is an Emergency Requirement Expenditure, Manager may incur the expense without obtaining Owner's advance approval using the funds in the Hotel Accounts, but will notify

39

Owner of the Capital Expenditure as soon as reasonably possible afterwards. The approval of Owner will not be required for any increases necessary to comply with Critical Brand Standard Changes.

9.5    **Budgets and Projections**.  Owner acknowledges that Budgets, projections, forecasts, and other predictions of future events provided by Manager are not a guarantee or warranty regarding the financial performance of the Hotel and are for information purposes only.  Manager does not warrant, represent, undertake or guarantee the accuracy or completeness of such information (including that the Hotel can or will achieve the results shown).  If the financial performance of the Hotel is less than the Budget for any Operating Year, this will not constitute a default of Manager under this Agreement.  Owner further acknowledges that any Budget, projections or similar information is based on assumptions and estimates that may not turn out to be accurate, that the actual results achieved by the Hotel may vary, and that those variations may be material.

9.6    **Reports and Meetings**.

9.6.1    *Monthly Reports.*  Manager will deliver the Monthly Financial Statement to Owner within 20 days of the end of each month.

9.6.2    *Annual Reports.*

(a)    *Preparation of Statements and Selection of Auditors.*  Manager will prepare the Annual Financial Statement.  If Owner requests, Manager will submit the Annual Financial Statement to the Auditors.  Owner's appointment of the Auditors will be subject to Manager's approval unless the Auditors are a large international firm of accountants with experience serving clients in the hospitality industry and familiar with the Uniform System.  The Auditors will audit and deliver the Annual Financial Statement to Owner and Manager within 60 days after the end of the applicable Operating Year.  Fees of the Auditors will be an Operating Expense.

(b)    *Finalization.*  If the Annual Financial Statement has been submitted to the Auditors at Owner's request, then it will be deemed correct and conclusive unless either Owner or Manager objects to the other in writing within 90 days of receipt from the Auditors. Owner and Manager will endeavor to resolve any objection raised within the following 60 days.  If the Annual Financial Statement has not been submitted to the Auditors, then it will be deemed correct and conclusive unless Owner objects to Manager in writing within 90 days of receipt from Manager.  Owner and Manager will endeavor to resolve any objection raised within the following 60 days.

9.6.3    *Meetings.*  Upon Owner's request and no more than once each month, the General Manager (or nominated deputy to the extent the General Manager is unavailable) will meet with Owner's representative at the Hotel (or via virtual conference) during the Operating Term at a mutually convenient time (i) on a weekly basis to discuss sales pace and revenue management; and (ii)

40

monthly to discuss and review the Monthly Financial Statement, the Hotel's operating results, the forecasted results for the next period, actual and anticipated material adverse deviations from the Budget and the reasons for these, sales pace and revenue management and any other material concerns of the Owner concerning the operations that may arise. During the meetings, the General Manager (or nominated deputy) will discuss and review with Owner the actions underway to reduce the effects of the deviations.

**10.    INSURANCE AND INDEMNITIES**

10.1    **Required Insurance.**

10.1.1   *Required Coverage.*  Owner will obtain and maintain insurance in accordance with the terms of the Brand Standards (the "**Brand Insurance Requirements**").  In addition to the Brand Insurance Requirements, Owner will also be bound by the terms contained in this clause 10, which will supersede anything to the contrary contained in the Brand Insurance Requirements.

10.1.2   *Specific Requirements*.  Without limiting the generality of the foregoing:

(a)      the general liability and auto liability limits will be no less than US$100,000,000; and

(b)      Owner must participate in Manager's workers compensation and employer's liability, crime, and employment practices liability insurance coverage.

10.1.3   *Optional Manager Insurance Program Participation*.  Owner may request Manager, at the expense of Owner, to participate in Manager's optional insurance programs that Manager offers, provides or manages for any coverage required in the Brand Standards (e.g., property, business interruption, boiler and machinery, terrorism, general liability, auto liability, and storage tank liability) from time to time.  If Owner so requests, the following will apply:

(a)      Manager will not be obligated to purchase insurance programs on behalf of Owner that meet Owner's insurance requirements under this Agreement.

(b)      Upon termination or assignment of this Agreement, insurance coverage under any and all Manager-purchased insurance programs will terminate with respect to Owner and Owner's property and Owner's insurance risks in the same manner as if the insurance had expired on the date of such termination, assignment or breach.

(c)      Participation in an optional Manager-purchased insurance program will require a commitment of at least three annual policy periods by Owner subject always to the terms of paragraphs (a) and (b) above.  However, if Owner obtains financing under the terms of which a lender requires insurance of a type or quality which a Manager-purchased insurance program does not satisfy in whole or part, then Owner will be relieved from its three year commitment hereunder.

(d)  Manager-purchased insurance programs, if any, maintained by Manager under this clause 10.1.3 may, at Manager's option, be effected under policies of blanket insurance which also cover Other Managed Hotels.  Manager will have the right to charge the Hotel a share of the total cost paid by Manager, such share to be allocated to the Hotel using the same methodology or formula as used to allocate to participating Other Managed Hotels.  The "total cost" will include all costs associated with the procurement and maintenance of that insurance program, including premiums, taxes, assessments, agent/broker fees, agent/broker commissions, claims within deductibles, administrative costs of risk management and claims personnel of Manager, actuarial fees, collateral costs, and claims administration fees.

(e)  Owner will be responsible for any deductible or retention expense under Manager-purchased insurance programs.  If such a deductible or retention expense is incurred, Manager may either invoice Owner with the payment to be made directly by Owner or Manager may initially pay the expense on behalf of Owner and then charge the cost back to Owner either directly or through the allocation of costs as provided in paragraph (d) above.

(f)  Manager-purchased insurance programs, if any, maintained by Manager under this clause 10.1.3 may use elements of self-insurance or self-assumption including the use of captives or other forms of alternative risk financing.

10.1.4  *Liability for Claims.*  The insurance requirements contained herein will not be construed in any manner to replace, relieve or limit Owner's indemnity obligations for any loss or Claims arising out of this Agreement or otherwise.

10.1.5  *Ability of Manager to 'Force Place' Insurance.*  If Owner does not obtain and continuously maintain in force the insurance and policy limits set forth in clauses 10.1.1 and 10.1.2, Manager may (but is not obligated to) obtain and maintain such insurance for Owner.  Owner will reimburse Manager for premiums and other costs incurred by Manager in force placing such insurance.

10.1.6  *Changes to Insurance.* Manager will have the right to raise the minimum amount of insurance to be maintained with respect to the Hotel to make such insurance comparable to the amount of insurance carried with respect to Other Managed Hotels, taking into account the size and location of the Hotel.  In addition, neither Party will unreasonably withhold its consent to a written request by the other Party, supported by relevant evidence, that such minimum limits of insurance be lowered on the basis that such insurance cannot be obtained in such amounts, or can be obtained only at a prohibitive cost.

10.1.7  *Additional Insureds and Waiver of Subrogation.* All insurances obtained by either Owner or Manager must name the other, and the Manager's Affiliates required by the Brand Standards, as "additional insureds" and include both cross-liability and severability of interest clauses and a

permission for a waiver of the insured's rights of subrogation in favor of the other and Manager's Affiliates required by the Brand Standards.

10.1.8  *Certificates*. Owner and Manager will provide each other with satisfactory evidence of all insurance procured and maintained, either at the request of the other or within a reasonable time after the insurance is procured, renewed, or amended.  Owner and Manager will also promptly notify the other of any notice of cancellation of coverage received.

10.1.9  *Business Interruption Insurance*. Business interruption and/or contingent business interruption coverage will include the fair value of Manager's expected compensation under this Agreement and other fees ordinarily paid to Manager by Owner.  Business interruption proceeds will be allocated between Owner and Manager in proportion to the net income to Owner and fees to Manager that would have been earned during the period to which the proceeds relate.

10.2    **Indemnities**.

10.2.1  *Owner Indemnity to Manager.*  Except as provided in clause 10.2.2 and notwithstanding any contrary provision of this Agreement including clause 22.14, Owner will fully Indemnify Manager for, from and against any and all Claims that Manager may have alleged against it, incur, become responsible for or pay out for any reason related to or connected with the design, construction, development, operation, or ownership of the Hotel, or related to or connected to any breach of Owner's representations, warranties, undertaking and statements in this Agreement.

10.2.2  *Manager Indemnity to Owner.*  Manager will fully Indemnify Owner for, from and against any and all Claims that Owner may have alleged against it, incur, become responsible for or pay out to the extent caused by Manager's Grossly Negligent or Willful Acts.

10.2.3  *Defense, Settlement and Insurance Coverage*.  Owner and Manager acknowledge that their respective Indemnity obligations may create a conflict of interest in the defense of a Claim.  Owner and Manager will cooperate in an effort to defend and, if appropriate, settle any Claim in a manner that minimizes liability to the claimant under the circumstances.  Pending the resolution of any question as to whether Manager or any of its Affiliates or any of its officers or employees are entitled to Indemnity under this clause 10.2 or any other Indemnification provisions of this Agreement, Manager is authorized to pay from the Operating Accounts all expenses of defending or handling any matter referred to in this clause 10.2 or such other provisions of this Agreement. To the extent that it is ultimately determined that such entities or persons are not entitled to Indemnity, Manager will reimburse Owner for all such expenses.  The settlement by either Party in good faith of any Claim will not create any presumption of the validity of the Claim or that the acts or omissions giving rise to the Claim constitute a basis for Indemnity.  Owner and Manager will look first to the appropriate insurance coverages in effect if any claim or liability occurs as a result of personal injury or property damage, regardless of the cause of such claim or liability.

43

10.2.4   *Indemnified Parties*.  Notwithstanding clause 22.9, (i) the Indemnities to Manager contained in clauses 3.4.3, 4.7, 9.2.3, 10.2, 14.3 and any other provision of this Agreement will run to the benefit of Manager and its Related Parties, and (ii) the Indemnities to Owner contained in clause 10.2 and any other provision in this Agreement will run to the benefit of Owner and its Related Parties.

10.2.5   *Survival*.  The provisions of this clause 10.2 will survive the expiration or termination of this Agreement.

10.2.6   *Notice of Indemnity Obligations*.  Any Party seeking Indemnity under this clause 10.2 will notify the other Party promptly after receiving notice of the underlying Claim.  Any omission or delay in providing such notice will relieve the other Party of its Indemnity obligation to the extent that it is materially prejudiced by the omission or delay.  Any Indemnified Party will be entitled to the timely appointment of counsel by the Indemnifying Party for the defense of any Claim and the right to approve such counsel.  If, in the Indemnified Party's judgment, a conflict of interest exists, the Indemnified Party may appoint independent counsel of its choice for its defense at its own expense.  The Indemnified Party has the right to participate in the defense of any Claim and approve any proposed settlement of such Claim.  If the Indemnifying Party fails to timely pay any costs and expenses of such Claim, the Indemnified Party has the right to pay such amounts and be reimbursed for the same, together with Interest thereon until paid in full.  It is not a defense to a demand for Indemnity that less than all Claims asserted against the Indemnified Party are subject to Indemnification.

10.2.7   *Implied Indemnity*.  No Party or other person or entity will be entitled to any form of equitable or implied Indemnification at any time.

## 11.    INTELLECTUAL PROPERTY

11.1   **Hotel Name**. During the Operating Term the Hotel will be known by the Hotel Name.  The Brand (whether used alone or with other words), and all other names, logos or designs owned by Manager or any of its Affiliates and used in the Hotel Name or used in the operation of the Hotel, together with the goodwill appurtenant thereto (collectively, the "**Manager-Owned Hotel Names**"), are the exclusive property of Manager or its Affiliates.  No default of Manager or any provision of this Agreement confers upon Owner, or its successors or assigns, the right to use Manager-Owned Hotel Names for any purpose.

11.2   **Manager's Intellectual Property**.

11.2.1   *Use of Manager's Intellectual Property.*  Manager will use Manager's Intellectual Property in the operation of the Hotel to the extent Manager considers appropriate, and any use by Manager will be strictly on a non-exclusive basis. Owner acknowledges that Manager's Intellectual Property, when used alone or with any other words, is the exclusive property of Manager.  No right or remedy of Owner for any default of Manager, nor delivery of the Hotel to Owner upon the

44

Termination Date, nor any provision of this Agreement gives Owner or any other person any proprietary license or any right to use any of Manager's Intellectual Property.

11.2.2  *Consent for Use by Owner.*  Owner will not (and will ensure that its directors, officers, employees, agents, advisers, representatives, consultants and contractors do not) use Manager's Intellectual Property for any purpose without Manager's prior written consent (to be given, withheld or made subject to conditions in Manager's sole discretion).

11.2.3  *Restricted Actions*.  Owner will not:

(a)     contest the ownership of any of Manager's Intellectual Property including any additions or alterations to it;

(b)     challenge or impair the validity of any registration of Manager's Intellectual Property, including by making or assisting any application to oppose or remove a registration, or by requiring a restriction or disclaimer on any of the Marks anywhere in the world;

(c)     use any other trademark or service mark, domain name, words, logos or symbols similar to or resembling any of the Marks so as to be likely to cause deception or confusion;

(d)     register, apply to register, own or maintain any internet sites relating to the Hotel, any part of the Site or to hotels operated under a brand owned by Manager or any of its Affiliates;

(e)     use the Marks as all or part of its legal name or any trade or assumed name under which Owner does business (other than the Hotel in accordance with the terms of this Agreement);

(f)     apply for, own or maintain the registration of the Marks anywhere in the world;

(g)     do or omit to do anything which could impair the rights of Manager or any of its Affiliates in the Marks or in any registrations or applications relating to any of the Marks;

(h)     superimpose on, associate with or show in such proximity to the Marks, any other letter, word, design, symbol or other matter of any kind so as to alter or dilute the Marks, and Owner will not combine any of the Marks with any other trademark, service mark or logo, nor will it use any of the Marks in association with any of its other businesses or ventures without first obtaining Manager's consent;

(i)     not publish any Hotel advertising materials or implement any Hotel advertising or promotional programs of its own without first obtaining Manager's consent (which may be withheld in Manager's sole discretion); or

(j)     authorize any third party to do any of the acts referred to above.

US_Active\118580889\V-9

11.2.4 *Notice of Potential Infringement.*  During the Term, Owner will promptly notify Manager and provide full details regarding any knowledge Owner has of any potential infringement of, or challenge to, Manager's Intellectual Property or of any claim or proceeding by any third party that comes to Owner's actual attention.  Owner will reasonably cooperate with Manager to assist in taking any action that Manager, in its sole discretion and at its cost, chooses to pursue in this regard.  Manager reserves the sole right and discretion to handle disputes and control actual or threatened litigation with third parties relating to any part of the Marks.

11.2.5 *Injunctive Relief.*  Manager may obtain injunctive or other relief to enforce the provisions of this clause 11.2.

11.2.6 *Goodwill.*  Without the need for any notice, all goodwill arising from any use by Owner of Manager's Intellectual Property, even if developed by Owner, will be for the benefit of and become the property of Manager.  Owner assigns (by way of present assignment of future rights) to Manager or any Affiliates designated by Manager, with full title guarantee, all Intellectual Property rights (if any) Owner has in and to Manager's Intellectual Property created by or on behalf of Owner and the goodwill associated to these rights.  Any use of Manager's Intellectual Property will be on a non-exclusive basis and neither the use nor anything contained in this Agreement confers on Owner or any other person any proprietary license or other rights in the Manager's Intellectual Property.

11.2.7 *Manager's Reserved Rights*.  Manager reserves the sole right and discretion to set standards for and designate approved third party suppliers of products bearing any of the Marks, and receive third party commissions, fees or royalty payments.

11.2.8 *Survival.*  This clause 11.2 will survive the termination or expiration of this Agreement.

**12.    RIGHT TO PERFORM**

12.1    **Right to Perform**.  If Owner fails to make any payment, provide any required funds or perform any act required by this Agreement within the specified time limit and after due notice, Manager may, without waiving any other rights or remedies Manager may have available at Law, perform the act, transfer and pay the amount or withdraw the funds from the Hotel Accounts and Owner will be required to promptly replenish the Hotel Accounts with such amount transferred or withdrawn.

**PART C:  TRANSFERS AND ASSIGNMENTS**

**13.    TRANSFERS/ASSIGNMENTS**

13.1    **Assignment by Manager**.

13.1.1 *Assignment, Transfer or Delegation to an Affiliate.*  Manager may, without Owner's consent, assign any of its rights or transfer, subcontract or delegate any of its obligations under this

46

Agreement or its interest in the Hotel in whole or in part to any of its Affiliates, provided that, without further act or action, Manager will continue to be liable under this Agreement to the same extent as though no assignment, transfer, subcontract or delegation had been made.

13.1.2 *Merger or Reorganization.*  The merger, consolidation, reorganization or purchase by or of Manager or its Affiliates of or by a third party will not constitute an assignment of this Agreement if the Hotel receives the benefits of Manager's organization to the same extent as the majority of other Brand hotels.

13.1.3 *No Other Assignment.*  Except as provided above, Manager may not assign this Agreement without the prior written consent of Owner.

13.2   **Assignment and Borrowings by Owner**.

13.2.1 *Assignment to an Affiliate.*  Subject to clauses 13.2.5, 13.2.6 and 13.2.7, Owner may assign its entire interest in this Agreement, together with a concurrent sale or transfer of its entire interest and ownership of the Hotel and the business conducted therein, to any of its Affiliates, if:

(a)    without further act or action, Owner continues to be liable under this Agreement to the same extent as though no assignment, sale or transfer had been made; and

(b)    Owner obtains Manager's prior written confirmation that the proposed Affiliate and any person having a Material Interest in the proposed Affiliate is not a Prohibited Person or a Sanctioned Person and the transaction would not create an event of default under clause 14.

13.2.2 *Assignment to a Third Party.*  Subject to clauses 13.2.5,  13.2.6 and 13.2.7, Owner may assign its entire interest in this Agreement, together with a concurrent sale or transfer of its entire interest and ownership of the Hotel and the business conducted from the Hotel, to an unrelated third party, if Owner obtains Manager's prior written confirmation that the proposed third party is not a Prohibited Person or a Sanctioned Person and the transaction would not create an event of default under clause 14.

13.2.3 *Acquisition of a Material Interest.*  Subject to clauses 13.2.6 and 13.2.7, a person may acquire a Material Interest in Owner or the Hotel if Owner obtains Manager's prior written confirmation that such acquisition would not be by a Prohibited Person or a Sanctioned Person and would not create an event of default under clause 14. In such an event, Owner shall provide written notice to Manager, including the relevant information about the party to acquire a Material Interest, such as name, entity, address or such other reasonable information so as to allow Manager to run the necessary reports to confirm such party is not a Prohibited Person or a Sanctioned Person. Manager shall provide such approval or disapproval within fifteen (15) business days of receipt by Manager of Owner's written request, and if Manager fails to respond, then Owner shall provide a second written notice to Manager, upon which if Manager shall have ten (10) business days to

47

respond. Such second notice must clearly state the following on the bottom of the first page in bolded 14pt type:

**"THIS IS YOUR SECOND NOTICE.  FAILURE TO RESPOND WILL RESULT IN THE DEEMED APPROVAL OF THE PROPOSED ACQUISITION OF A MATERIAL INTEREST IN THE OWNER OF THE SIGNIA BY HILTON SAN JOSE HOTEL."**

If Manager fails to respond within said ten (10) business day period, then such request shall be deemed approved.

13.2.4  *Other Assignments and Disposals.*  Except to the extent expressly permitted pursuant and subject to the terms and conditions in clauses 13.2.1, 13.2.2, and 13.2.3, Manager's prior written consent is required for Owner to:

(a)      assign any of its rights or transfer, subcontract or delegate any of its obligations under (i) this Agreement or (ii) any lease, concession or other agreement under which Owner's right and interest in the Hotel is derived; or

(b)      sell, convey, transfer, assign or dispose of all or any part of the Hotel.

13.2.5  *Assignment and Assumption Agreement.*  As a condition precedent to any assignment, sale, transfer or other conveyance by Owner of any portion of the Hotel and/or Owner's interest in this Agreement, Owner must ensure that the transferee enters into an assignment and assumption agreement with Manager and all other relevant counterparties to this Agreement, in a form approved by Manager, to observe, perform and be bound by all of Owner's covenants, conditions and obligations under this Agreement from the Execution Date and any subordination and non-disturbance agreement entered into pursuant to this Agreement that will survive the transaction.

In the event the Hotel is sold or otherwise transferred to a transferee that takes title to the Hotel as a lessee under an Affiliate lease or similar arrangement (an "**Affiliate Lease**") with an Affiliate lessor (an "**Affiliate Lessor**"), then such sale or transfer will also be conditioned on the Affiliate Lessor entering into an agreement with Manager that, among other things, requires the Affiliate Lessor to (i) assume all of "Owner's" obligations under this Agreement in the event the Affiliate Lease terminates and (ii) guarantee "Owner's" obligations under this Agreement.   Any rent or similar payment pursuant to an Affiliate Lease will be disregarded for the purpose of calculating Incentive Income.

13.2.6  *Additional Conditions to Transfer.*  Furthermore, Manager may, at its sole option, condition its consent, to the extent that Manager's consent is required hereunder, of any proposed transfer on:  (i) the cure of any existing defaults or events which would become defaults with the giving of notice and passage of time, including the payment in full at the closing of such sale or lease and

48

assignment (the "**Closing**") of all unpaid obligations owed Manager and its Affiliates by Owner and/or Owner's agreement to undertake and complete renovation of all or part of the Hotel; (ii) receipt of evidence from the purchaser or tenant that insurance coverage, as required by ARTICLE 10, is in full force and effect on the Closing date; and (iii) payment of the amount of any estimated fees and charges which will accrue to Manager and its Affiliates through the Closing date, which amounts cannot be calculated in full prior to or at the Closing date (provided, that with respect to a sale of the Hotel, Manager will not unreasonably refuse Owner's request to waive this requirement with respect to fees owed to Manager that are not yet due and payable if the purchaser agrees, in form and substance acceptable to Manager, to expressly assume liability for the payment of the same).

13.2.7  *General Prohibitions*.

(a)     Owner may not issue, convert or otherwise allow any form of direct or indirect equity or other ownership interest in Owner or the Hotel in the form of bearer shares or any other form of ownership for which there is no traceable record of the identity of the direct or indirect legal and beneficial owner of such interest.

(b)     Neither Owner nor any person with a Material Interest in Owner may become a Prohibited Person or a Sanctioned Person as a result of any other event.

13.2.8  *Prohibited Lenders and Guarantors.*  Owner covenants that no Mortgage will be made to or held by: (i) an Affiliate of Owner (unless Manager has consented in writing); (ii) a Sanctioned Person; or (iii) any entity which is not regularly engaged in the business of making commercial loans of the magnitude and type of loan contemplated by Owner.  No guarantor of Owner's obligations under this Agreement may be a Sanctioned Person.

13.2.9  *Information Requests.*  Upon Manager's request, Owner will provide information reasonably requested by Manager to verify:

(a)     the identity, ultimate beneficial owners, respective voting rights and funding resources of, any proposed transferee; and

(b)     the identity and ultimate beneficial owners of any lender, mortgagee, or secured party.

Manager will respond to each written request of Owner for its confirmation or consent as soon as reasonably possible and in any event within 30 days after the later of Owner (i) notifying Manager in writing of such proposed person and (ii) providing Manager with the information requested.

13.2.10 *No Liability.* In the event of a dispute over whether a person is a Prohibited Person or a Sanctioned Person, Manager will not be liable for any losses, costs, damages, account of profits, compensation or other relief regardless of the outcome of such dispute.

US_Active\118580889\V-9

13.2.11 *Information Memoranda.* Owner will obtain Manager's prior approval for any reference to Manager or its Affiliates in any memorandum produced by or on behalf of Owner or its Affiliates in connection with any sale or financing relating to the Hotel, Owner or its Affiliates. Manager shall provide such approval or disapproval within ten (10) business days of receipt by Manager of Owner's written request, and if Manager fails to respond, then Owner shall provide a second written notice to Manager, upon which if Manager shall have ten (10) business days to respond. Such second notice must clearly state the following on the bottom of the first page in bolded 14pt type:.

### "THIS IS YOUR SECOND NOTICE.  FAILURE TO RESPOND WILL RESULT IN THE DEEMED APPROVAL OF THE REVIEW MATERIALS PROVIDED."

If Manager fails to respond within said ten (10) business day period, then such request shall be deemed approved.

13.2.12 *Loan to Value Ratio.*  On the date a Mortgage is made, the Loan to Value Ratio of the Mortgage (when aggregated with any other Mortgages) will not exceed 80%.  Owner will provide Manager with all information reasonably requested to verify Owner's compliance with this clause.

13.2.13 *Subordination and Non-Disturbance Agreement.* In respect of any Mortgage encumbering any part of the Hotel or its operation, Owner will, and will ensure that the mortgagee or secured party does, execute in favor of Manager a subordination and non-disturbance agreement in a form approved by Manager which provides that, so long as Owner is not entitled to terminate this Agreement for a Manager event of default in accordance with clause 14 as of the date of a default, foreclosure, conveyance in lieu of foreclosure or exercise of any other remedy under such Mortgage (each a "**Foreclosure**"):

(a)     this Agreement will continue in full force and effect in accordance with its terms notwithstanding such Foreclosure;

(b)     no such Foreclosure will disturb Manager's rights under this Agreement; and

(c)     such mortgagee, secured party, or any purchaser or transferee in connection with a Foreclosure, as applicable, will take the Hotel subject to this Agreement.

Owner will pay the reasonable fee charged by Manager for execution of such non-disturbance agreement (which as of the Execution Date is $3,500).

13.2.14 *Restrictions on Security Interests*.  In respect of any Mortgage, Owner will ensure that (i) any security interest in the Hotel Accounts will be subject to the terms of this Agreement, and (ii) no security interest will be given in business interruption proceeds to be used either for Hotel operations or allocated to Manager.

US_Active\118580889\V-9

13.3   **Successors**.  This Agreement will be binding upon and continue for the benefit of the successors in interest of the Parties.

13.4   **Ownership Structure**.  Owner represents that a true and correct ownership structure of Owner is attached as Appendix D.

**PART D:  DEFAULTS AND TERMINATION**

**14.**   **DEFAULTS**

14.1   **Events of Default**.

14.1.1  Owner is in default if it fails to provide the requested Working Capital into the Operating Accounts within 10 days after Manager's request under clause 9.2.

14.1.2  Without limiting the terms of clause 14.1.1, Owner or Manager is in default if it fails to make any payment to the other Party as and when required by this Agreement and such failure continues for 30 days after notice from the other Party.

14.1.3  Owner is in default if:

(a)   Owner fails to diligently and continuously carry out the Pre-Opening Works to be carried out under the PIP so that these works are not expected to be completed by the applicable dates in the PIP or, where no dates are specified, by the Pre-Opening Works Completion Date;

(b)   completion of the Pre-Opening Works does not occur by the applicable dates set out in the PIP or, where no dates are specified,  by the Pre-Opening Works Completion Date;

(c)   Owner fails to diligently and continuously carry out the Post-Opening Works to be carried out under the PIP so that these works are not expected to be completed by the applicable dates set out in the PIP or, where no dates are specified, by the Post-Opening Works Completion Date; or

(d)   completion of the Post-Opening Works does not occur by the applicable dates set out in the PIP or, where no dates are specified, by the Post-Opening Works Completion Date,

unless Manager has consented in writing to extend any such date.  If Manager terminates this Agreement in accordance with this clause because Owner has failed to meet any of the above-referenced dates as a result of a Force Majeure Event, then termination will be Manager's sole right with respect to this specific default, but without waiving any other right or remedy Manager may have as at the Termination Date for a separate, independent breach of contract or otherwise.

14.1.4  Owner or Manager is in default if an Insolvency Event occurs as to that Party.

US_Active\118580889\V-9

14.1.5   Owner is in default if any event occurs or fact exists with respect to the Hotel or its ownership that is likely to jeopardize any gaming license of, or application for a gaming license by, Manager or its Affiliates.

14.1.6   Owner is in default if the Hotel Lease is terminated, or if Owner's rights under the Hotel Lease are materially impaired such that Manager is unable to operate the Hotel as contemplated by this Agreement, or if Owner ceases to diligently pursue curing a default under the Hotel Lease that has been asserted by Lessor in writing.

14.1.7   Owner or Manager is in default if it breaches any representation, warranty, covenant, undertaking, obligation or condition set out in this Agreement and such breach continues for 30 days after the date of service of written notice of the breach , unless the nature of the breach is such that it cannot be cured within 30 days, in which case the breaching Party will have additional time to cure the breach (not to exceed 90 days) so long as such Party proceeds and continues with all due diligence to cure the breach as quickly as possible until the breach is cured.

14.2   **Procedure**.  If any event of default occurs under clauses 14.1.1 to 14.1.6 (inclusive), any material default occurs under clause 14.1.7, the terminating or non-defaulting (as applicable) Party may exercise its right to terminate this Agreement by giving to the non-terminating or defaulting (as applicable) Party written notice of its intention to terminate this Agreement (the "**Termination Notice**"), in which case this Agreement will terminate upon the date specified in the Termination Notice, which date will be: (i) any time after delivery of a Termination Notice for a termination based on an event of default resulting from failure to comply with clause 21.3; (ii) not less than five days nor more than seventy-five days after the delivery of the Termination Notice for a termination based on an event of default occurring under clause 14.1.1; and (iii) not less than thirty days nor more than seventy-five days after the delivery of the Termination Notice for any other termination.  The terminating or non-defaulting (as applicable) Party may at any time withdraw the Termination Notice and the Termination Notice will be of no force or effect. Also, the terminating or non-defaulting (as applicable) Party may at any time prior to the termination, extend the applicable cure period or termination period (as applicable) for such duration and frequency as the non-defaulting Party will decide. In the case of a termination as a result of a default, the non-defaulting  Party's right to terminate the Agreement is in addition to, and not a substitute for, all other rights and remedies for breach of contract granted by Laws.

14.3   **Employee Termination Notice Requirements**.

14.3.1   Notwithstanding any contrary provision of this Agreement, in connection with any termination of this Agreement, Owner will take (or cause to be taken) all action necessary with respect to Hotel Personnel (including rehiring, or causing to be rehired, the Hotel Personnel) so that Manager will not be required to comply with any Employee Termination Notice Requirements.  Owner will fully Indemnify Manager from and against any and all Claims asserted against or incurred by Manager related to (a) hiring, discharging, offering to hire or failing to hire any of the Hotel Personnel; (b) termination of the Hotel Personnel by reason of the termination of this Agreement; or (c) Owner's

52

failure to take, or cause to be taken, the action necessary with respect to Hotel Personnel so that the Manager will not be required to comply with any Employee Termination Notice Requirements.

14.3.2   If Manager is otherwise required to comply with any Employee Termination Notice Requirements, the termination date specified by any termination notice under this clause 14 will automatically be deemed extended, to the extent necessary, to the date equal to fifteen days plus the number of days necessary for Manager to comply with any Employee Termination Notice Requirements. Manager may waive this automatic extension for any termination based on an Owner event of default, in which case Owner will Indemnify Manager from any and all Claims asserted against or incurred by Manager as a result of any actual or alleged failure to comply with any Employee Termination Notice Requirements.

## 15.    PERFORMANCE TEST

15.1   **Performance Test**

15.1.1   *Test.*  If in each of 2 consecutive Full Operating Years during the Performance Period:

(a)      the Gross Operating Profit of the Hotel is less than the GOP Performance Test Percentage of the budgeted Gross Operating Profit set out in the Budget; and

(b)      the RevPAR of the Hotel is less than the RevPAR Performance Test Percentage of the average RevPAR of the hotels in the Competitive Set ("**Competitive Set RevPAR**"),

then Owner may, subject to clause 15.1.5 and Manager's cure rights below, terminate this Agreement. Competitive Set RevPAR will be calculated by the RevPAR Expert appointed by Owner and Manager, and the fees of the RevPAR Expert will be an Operating Expense.  If the RevPAR Expert is unable to determine Competitive Set RevPAR for any Operating Year, the performance test will be deemed met for that Operating Year.

15.1.2   *Procedure.*  To exercise its termination right, Owner must deliver a written notice to Manager (the "**Performance Termination Notice**") within 30 days after receiving the latter of (a) the RevPAR data and (b) Annual Financial Statement for the second relevant Operating Year, specifying Owner's intention to terminate this Agreement and a Termination Date that must be (i) on the last day of a month and (ii) between 90 and 180 days after the date of the Performance Termination Notice.  Within 30 days of its receipt of the Performance Termination Notice, Manager must deliver a written notice to Owner electing to either:

(a)      accept the termination of this Agreement; or

(b)      dispute such performance test failure and/or refer the matter to an Expert; or

(c)      pay the Cure Amount for either of the relevant Operating Years (as selected by Manager).

US_Active\118580889\V-9

If Manager accepts termination, this Agreement will terminate on the Termination Date specified in the Performance Termination Notice.  If Manager elects to pay the Cure Amount, it will do so within 30 days of delivery of its written notice to Owner electing to pay the Cure Amount, and the performance test will be deemed met for both relevant Operating Years.  Manager shall only have the right to pay the Cure Amount a total of two (2) times during the Initial Operating Term and one (1) additional time during the Extension Term.

15.1.3   *Expert Resolution.*  If Manager disputes such performance test failure and/or refers the matter to an Expert, the sole questions to be decided will be (i) whether there was a performance test failure, and (ii) whether the failure to achieve the requisite Gross Operating Profit and RevPAR in either relevant Operating Year was due to causes, circumstances or conditions beyond Manager's reasonable control.

15.1.4   *Effect of Expert Resolution.*  If the Expert resolves the matter in Manager's favor, the Performance Termination Notice will be rendered null and void.  If the Expert resolves the matter in Owner's favor, Manager may pay the Cure Amount for either relevant Operating Year within 30 days after receipt of the Expert's decision.  If Manager does not pay the Cure Amount, this Agreement will terminate 60 days after Manager's receipt of the Expert's decision.  If Manager pays the Cure Amount, the performance test will be deemed met for both relevant Operating Years.

15.1.5   *No Termination.*  Notwithstanding anything contained herein to the contrary, Owner cannot exercise the right of termination under clause 15.1.1 if the applicable level of Gross Operating Profit or the RevPAR of the Hotel is not achieved as a result of causes, circumstances or conditions beyond Manager's reasonable control, including:  (a) a Force Majeure Event; (b) failure of Owner to provide Working Capital to maintain the Hotel in accordance with the Brand Standards after applicable notice from Manager; (c) a casualty; (d) a taking by eminent domain;  (e) the impact of significant capital improvement programs at the Competitive Set hotels; or (f) the performance of capital expenditures adversely affecting a material portion of the income generating areas of the Hotel or any other area material to the operation of the Hotel; provided, however, if any of the foregoing causes a performance failure in the second of two consecutive Full Operating Years, the next qualifying year of operation would constitute a "consecutive year" with the first year for purposes of determining whether Manager failed the performance test.

15.1.6   *Payment upon Termination.*  As a condition precedent to termination under this clause 15, Owner must pay Manager all amounts due and payable as at the Termination Date.  Manager may waive this condition precedent in its sole discretion.

15.1.7   *Competitive Set.*  At the request of Owner or Manager, the Parties will discuss and agree to the initial comparable and competitive hotels that will make up the Competitive Set in addition to the Hotel. Owner and Manager may subsequently mutually agree to adjust the Competitive Set by adding, substituting or removing comparable and competitive hotels.  Adjustments will take effect from the beginning of the next Operating Year unless otherwise agreed to by the Parties.  Either

54

Owner or Manager may submit any dispute over the composition of the Competitive Set to an Expert.

15.1.8   *Adjustments to RevPAR Test*. In connection with the removal of a hotel from the Competitive Set or the selection of a replacement hotel or hotels for the Competitive Set, either Party may also request that the RevPAR Performance Test Percentage be modified to equitably account for the changes to the Competitive Set.  If the Parties are unable to reach agreement as to a modification of the RevPAR Performance Test Percentage, either Party may request that an Expert resolve such dispute, concurrently with the resolution of whether a hotel should be removed from the Competitive Set and/or which hotels are to be included in the Competitive Set.

**16.    DAMAGE AND DESTRUCTION**

16.1    **Repair**.

16.1.1   *Owner Obligation*.  Subject to clause 16.2, Owner will diligently repair, rebuild or replace any part of the Hotel damaged or destroyed by fire or any insured casualty risk to its prior condition and current requirements of the Brand Standards.  All repairs will be conducted in accordance with clause 8.3.  During the period of the repairs, Manager will continue to operate the remainder of the Hotel to the extent, in Manager's opinion, it is reasonable and prudent to do so.  If the Hotel does not remain in operation, the Operating Term will be suspended from the date of the casualty until the Hotel reopens.

16.1.2   *Remedy.*  If Owner fails to commence the repairs within 180 days after the casualty, or fails to perform such repairs diligently, Manager may terminate this Agreement in accordance with clause 14.

16.2    **Termination and Reinstatement**.

16.2.1   *Termination.*  If, following major damage or destruction of the Hotel, Owner determines, in its reasonable opinion, that it is not economically feasible to rebuild the Hotel, Owner may terminate this Agreement by providing written notice to Manager. Manager will be entitled to compensation for its loss of this Agreement in an amount agreed between Owner and Manager provided that priority will be given to Owner's recoupment of its investment in the Hotel with such amount to be payable from the proceeds of insurance and the residual value of the Site and any of the Hotel. Failing agreement as to the amount of the compensation within 30 days of receipt of Owner's notice, the amount will be determined by an Expert. Compensation will be payable within 30 days of the amount being agreed or determined. This Agreement will then terminate 30 days after Manager receives the written notice from Owner or, if later, in the sole discretion of Manager, upon payment of the compensation.

16.2.2   *Reinstatement.*  If within 3 years after the termination of this Agreement under this clause 16, Owner initiates construction of a hotel on the Site of similar standard to the Hotel, Owner will

55

US_Active\118580889\V-9

give Manager the option to enter into a new management agreement in respect of such hotel (the "**New Management Agreement**"). The terms and conditions of the New Management Agreement would be the same as this Agreement except that the operating term of the New Management Agreement would commence on the opening of the rebuilt hotel and would be equal to the amount of time remaining in the Operating Term at the time of termination of this Agreement. So that Manager can consider whether or not to exercise this option, Owner will serve written notice on Manager providing all of the information that Manager reasonably requests and Manager will respond to the notice within 90 days after receipt. If Manager exercises the option, it will refund to Owner any compensation paid under clause 16.2.1 within 30 days of the start of the operating term under the New Management Agreement.

16.2.3    *Survival.*  clause 16.2.2 will survive the expiration or termination of this Agreement.

**17.    EMINENT DOMAIN**

17.1    **Whole of the Hotel**.  If the whole of the Hotel is subject to Eminent Domain, then this Agreement will terminate concurrently with completion of the Eminent Domain.  Owner will promptly notify Manager of the amount of any resulting award.

17.2    **Part of the Hotel**.  If a portion of the Hotel is subject to Eminent Domain, Manager will decide (acting reasonably) if it is prudent to operate the remaining part of the Hotel.  Manager will give its decision to Owner in writing no later than 90 days after completion of the Eminent Domain. If Manager decides that it is not prudent to operate the remaining part of the Hotel, this Agreement will terminate 30 days after Manager's written notice or, if later, in the sole discretion of Manager, upon payment of the compensation.  If Manager decides (acting reasonably) that it is prudent to operate the remaining part of the Hotel, this Agreement will continue in full force and effect (subject to any necessary amendments to reflect that only part of the Hotel will continue to be operated).  Owner will use any resulting award to make alterations or modifications to the Hotel that are reasonably necessary to provide an appropriate hotel for the Brand and in compliance with the Brand Standards.  All alterations or modifications will be conducted in accordance with clause 8.3.

17.3    **Owner's Priority of Recoupment**.  Owner and Manager will agree upon a fair and equitable apportionment of any resulting award (if the whole or any remaining part of the Hotel is closed following Eminent Domain) or the balance of any resulting award (if the remaining part of the Hotel continues in operation following Eminent Domain) to compensate each of them for their respective loss of income resulting from the Eminent Domain, with priority to Owner's recoupment of its investment in the Hotel and the Site, or failing agreement within 30 days of Manager's notice, the amount determined by an Expert. Compensation will be payable within 30 days of the amount being agreed or determined.

**18.    ACTIONS AT THE END OF THE AGREEMENT**

US_Active\118580889\V-9

18.1    **Books and Records**.  Upon expiration or earlier termination of this Agreement, Manager will provide Owner with all such books and records of the Hotel maintained under clause 9.1 that do not constitute Manager's proprietary information, subject to any applicable Laws.

18.2    **Reconciliation of Accounts**. All Management Fees, reimbursable expenses and other amounts due Manager under the terms of this Agreement through the Termination Date will be due and payable to Manager.  The obligation to pay any Management Fees, reimbursable expenses and other amounts due and owing to Manager under the terms of this Agreement through the Termination Date will survive termination of this Agreement.   Those amounts that are ascertainable as of the Termination Date will be paid to Manager as a condition to termination of this Agreement (unless otherwise waived by Manager in its sole discretion).  Those amounts that are not ascertainable or calculable as of the Termination Date will be payable to Manager following the Termination Date following Manager's calculation of such amounts.   In connection with this clause 18.2, Manager has the right to pay itself the foregoing fees, charges, reimbursable expenses and amounts out of any available funds in the Hotel Accounts.

18.3     **Obligations under Contracts**.  After the Termination Date, Owner will (i) continue to perform all contractual and other obligations required by Law in respect of the employees of the Hotel, (ii) assume direct responsibility to perform and discharge all obligations under all contracts, agreements, undertakings and arrangements entered into by Manager in its operation of the Hotel (including collective bargaining agreements and pension plans, leases, licenses or concession agreements and maintenance and service contracts), and (iii) honor all business confirmed for the Hotel with reservation dates after the Termination Date.

18.4    **De-Identification and Disconnection**.

18.4.1  *De-Identification.*  Promptly after the Termination Date, Owner will complete the De-identification Actions.  To the extent necessary, Owner may continue to use Operating Supplies bearing the Marks pending their replacement for up to 60 days following the Termination Date.

18.4.2  *Remedy.*   If Owner fails to complete the De-identification Actions within 60 days, Owner authorizes Manager to enter the Hotel to perform and complete the De-identification Actions at the Owner's expense.  Manager may recover all losses, costs, expenses and damages caused by Owner's failure to complete the De-identification Actions.  Manager's right to damages and reimbursement is in addition to all other rights and remedies available at Law, including injunctive and other equitable relief.

18.4.3  *Disconnection*.  As of the Termination Date, Manager will remove the Information System and Manager Proprietary IT from the Hotel and disconnect the Hotel from the reservations systems and the related software applications.

18.4.4  *Survival.*   clauses 18.4.1, 18.4.2 and 18.4.3 will survive the expiration or termination of this Agreement.

US_Active\118580889\V-9

**PART E:  GENERAL PROVISIONS**

**19.    DISPUTE RESOLUTION**

19.1    **Determination by an Expert**.

19.1.1  *Scope.*  Unless otherwise agreed by both Parties in writing, any disputes over the following will be determined by an Expert:

(a)    calculation of the Management Fees;

(b)    verification of Owner's Additional Investment;

(c)    calculation, withholding, and payment of Taxes;

(d)    Working Capital;

(e)    calculation or payment of the Services Charges;

(f)    approval, content or expenditures in excess of the Re-Launch Budget or the Budget;

(g)    approval of the Annual Financial Statement;

(h)    termination for failure of the performance test, composition of the Competitive Set or adjustment to the RevPAR Performance Test Percentage;

(i)    the form or content of the assignment and assumption agreement under clause 13.2.5;

(j)    whether a person is a Prohibited Person;

(k)    the form or content of a non-disturbance agreement under clause 13.2.13; and

(l)    the amount of the compensation payable under clause 16.2.1 or clause 17.3.

19.1.2  *Selection.*  Owner and Manager will jointly select the Expert upon either Party's written request. If Owner and Manager are unable to agree on an Expert within 5 business days after delivery of the request, either Party may request that the Chairman of the International Society of Hospitality Consultants appoint an Expert.

19.1.3  *Qualifications.*  Unless Owner and Manager agree otherwise, the Expert must be independent of each Party.  To the extent practicable, the Expert should also:

(a)    be a lawyer, accountant, consultant or other qualified professional;

(b)    have expertise in the subject matter of the dispute; and

58

US_Active\118580889\V-9

(c)      have a reputation as an expert in the hotel industry.

19.1.4  *Terms of Appointment.*  The terms of appointment of the Expert (including fees, costs and any limitations on liability) will be agreed between Owner, Manager and the Expert and each will sign an agreement incorporating those terms.  If the terms of appointment have not been agreed and signed within 14 days of the selection of the Expert, Owner and Manager will be required to accept the standard terms of appointment of the Expert generally applied by the Expert for such an engagement (including fees, costs and any limitations on liability) and they will each sign an agreement incorporating those terms.  Owner and Manager will also require the Expert to sign an agreement agreeing to keep the resolution proceedings strictly confidential.

19.1.5  *Procedure.*  Unless otherwise agreed by both Parties in writing, the Expert will establish in its sole discretion the procedure for resolving the dispute, including what evidence to consider, whether to allow written submissions, and whether to hold a hearing, subject to the following:

(a)      the Expert has the power to demand from either Party whatever information in that Party's possession that the Expert deems necessary to resolve the dispute;

(b)      except as specifically requested by the Expert, no Party may present any evidence that was not shared with the other Party in a good faith attempt to resolve the dispute;

(c)      no discovery may be conducted between the Parties;

(d)      no attorneys may appear on behalf of either Party (although either Party may use attorneys for their own consultation or advice); and

(e)      the Expert will schedule and conduct all proceedings with the objective of resolving the dispute as quickly and efficiently as reasonably possible.

19.1.6  *Finality*.  The decision of the Expert is final and binding upon the Parties and not capable of challenge, whether by arbitration or otherwise, except for manifest error.

19.1.7  *Role.*  The Expert will act as an expert and not an arbitrator.  Unless Owner and Manager agree otherwise, the terms of engagement of the Expert will obligate the Expert to issue a final decision within 10 days after the Parties' final submissions.

19.1.8  *Authority*.  The authority of the Expert is limited to deciding the matter submitted to it.

19.1.9  *Limitation on Remedies*.  Notwithstanding anything to the contrary contained in the rules adopted by an Expert, the Parties agree that all awards and decisions by an Expert will be subject to the limitation on remedies set forth in clause 22.14 of this Agreement and the Parties hereby instruct all Experts to strictly comply with such limitations.

US_Active\118580889\V-9

19.1.10 *Costs and Expenses.*  Except in relation to any costs and expenses incurred pursuant to clause 15.1.1, costs and expenses incurred in connection with the Expert are not Operating Expenses and the Expert will charge its costs and expenses to Owner and Manager in proportion to the relative merits of their respective positions.

19.2    **Mediation**.

19.2.1  *Mediation as a Prerequisite*.  Except for disputes relating to matters resolved by Expert determination in accordance with clause 19.1 or relating to matters described in clause 19.3.2, or as otherwise specified in this Agreement, the Parties may not commence litigation or other legal proceedings with respect to any dispute, claim, controversy or issue arising out of or relating to this Agreement or the relationship created by this Agreement or the breach, termination, enforcement, interpretation or validity of this Agreement ("**Dispute**"), until the Party has complied with this clause 19.2.  In the event of any such Dispute, the Parties must first attempt to resolve the Dispute in accordance with this clause 19.2.  The Parties must first attempt to settle the Dispute by participating in at least eight (8) hours of mediation, or such shorter period as the Parties may agree.

19.2.2  *Service Provider*.  The mediation process will be administered by JAMS or its successors ("**JAMS**"). The mediation will be held in the city in which the Hotel is located, or such other location as the Parties may agree.  If, at the time a Dispute arises, JAMS does not exist or does not have a mediator that can serve in accordance with the terms of this clause 19.2, the mediation process will be administered by the American Arbitration Association or its successors ("**AAA**").  The service provider identified in accordance with the provisions of this clause 19.2 is referred to in this Agreement as the "**Mediation Service Provider**."  If, at the time a Dispute arises, AAA does not exist or does not have a mediator that can serve in accordance with the terms of this clause 19.2, and the Parties cannot agree on the identity of a substitute Mediation Service Provider, then the obligation to comply with this clause 19.2 for such Dispute will be deemed waived, and the complaining Party may commence litigation or other legal proceedings.

19.2.3  *Procedures*.  The complaining Party must notify the other Party or Parties that a Dispute exists and then contact the Mediation Services Provider to schedule the mediation conference.  The mediator shall then be selected under the rules of the Mediation Services Provider, but the mediator must have experience in the hospitality industry and must not have any conflict of interest.  If one Party invokes mediation pursuant to this clause 19.2, the other Party will make good faith efforts to meet within a reasonable time to undertake the mediation.  If a Party has not made good faith efforts to undertake mediation within forty-five (45) days after the other Party has invoked mediation, then the Party that had invoked such mediation may proceed to litigation or other legal proceedings without further action.  The mediation shall be a non-binding conference between the Parties in accordance with applicable rules and procedures of the Mediation Service Provider.  No Party may initiate legal proceedings until the mediation is

60

complete, except as otherwise provided in this Agreement.   Any mediation is considered complete:

(a)      if the Parties enter into an agreement to resolve the Dispute;

(b)      by the Party submitting the Dispute to mediation, if the other Party fails to appear at or participate in a reasonably scheduled mediation conference; or

(c)      if the Dispute is not resolved within five (5) days after the mediation is commenced, provided the Parties have participated in at least 8 hours of mediation as provided above.

19.2.4  *Costs and Expenses*.  The Parties will share equally the costs, including fees, of the any mediator selected or appointed under this clause 19.2.

19.3     **Legal Proceedings**.

19.3.1  Except for those matters which this Agreement states are to be determined by an Expert or which the Parties otherwise agree are to be referred to an Expert, if any Dispute remains between the Parties after mediation pursuant to clause 19.2 is complete (or if the obligation to mediate has been deemed waived pursuant to clause 19.2), the Parties have the right to commence litigation or other legal proceedings with respect to any Dispute.

19.3.2  Notwithstanding anything in this clause 19 to the contrary, the Parties have the right at any time to commence litigation or other legal proceedings with respect to any Disputes solely relating to: (a) preserving or protecting the proprietary information of Manager or its Affiliates; (b) emergency or injunctive relief; (c) enforcement of the dispute resolution provisions of this Agreement; or (d) enforcement of the decision and/or award by any Expert.

19.3.3  Prior to initiating any litigation or other legal proceedings, the initiating Party shall send written notice to the other Party detailing the terms of the Dispute.  Such notice shall be sent 5 days prior to filing any litigation or other legal proceeding.  The Parties agree that this provision is deemed waived should either Party be seeking emergency or injunctive relief.

19.4     **Venue and Jurisdiction**.  The Parties agree that any action brought pursuant to this Agreement or the relationship between them must be brought in the U.S. District Court for the Eastern District of Virginia, in Alexandria, Virginia, or if that court lacks subject matter jurisdiction, then in Fairfax County, Virginia or New York, New York, or in a court of competent jurisdiction in the county and state where the Hotel is located.  Each Party consents to personal jurisdiction and venue in each of these jurisdictions and waives, and agrees not to assert, move or otherwise claim that the venue in any of these jurisdictions is improper.

20.      **FORCE MAJEURE**

US_Active\118580889\V-9

20.1    **Excuse from Performance**.  Neither Owner nor Manager will be liable to the other for an inability or failure to perform, or delay in performing, any of its obligations under this Agreement (other than the payment of money) caused by a Force Majeure Event if the affected Party takes all reasonable steps to reduce the effect of the Force Majeure Event.

20.2    **Hotel Closure**.  Manager may, in its discretion, temporarily close all or part of the Hotel if, due to a Force Majeure Event, it is not reasonable in the circumstances to continue with operations in accordance with this Agreement.

**21.    COMPLIANCE**

21.1    **Manager Representations**.  Manager represents and warrants to Owner that as of the Execution Date:

(a)    Manager is duly organized, validly existing and in good standing under the Laws of the state of its organization, is duly qualified to do business in the state in which the Hotel is located, and has full power, authority and legal right to execute and perform this Agreement.  Manager's execution, delivery and performance of this Agreement have been duly authorized by all necessary action on the part of Manager;

(b)    this Agreement constitutes a legal, valid and binding obligation of Manager and does not constitute a breach or default of any of the organizational and governing documents of Manager or the terms, conditions or provisions of any Laws by which Manager is bound or any agreements to which Manager is a party;

(c)    this Agreement is enforceable against Manager in accordance with its terms;

(d)    no approval of any third party that has not been obtained prior to the execution of this Agreement is required for Manager's execution and performance of this Agreement; and

(e)    there is no litigation or proceeding pending or threatened against Manager that could adversely affect the validity of this Agreement or the ability of Manager to comply with its obligations under this Agreement.  Without limiting the foregoing, no Insolvency Event has occurred with respect to Manager.

21.2    **Owner Representations**.  Owner represents and warrants to Manager that as of the Execution Date:

(a)    Owner is duly organized, validly existing and in good standing under the Laws of the state of its organization, is duly qualified to do business in the state in which the Hotel is located, and has full power, authority and legal right to execute and perform this Agreement.  Owner's execution, delivery and performance of this Agreement have been duly authorized by all necessary action on the part of Owner;

62

(b)     this Agreement constitutes a legal, valid and binding obligation of Owner and does not constitute a breach or default of any of the organizational and governing documents of Owner or the terms, conditions or provisions of any Laws by which Owner is bound or any agreements to which Owner is a party;

(c)     this Agreement is enforceable against Owner in accordance with its terms;

(d)     no approval of any third party (including the holder of any Mortgage) that has not been obtained prior to the execution of this Agreement is required for Owner's execution and performance of this Agreement;

(e)     Owner holds (or will hold prior to the Opening Date) and will maintain throughout the Operating Term all approvals and permits necessary to permit the ownership and operation of the Hotel in accordance with the Brand Standards and applicable Laws;

(f)     Lessor is the sole owner of the Site, Owner is the sole owner of the Hotel Building and its contents and the lessee of the Site on which the Hotel is located.  Owner has full power, authority and legal right to own or lease such real and personal property;

(g)     there is no litigation or proceeding pending or threatened against Owner or the Hotel that could adversely affect the validity of this Agreement or the ability of Owner to comply with its obligations under this Agreement.  Without limiting the foregoing, no Insolvency Event has occurred with respect to Owner;

(h)     to the best of Owner's knowledge:  (i) no hazardous or toxic materials are present in or on or have been released from the Hotel or the Site; (ii) there are no other soil, water, mineral, chemical or environmental conditions in or at the Hotel or on or under the Site that presently or with the passage of time will require notice or reporting to any governmental authority or employees or patrons of the Hotel, pose any threat to the health and safety of the employees or patrons of the Hotel or otherwise require, based on any Legal Requirement or standard of prudent ownership, any monitoring or remedial action; (iii) there is no identifiable threat of contamination of the Site by release of hazardous or toxic materials from existing sources adjacent to the Hotel; and (iv) the Site does not contain any underground storage tanks; and

21.3    **Anti-Corruption and Trade Restrictions**.

21.3.1  Each Party, in respect of itself, represents, warrants and covenants on a continuing basis, that:

(a)     neither it nor any of its directors, executive officers, senior management, or persons or entities having a Material Interest in it or in the Hotel is a Sanctioned Person or, to its actual or constructive knowledge, otherwise the target of any Trade Restrictions;

63

(b)     it has not and will not obtain, receive, transfer or provide any funds, property, debt, equity or other financing related to this Agreement and the Hotel, including any of the Key Money, to or from a Sanctioned Person or, to its actual or constructive knowledge, a person who is otherwise the target of any applicable Trade Restrictions;

(c)     it is familiar with the provisions of Anti-Corruption Laws and will comply with Anti-Corruption Laws in performance of its obligations under or in connection with this Agreement;

(d)     any funds received or paid in connection with entry into or performance of this Agreement, including any of the Key Money, have not been and will not be derived from illegal sources or activities or commingled with illegal funds, and that it is not engaging in this transaction in furtherance of a criminal act, including acts in violation of Anti-Corruption Laws;

(e)     in preparation for and in entering into this Agreement, it has not made any Improper Payment or engaged in any acts or transactions otherwise in violation of any Anti-Corruption Laws and, in connection with this Agreement or the performance of its obligations under this Agreement, it will not directly or indirectly make, offer to make or authorize any Improper Payment or engage in any acts or transactions otherwise in violation of any Anti-Corruption Laws;

(f)     it will ensure that neither it nor any of its officers, employees, representatives, agents, direct or indirect legal or beneficial owners who at any time during this Agreement may be considered a Government Entity or Government Official will, directly or indirectly: (i) improperly use its status or position to influence official actions or decisions or to secure any improper advantage to or for the benefit of the Hotel or Manager or (ii) make, offer to make, or authorize any Improper Payment or engage in any acts or transactions that otherwise violate Anti-Corruption Laws;

(g)     neither Owner nor anyone having a Material Interest in Owner has been convicted of, pleaded guilty to, or otherwise been adjudged liable for any violation of laws, ordinances, rules or regulations that pertain to bribery or corruption, money laundering, competition, securities or financial fraud, trade sanctions or export controls, human trafficking, sex trade or forced labor;

(h)     any statements, oral, written, electronic or otherwise, submitted to the other Party or to any third party in connection with the representations, warranties and covenants described in this clause 21.3 are true and accurate in all material respects;

(i)     it will use reasonable endeavors to ensure that its appointed agents in relation to this Agreement comply in all material respects with the representations, warranties and covenants set out in this clause 21.3; and

64

US_Active\118580889\V-9

(j)       it will notify the other Party in writing immediately upon becoming aware of the occurrence of any event which renders the representations, warranties and covenants of this clause 21.3 incorrect.

21.3.2   Without prejudice to clause 14, in the event that either Party has a reasonable belief that the other Party may not be in compliance with any of the representations, warranties or covenants set out in clause 21.3, the Party will advise the other Party of this belief and the other Party will cooperate with any and all reasonable information and documentation requests, including requests for execution of certificates of compliance and associated inquiries, and will permit inspection at all reasonable times and upon reasonable prior notice of the following books and records:

(a)       in the case of Owner, books and records relating to the Site acquisition, development, ownership and use of the Hotel; and

(b)       in the case of Manager, books and records relating to the management of the Hotel.

**22.    MISCELLANEOUS**

22.1    **Notices**.

22.1.1   *Service.*  All written notices required by this Agreement must be either (a) delivered by registered or certified mail, postage prepaid, return receipt requested; (b) sent by overnight delivery by the United States Postal Service, FedEx, UPS, or other nationally recognized delivery service; or (c) hand delivered, in each case, to the address set out in the Notices Address.

22.1.2   *Proof of Service.*  Notices are deemed to have been duly delivered and to be effective:  (i) upon personal delivery thereof to the other Party; (ii) on the next business day following deposit by the sender via overnight delivery by the United States Postal Service, FedEx, UPS, or other nationally recognized delivery service; or (iii) three business days after deposit by the sender in the United States Postal Service, or its successor, as registered or certified mail, postage prepaid, return receipt requested.  Refusal to accept delivery of a notice constitutes delivery.

22.1.3   *Changes to Notice Address.*  Either Owner or Manager may change its Notices Address by written notice served according to the requirements of this clause.  The change will be effective on the later of (i) the date (if any) specified in the notice and (ii) the date on which the notice is served.

22.2    **Governing Law**.  All issues arising out of or in connection with this Agreement will be construed, interpreted and applied in accordance with, and governed by, the Laws applicable in the State of New York without recourse to its choice of law or conflict of law principles.

22.3    **Confidentiality**.  Except as provided below, each Party will keep confidential all Confidential Information of another Party and its Affiliates.  A Party may not, without the prior written consent of the relevant Party, disclose Confidential Information of the other Party or its Affiliates to any

third party (other than to its own or its Affiliates' legal, professional and financial advisers, officers, employees, consultants and subcontractors, each subject to co-extensive duties of confidentiality), except as disclosure may be required to obtain the advice of professionals or consultants, or financing for the Hotel from a lender or potential investors in accordance with the provisions of clause 13.2, or in furtherance of a permitted or proposed assignment of this Agreement.  Furthermore, Manager and its Affiliates may use information obtained through the operation of the Hotel in the operation of other hotels provided that such use is not to Owner's or the Hotel's material detriment.  The prohibition referred to above does not apply if the Confidential Information:

(a)      is required by Law to be disclosed;

(b)      is required to be disclosed by any regulatory or governmental or other authority with jurisdiction over the Party (including any relevant stock or securities exchange);

(c)      is in or enters (otherwise than by breach of this Agreement) the public domain;

(d)      is lawfully in the possession of the recipient Party other than pursuant to disclosure from the other Party;

(e)      subsequently comes lawfully into the possession of the recipient Party from a third party without the imposition of any duty of confidentiality by the third party; or

(f)      is independently developed by a Party by persons having no access to the Confidential Information.

The obligations set forth in this clause 22.3 will survive any termination or expiration of this Agreement.

Additionally, Owner and Manager will cooperate with one another on all public statements, whether written or oral and no matter how disseminated, regarding their contractual relationship as set forth in this Agreement or the performance of their respective obligations under this Agreement.

22.4    **Partial Invalidity**.

22.4.1  *Severance.*  If any provision of this Agreement (other than concerning the payment or receipt of monies) is held to be invalid or unenforceable by any judicial or other competent authority, all other provisions of this Agreement will remain in full force and effect.

22.4.2  *Enforceability.*  If any provision of this Agreement is held to be invalid or unenforceable but would be valid or enforceable if some part of the provision were deleted, or the period of the obligation reduced in time, or the range of activities or area covered reduced in scope, the provision in question will apply with the minimum modifications necessary to make it valid and enforceable.

66

22.5    **Entire Agreement**.  This Agreement (a) constitutes the whole agreement and understanding between the Parties with respect to the subject matter of this Agreement, (b) supersedes all prior agreements, negotiations and discussions between the Parties relating to the subject matter of this Agreement, and (c) may be amended only in writing signed by all Parties. Owner acknowledges that in entering into this Agreement, Owner has not relied on, and will have no remedy in respect of, any statement or representation, agreement or undertaking, whether or not made by or on behalf of Manager or its attorneys, agents, consultants or advisers, that is not incorporated into this Agreement except in the case of fraud.

22.6    **Cumulative Remedies**.  Any single or partial exercise of a right, power, privilege or remedy arising under this Agreement does not preclude or impair any other or further exercise of that or any other right, power, privilege or remedy.  A waiver of any right, power, privilege or remedy provided by this Agreement must be in writing and may be conditioned by the grantor in its sole discretion.  Any omission to exercise, or delay in exercising, any right, power, privilege or remedy provided by this Agreement does not constitute a waiver of that or any other right, power, privilege or remedy or of any breach or default by any other Party.  Except as otherwise expressly provided by this Agreement, the rights, powers, privileges and remedies provided in this Agreement are cumulative and are not exclusive of any other rights, powers, privileges and remedies provided by Law or equity.

22.7    **Duplicate Originals, Counterparts; Electronic Copies**.  This Agreement may be executed in any number of duplicate originals and each duplicate original will be deemed to be an original.  This Agreement may be executed in any number of counterparts, each of which constitutes an original, and all the counterparts together constitute one and the same Agreement.  Electronic copies of this Agreement and signatures thereon will have the same force, effect and legal status as originals.

22.8    **Further Assurances**.  Owner and Manager will do and cause to be done all acts, and execute and deliver all documents and instruments, reasonably necessary for each of them to perform their respective obligations under, and to give effect to the transactions contemplated by, this Agreement.

22.9    **No Third Party Rights**.  This Agreement is made for the benefit of the Parties and their successors and permitted assigns and is not intended to benefit, confer rights on, or be enforceable by, any other person.

22.10   **Survival**.  Any covenant, term or provision of this Agreement which, in order to be effective, must survive the termination of this Agreement, shall survive any such termination. Termination of this Agreement does not affect the rights or liabilities of any Party that accrued prior to termination.

22.11   **Approvals and Consents**.  A Party may not unreasonably withhold, delay or impose any unreasonable conditions on any consent, approval, agreement or other similar action required under this Agreement unless this Agreement expressly provides otherwise.

67

22.12   **Performance by Manager's Affiliates**.  Manager may perform any of its obligations under this Agreement through its Affiliates.  To the extent that it does so, references in this Agreement to "Manager" include those Affiliates.  Owner will not pay more for the Affiliate's services and expenses than Manager would have been entitled to receive under this Agreement had Manager performed the services.  If Manager arranges for an Affiliate of Manager to provide goods to the Hotel, such goods will be supplied at prices and on terms at least as favorable to the Hotel as generally available in the relevant market.

22.13   **Relationship of Parties and Limitations on Fiduciary Duties**.

22.13.1 Except as set forth in Schedule 1 with respect to the provision of the Technical Services, the relationship between the Parties is that of principal, in the case of Owner, and agent, in the case of Manager.  Nothing in this Agreement constitutes, or will be construed to constitute or create, a partnership, joint venture or lease between Owner and Manager with respect to the Hotel.

22.13.2 This Agreement and any liability between the Parties will be interpreted in accordance with general principles of contract interpretation, without regard to the common law principles of agency.  To the extent any fiduciary or other duties that exist or are implied under the common law principles of agency or otherwise, including those resulting from the relationship between the Parties, and including all duties of loyalty, good faith, fair dealing, care, full disclosure, or any other duty deemed to exist under the common law principles of agency or otherwise (collectively, the "**Implied Duties**") are inconsistent with, or would have the effect of modifying, limiting or restricting, the express provisions of this Agreement, the terms of this Agreement will prevail.  Furthermore, for purposes of assessing Manager's duties and obligations under this Agreement, the Parties acknowledge that the terms and provisions of this Agreement and the duties and obligations set out in this Agreement are intended to satisfy any fiduciary duties or other Implied Duties which may exist between the Parties.  Owner specifically consents to all transactions and conduct by Manager and its Affiliates described in this Agreement and specifically waives any Implied Duties which Manager may owe to Owner now, or which may arise in the future, in connection with such transactions or conduct, including without limitation, those described in clause 3.1 (Re-Launch and Initial Working Capital'), clause 4 (Hotel Operations), clause 5.1 (Fees and Charges), clause 5.2 (Payment of Fees and Charges), clause 8 (Repairs, Maintenance and Capital Expenditures), clause 9 (Hotel Finances and Owner Distributions), clause 10.1 (Required Insurance), clause 11.2.1 (Use of Manager's Intellectual Property), clause 11.2.6 (Goodwill), clause 12 (Right to Perform), clause 13.1 (Assignment by Manager), clause 20 (Force Majeure), and clause 22.12 (Performance by Manager's Affiliates) clause 23 (Restraint of Trade).  Owner acknowledges and agrees that its consent to the transactions and conduct by Manager and its Affiliates described in this Agreement and its waiver of any Implied Duties:  (i) has been obtained by Manager in good faith; (ii) is made knowingly by Owner based on its adequate informed judgment as a sophisticated party after seeking the advice of competent and informed counsel; and (iii) arises from the Owner's knowledge and understanding of the specific transactions and actions or inactions of Managers that are normal, customary, and reasonably expected in the

68

hotel industry generally, and also arises from those specific transactions and action or inactions of Manager that are normal, customary and reasonably expected by Owner under this Agreement.

Manager Initials _____    Owner Initials _____

22.14    **Limitation on Remedies**. NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT OR THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY, TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE LAW, OTHER THAN AND EXCLUDING (i) THE RESPECTIVE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER CLAUSE 10.2 OF THIS AGREEMENT (INDEMNITIES) AND (ii) ANY OTHER INDEMNIFICATION OR DEFENSE OBLIGATIONS OF A PARTY UNDER THIS AGREEMENT IN THE CASE OF UNAFFILIATED THIRD PARTY CLAIMS ("**INDEMNIFICATION EXCLUSION**"), NEITHER PARTY (INCLUDING ANY RELATED PARTY) WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR TREBLE DAMAGES OR LOSSES INCURRED BY THE OTHER PARTY OR ANY OF ITS RELATED PARTIES ARISING FROM OR RELATING TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCTS OR STRICT LIABILITY OR ANY OTHER FORM OF ACTION, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES (COLLECTIVELY "**CONSEQUENTIAL DAMAGES**"); AND SUBJECT TO THE INDEMNIFICATION EXCLUSION ABOVE, EACH PARTY HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES AND RELEASES ANY RIGHT, POWER OR PRIVILEGE EITHER MAY HAVE TO CLAIM OR RECEIVE FROM THE OTHER PARTY HERETO ANY SUCH CONSEQUENTIAL DAMAGES. FOR THE AVOIDANCE OF DOUBT, THIS LIMITATION OF LIABILITIES CLAUSE WILL NOT BE APPLICABLE TO ANY DIRECT DAMAGE CLAIMS BETWEEN THE PARTIES. EACH PARTY ACKNOWLEDGES AND AGREES THAT THE REMEDIES HEREIN PROVIDED, AND OTHER REMEDIES AT LAW AND IN EQUITY, WILL IN ALL CIRCUMSTANCES BE ADEQUATE (INCLUDING THE RIGHT TO RECOVER DIRECT DAMAGES). FURTHERMORE AND NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IF MANAGER BREACHES ANY AGENCY DUTY, OWNER WILL NOT BE ENTITLED TO: (A) DISGORGEMENT, FORFEITURE OR RESTITUTION OF ANY COMPENSATION PAID BY OWNER TO MANAGER; (B) DISGORGEMENT, FORFEITURE OR RESTITUTION OF ANY BENEFIT RECEIVED BY MANAGER IN CONNECTION WITH ANY TRANSACTION ON BEHALF OF OWNER OR THE HOTEL UNLESS THE MONETARY VALUE OF SUCH BENEFIT COULD HAVE BEEN CALCULATED AND PASSED THROUGH TO OWNER IN A COMMERCIALLY REASONABLE MANNER; (C) DIVESTITURE OF ANY FINANCIAL OR OTHER INTEREST HELD BY MANAGER; OR (D) ANY RELIEF THAT DOES NOT TAKE INTO ACCOUNT THE BENEFITS RECEIVED BY OWNER FROM THE SERVICES PROVIDED BY MANAGER.

**THE FOREGOING WAIVERS WILL APPLY TO ANY ACTION OR PROCEEDING BETWEEN THE PARTIES (INCLUDING ANY EXPERT OR ARBITRATION PROCEEDING) WITH RESPECT TO THIS AGREEMENT, THE HOTEL OR THE RELATIONSHIP OF THE PARTIES HEREUNDER AND FOR ALL CAUSES OF ACTION OR THEORIES OF LIABILITY OTHER THAN AND EXCLUDING THE INDEMNIFICATION EXCLUSION. BOTH PARTIES FURTHER ACKNOWLEDGE THAT THEY ARE EXPERIENCED IN NEGOTIATING AGREEMENTS OF THIS SORT, HAVE HAD THE ADVICE OF COUNSEL IN**

hotel industry generally, and also arises from those specific transactions and action or inactions of Manager that are normal, customary and reasonably expected by Owner under this Agreement.

Manager Initials _____                         Owner Initials _____

22.14  **Limitation on Remedies.** NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT OR THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY, TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE LAW, OTHER THAN AND EXCLUDING (i) THE RESPECTIVE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER CLAUSE 10.2 OF THIS AGREEMENT (INDEMNITIES) AND (ii) ANY OTHER INDEMNIFICATION OR DEFENSE OBLIGATIONS OF A PARTY UNDER THIS AGREEMENT IN THE CASE OF UNAFFILIATED THIRD PARTY CLAIMS ("**INDEMNIFICATION EXCLUSION**"), NEITHER PARTY (INCLUDING ANY RELATED PARTY) WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR TREBLE DAMAGES OR LOSSES INCURRED BY THE OTHER PARTY OR ANY OF ITS RELATED PARTIES ARISING FROM OR RELATING TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCTS OR STRICT LIABILITY OR ANY OTHER FORM OF ACTION, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES (COLLECTIVELY "**CONSEQUENTIAL DAMAGES**"); AND SUBJECT TO THE INDEMNIFICATION EXCLUSION ABOVE, EACH PARTY HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES AND RELEASES ANY RIGHT, POWER OR PRIVILEGE EITHER MAY HAVE TO CLAIM OR RECEIVE FROM THE OTHER PARTY HERETO ANY SUCH CONSEQUENTIAL DAMAGES.  FOR THE AVOIDANCE OF DOUBT, THIS LIMITATION OF LIABILITIES CLAUSE WILL NOT BE APPLICABLE TO ANY DIRECT DAMAGE CLAIMS BETWEEN THE PARTIES.  EACH PARTY ACKNOWLEDGES AND AGREES THAT THE REMEDIES HEREIN PROVIDED, AND OTHER REMEDIES AT LAW AND IN EQUITY, WILL IN ALL CIRCUMSTANCES BE ADEQUATE (INCLUDING THE RIGHT TO RECOVER DIRECT DAMAGES).  FURTHERMORE AND NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IF MANAGER BREACHES ANY AGENCY DUTY, OWNER WILL NOT BE ENTITLED TO: (A) DISGORGEMENT, FORFEITURE OR RESTITUTION OF ANY COMPENSATION PAID BY OWNER TO MANAGER; (B) DISGORGEMENT, FORFEITURE OR RESTITUTION OF ANY BENEFIT RECEIVED BY MANAGER IN CONNECTION WITH ANY TRANSACTION ON BEHALF OF OWNER OR THE HOTEL UNLESS THE MONETARY VALUE OF SUCH BENEFIT COULD HAVE BEEN CALCULATED AND PASSED THROUGH TO OWNER IN A COMMERCIALLY REASONABLE MANNER; (C) DIVESTITURE OF ANY FINANCIAL OR OTHER INTEREST HELD BY MANAGER; OR (D) ANY RELIEF THAT DOES NOT TAKE INTO ACCOUNT THE BENEFITS RECEIVED BY OWNER FROM THE SERVICES PROVIDED BY MANAGER.

**THE FOREGOING WAIVERS WILL APPLY TO ANY ACTION OR PROCEEDING BETWEEN THE PARTIES (INCLUDING ANY EXPERT OR ARBITRATION PROCEEDING) WITH RESPECT TO THIS AGREEMENT, THE HOTEL OR THE RELATIONSHIP OF THE PARTIES HEREUNDER AND FOR ALL CAUSES OF ACTION OR THEORIES OF LIABILITY OTHER THAN AND EXCLUDING THE INDEMNIFICATION EXCLUSION.  BOTH PARTIES FURTHER ACKNOWLEDGE THAT THEY ARE EXPERIENCED IN NEGOTIATING AGREEMENTS OF THIS SORT, HAVE HAD THE ADVICE OF COUNSEL IN**

**CONNECTION HEREWITH, AND HAVE BEEN ADVISED AS TO, AND FULLY UNDERSTAND, THE NATURE OF THE WAIVERS CONTAINED IN THIS CLAUSE.**

22.15   **Rules of Interpretation**.  In this Agreement, except where the context otherwise requires:

(a)    headings and the contents page are for ease of reference only and do not affect the interpretation of any of its provisions;

(b)    a "person" includes individuals, firms, bodies corporate, unincorporated associations, partnerships, executors and administrators;

(c)    a "person" includes that person's legal personal representatives, successors and permitted assigns;

(d)    words in the singular include the plural and vice versa;

(e)    any act, regulation or other statutory provision includes any amendment or re-enactment of the act, regulation or provision (whether before or after the Execution Date) and any subordinate legislation made there under;

(f)    if any condition, undertaking or covenant contained in this Agreement requires a Party or party not to do an act or thing, it will be a breach of any such condition, undertaking or covenant for the Party or party to permit or suffer the act or thing to be done;

(g)    the words "include" and "including" (or any similar term) do not imply any limitation and general words introduced by the word "other" (or any similar term) do not have a restrictive meaning because they precede or follow words indicating a particular class of acts, matters or things;

(h)    this Agreement includes its schedules, appendices, exhibits, supplements and amendments, each of which forms part of the Agreement and has the same force and effect as if expressly set out in the body of this Agreement;

(i)    time periods specified as from a given day, or from the day of an act or event, exclude that day; and

(j)    references to any New York legal term for any action, remedy, method of judicial proceeding, legal document, legal status, court, official or any legal concept or thing include the closest approximation in any other applicable jurisdiction, and references to any New York statute or enactment include any equivalent or analogous Laws or rules in any other jurisdiction.

22.16   **BK Release.**  On or before the Execution Date, Owner shall deliver to Manager the final, fully executed and effective mutual releases contemplated by the approved Chapter 11 plan, on the

form of mutual releases previously approved by Manager. Owner's failure to deliver the same shall entitle Manager to terminate this Agreement immediately.

**23.    RESTRAINT OF TRADE**

23.1    **No Other Hotel**.  During the Restrictive Period, Manager agrees that it will not own, operate, lease, manage or franchise a hotel in the Restrictive Territory under the Brand, where that hotel will be fully operational and open to the public for business under the Brand before the expiration of the Restrictive Period.

23.2    **Permitted Activities**.  Owner agrees that clause 23.1 will not:

23.2.1    prohibit Manager or its Affiliates or any successors (by purchase, merger, acquisition or otherwise) from conducting or permitting pre-opening/soft opening activities in connection with any hotel within the Restrictive Territory before the first paying guest is accepted and arrives to stay in such hotel, as these activities are understood in the hospitality industry from time to time;

23.2.2    prohibit Manager or its Affiliates or any successors (by purchase, merger, acquisition or otherwise) from engaging in any of the activities relating to Other Businesses;

23.2.3    apply to any hotel that is, as of the Execution Date, open, under construction or approved for development or opening as a Brand hotel (or is a substantially equivalent replacement of such a hotel);

23.2.4    apply to any hotel which is owned, acquired, operated, leased, managed or franchised by Manager or its Affiliates arising from a Chain Transaction, or merger, acquisition, takeover or any other form of reorganization of Manager or its Affiliates, prior to the expiration of the Restrictive Period, provided, that, notwithstanding the above, no hotel in the Restrictive Territory acquired as part of a Chain Transaction shall be converted to a Brand hotel;

23.2.5    apply to areas located anywhere outside the Restrictive Territory;

23.2.6    apply to any waterways, rivers, streams, canals, lakes, seas or oceans, that are situated, wholly or partially, within the Restrictive Territory;

23.2.7    apply to any gaming-oriented hotels (whether or not trading under the Brand);

23.2.8    apply to any shared ownership properties commonly known as "vacation ownership" or "time share ownership" or similar real estate properties (whether or not trading under the Brand);

23.2.9    apply following a notice of termination of this Agreement being received or served by Manager; and

for the avoidance of doubt, apply to any "Hilton" brand hotel.

US_Active\118580889\V-9

[*signatures appear on following page*]

US_Active\118580889\V-9

Executed as of this __8__ day of __November_____, 2021.
Signed by

**Owner:**

NEX SJ LLC,
a Delaware limited liability company

    By:  RDNWD LLC,
         a Delaware limited liability company,
         its sole member

      By: FMT SJ Holdings LLC,
         a Delaware limited liability company,
         its sole member

        By: Eagle Canyon Capital, LLC,
          a Delaware limited liability company,
          its sole member

        By: ..........................................
        Name:  Sam Hirbod
        Its:      President

[Signatures continue on next page]

_____

*Signature Page to Branding and Management Agreement*

**Manager:**

Signia Hotel Management LLC,
a Delaware limited liability company

By:  Hilton Domestic Operating Company Inc.,
a Delaware limited liability company,
as "Operator"

By: .......................................

Name: Michael Hollman
Its:    Authorized Signatory

---

*Signature Page to Branding and Management Agreement (cont.)*

**SCHEDULE 1 – RENOVATION OF THE HOTEL**

1.  **RENOVATION OF THE HOTEL**

1.1.        **Owner's Responsibilities.**

1.1.1.      *Construction.*  Owner will perform the PIP Works according to the Brand Standards and the Plans.  Owner will obtain all required Approvals and comply with all Laws in relation to the PIP.

1.1.2.      *Professional Team.*  Owner will retain a Professional Team, including at a minimum each of the Mandatory Consultants specified in Appendix C.  Owner will obtain Manager's prior written approval to each member of the Professional Team designated as a Mandatory Consultant position and, when required to be appointed, those designated "As required by the PIP".

1.1.3.      *Plans.*  Owner will obtain Manager's prior written approval to all Plans before they are implemented.  Within 90 Calendar Days after completion of the PIP, Owner will provide Manager with a complete and accurate set of the Plans as executed.

1.1.4.      *Mock-Up Rooms.*  Owner will build a Mock-Up Room for no more than 2 typical room types as determined by Manager and present them to Manager for inspection and approval before (a) the end of the Mock-up Room Delivery Period, (b) mechanical, electrical and fire protection first fix (rough-in works) are installed, and (c) making purchasing commitments for FF&E and other guest room materials. Manager will specify in writing any changes necessary for a Mock-Up Room to comply with Brand Standards and Owner will implement those changes.  Manager will approve the Mock-Up Room when it is fully compliant with Brand Standards.

1.1.5.      *Responding to Requests for Approval.*  Manager will respond to each written request for approval under clause 1.1 of this Schedule 1 as soon as reasonably possible and in any event within 30 Calendar Days of receipt of each request.

1.1.6.      *Progress Reports.*  Owner will keep Manager informed of the progress of the PIP.  Owner will provide copies of all Approvals, rejections, conditions, and other relevant information within 30 Calendar Days of Manager's reasonable request. Manager may inspect any works performed under the PIP at reasonable times and upon reasonable notice to Owner.

1.2.        **Manager's Responsibilities**.

1.2.1.      *Technical Services.*  Manager will provide Owner with the Technical Services for the PIP.

1.2.2.      *Manager's Role in Providing Technical Services.*  Manager's performance of the Technical Services will not relieve Owner of its obligations under this Agreement or render Manager liable for the design of the works performed under the PIP or any delay or cost overrun in its

completion.  No person (other than Owner for the purposes set out in this Agreement) may rely on the Technical Services.

1.2.3.    *Delays.*  If Owner does not complete the last item of the PIP by the date set forth therein, Owner will reimburse Manager for the additional costs and expenses that Manager incurs in providing the Technical Services beyond such date.

1.2.4.    *Limitation on Duties and Obligations.*  Any advice, assistance, recommendation or direction by Manager or its Affiliates with respect to the development, design, construction, equipping, furnishing, or decoration related to the PIP is not intended to be and shall not constitute any representation, warranty, agreement, covenant, promise or guaranty of any kind or nature whatsoever and should be not be relied upon by Owner, its Affiliates, outside consultants or any third party as confirmation that (1) there are no errors in the plans and specifications for the PIP, (2) there are no defects in the design or construction related to the PIP, or (3) the plans, specifications, construction and installation work will comply with all Laws.  Manager is not liable for, and Owner agrees not to make any claim against Manager because of, any alleged errors of judgment made in good faith by Manager in connection with the performance of any services provided or arranged by Manager.

1.3.    **Relationship of the Parties.**  The Parties acknowledge and agree that (i) the relationship between them in connection with the performance of the Technical Services will be that of an independent contractor relationship and not of principal and agent; (ii) they are not joint venturers, partners, or joint owners with respect to the PIP, and (iii) nothing in this Agreement shall be construed as creating a partnership, agency, joint venture or similar relationship between the Parties.

2

**APPENDIX A**

*[intentionally omitted]*

US_Active\118580889\V-9

**APPENDIX B – PROPERTY IMPROVEMENT PLAN**

Appendix B

US_Active\118580889\V-9



PREPARED FOR:

**Fairmont Hotel**

To be converted to a Signia by Hilton



(Facility ID: 57300)

170 South Market Street, San Jose, California, United States

Inspection Date: 06-Oct-2020
by Jay Eubank

Final Approval Date: 04-Oct-2021

Final

PIP CONTACT

Jay Eubank
Email: jay.eubank@hilton.com
Phone: (901) 374-6333



Generated on: 04-Oct-2021

Appendix B

US_Active\118580889\V-9

Hilton

# PROPERTY INFORMATION

## BRAND STANDARDS

| ITEM # | ITEM DESCRIPTION | DUE DATE |
|---|---|---|
| B-1 | PIP Assistance – Visit https://designinformation.hilton.com/ for resources that can help you with many of the subjects covered in this document. Find brand standards and guidance for subjects including Design Narrative, fitness, mechanical systems and technical requirements. For website access - Username: hilton2021. Password: hilton2021. The username and password change each January. | Per Brand Standards |
| B-2 | This PIP document is updated from the PIP inspection conducted originally on October 6, 2020. The hotel was not re-inspected. This updated document will expire six months after the date of update ("PIP Expiration Date") unless you have entered into a Franchise Agreement or Branding and Management Agreement with Hilton or its affiliates prior to the PIP Expiration Date. | 06-Apr-2022 |

## FIRE/LIFE SAFETY

| ITEM # | ITEM DESCRIPTION | DUE DATE |
|---|---|---|
| B-3 | Fire and Life Safety - A Hilton Fire and Life Safety Survey checklist must be satisfactorily completed and signed by an appropriate engineer or approved hotel representative. The more stringent requirements between brand standards and local or state codes must be followed as a minimum. | Pre Conversion |
| B-4 | Life Safety - All guardrails (stairwells) must be modified or replaced so that a 4"/102mm diameter sphere can not pass through any gap. Bottom rails must not exceed 2" /50 mm above the floor. Railings must not be horizontal or climbable. | Pre Conversion |

## GENERAL

| ITEM # | ITEM DESCRIPTION | DUE DATE |
|---|---|---|
| B-5 | Signs (Interior North Tower Public Levels) - Replace all interior signs. | Pre Conversion |
| B-6 | Signs (Interior South Tower) - Replace the interior sign package. Signs must be removed from doors. | 30-Apr-2024 |
| B-7 | Brand Marketing and Identity - Replace Operating Supplies and Equipment (OS&E) throughout the hotel with Signia Hilton specific OS&E. | Pre Conversion |
| B-8 | Signs (Interior North Tower Guestroom Levels) - Replace the interior sign package. Signs must be removed from doors. | 30-Apr-2023 |
| B-9 | Signs (Interior/Exterior) - Remove all logos or identifying marks of the previous brand. | Pre Conversion |
| B-10 | Signs (Exterior) - Replace all exterior signs. Install new Signia Hilton signage. | Pre Conversion |

## TECHNOLOGY

| ITEM # | ITEM DESCRIPTION | DUE DATE |
|---|---|---|
| B-11 | Technology (HDTV / Connected Room Both Towers) – The Hilton Connected Room Edge Controller must be installed at all guestroom TVs. NOTE - *The hotel must not sign contracts or add interactive services including video-on-demand (VOD), casting (i.e. Chromecast or Sonifi's Staycast), or "over-the-top" content (streaming- Netflix, Hulu, YouTube, etc.). If the hotel has VOD, casting, over-the-top content, or uses set-back boxes, they must be removed when the current contract expires. These services may not be renewed. *If the hotel initiates new Free-to-Guest TV contracts or evaluates solutions to replace expiring contracts, only a head-end based Free-to- Guest (FTG) service may be implemented. | 30-Apr-2023 |
| B-12 | Technology (Cabling South Tower) – Voice and Data cabling must be installed per the Technology Wiring Standards found in the Design and Construction section of the brand standards. *Cabling must be tested and fully certified by an independent third party. | Pre Conversion |
| B-13 | Technology (Locks South Tower)- The electronic lock system must be replaced in the main tower and upgraded in the south tower. RFID/Radio frequency identification (contact-less) locks are required and must have Hilton BLE compatibility for integration with the Hilton Straight to | Pre Conversion |

Page 2 of 5

Appendix B

US_Active\118580889\V-9

Hilton

| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| | Room program. RFID locks must be installed at all locations as required in the brand standards. | |
| B-14 | Technology (Locks North Tower)- The electronic lock system must be replaced in the main tower and upgraded in the south tower. RFID/Radio frequency identification (contact-less) locks are required and must have Hilton BLE compatibility for integration with the Hilton Straight to Room program. RFID locks must be installed at all locations as required in the brand standards. | 30-Apr-2023 |
| B-15 | Technology (Cabling) – Voice and Data cabling must be installed per the Technology Wiring Standards found in the Design and Construction section of the brand standards. *Cabling must be tested and fully certified by an independent third party. | 30-Apr-2023 |
| B-16 | Technology (Music System) - Install music services in all required areas of the hotel. | Pre Conversion |
| B-17 | Technology (Operating System)- Install all components, to meet all current brand standards, of the Hilton OnQ Property Management System. Provide a new On-Q rack system, and electrical outlets/wiring as needed for proper installation at the front desk. | Pre Conversion |
| B-18 | Technology (HDTV) – Channel selections must meet brand standards. | Pre Conversion |
| B-19 | Technology (HSIA/Wi-Fi) - Install Stay Connected Internet Access. The Guest Internet Access must comply with the Stay Connected Technology requirements including the UnoNet technical standards. This converged network strategy, must utilize the UnoNet Meraki platform. | 30-Apr-2023 |
| B-20 | Technology – Install all necessary software to use the Hilton configuration of Delphi FDC to work with the OnQ operating system. | Pre Conversion |

## COMMERCIAL FACILITIES
### BACK OF HOUSE

| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| C-1 | Back of House Areas - A renovation of the employee restaurant is required to create a re-imaging of the space that is consistent with the Hilton Heart-of-House initiative. Install all Hilton House-of-House graphics in all areas as required by the initiative. See the Heart-of-House Design Narrative for guidance. | Pre Conversion |
| C-2 | Laundry - Construct a dryer enclosure. | Pre Conversion |

### CORRIDORS/ELEVATORS/STAIRWELLS

| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| C-3 | Elevators (South Tower) - Restore the interior of the elevator cabs to remove, scratches, scars and blemishes. | Pre Conversion |
| C-4 | Elevators (South Tower) - A complete renovation is required. *Install new flooring, finishes and lighting. Restore all metals and controls. Include controls and signals on elevators landings. | 30-Apr-2023 |
| C-5 | Stairwells (Main Tower) (Signage) - Install new reflective signage with the floor level clearly numbered, at each stairwell landing. | 30-Apr-2023 |
| C-6 | Stairwells (Main Tower) - Repair and paint the walls. | 30-Apr-2023 |
| C-7 | Elevators (Main Tower) - A complete renovation is required. *Install new flooring, finishes and lighting. Restore all metals and controls. Include controls and signals on elevators landings. | 30-Apr-2023 |
| C-8 | Elevator Lobbies (Main Tower) - Renovate the elevator lobbies to complement the renovated corridors. | 30-Apr-2023 |
| C-9 | Corridors (Main Tower) - Restore all entry doors, service doors, door hardware and door frames. Door hardware must be restored to original luster or replaced. Replace the service door lever door handles. | 30-Apr-2023 |
| C-10 | Corridors (Main Tower) - A complete renovation is required. Replace all finishes, fixtures, furnishings and decorative accessories. The thresholds must be included in the renovation. | 30-Apr-2023 |
| C-11 | Ice Machine Rooms (Main Tower) - Replace the floor tile. Replace the light fixture. | 30-Apr-2023 |
| C-12 | Stairwells (South Tower) (Signage) - Install new reflective signage with the floor level clearly numbered, at each stairwell landing. | 30-Apr-2024 |

Appendix B

US_Active\118580889\V-9



| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| C-13 | Stairwells (South Tower) - Repair and paint the walls. | 30-Apr-2024 |
| C-14 | Corridors (South Tower) - A complete renovation is required. Replace all finishes, fixtures, furnishings and decorative accessories. The thresholds must be included in the renovation. | 30-Apr-2024 |
| C-15 | Elevator Lobbies (South Tower) - Renovate the elevator lobbies to complement the renovated corridors. | 30-Apr-2024 |

### EXTERIOR COMPONENTS

| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| C-16 | Building - Modernize the main entrance and entry drive to create a near luxury first impression for guests. As part of the modernization of the porte-cochere, replace the sidewalk canopy at the front and back of the hotel. | Pre Conversion |
| C-17 | Porte Cochere - Install new outdoor seating. | Pre Conversion |
| C-18 | Porte Cochere - Replace bricks in the entry drive as needed to correct damage. | Pre Conversion |
| C-19 | Building - Restore all entry doors and door hardware to remove damage and tarnishing. Restore the brass doors and door hardware to the original luster. Provide automatic doors at North & South tower entries. | Pre Conversion |

### GIFT SHOP/BUSINESS CENTER

| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| C-20 | Business Center - A Signature Executive business center is required. The FedEx business service facility on the first floor will be considered as fulfilling this requirement, while it is open and operating. Otherwise, A Signature Executive Business Center must be constructed. | Per Brand Standards |
| C-21 | Retail - Abandoned retail space in the vicinity of the gift shop must be finished out or converted to an approved alternative use. | 30-Apr-2023 |
| C-22 | Market Concept - A quality self service, limited menu restaurant must be constructed in the lobby area. A gift shop or sundries shop is not required, and the Market may be constructed in this existing space. | 30-Apr-2023 |

### LOBBY/ENTRANCE/REGISTRATION

| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| C-23 | Concierge - Concierge services must be provided in an area separate from the registration desk. The existing facilities may be suitable for this purpose. | Pre Conversion |
| C-24 | Lobby Area (South Tower) - Replace all furnishings, rugs and decorative accessories. | 30-Apr-2024 |

### PUBLIC RESTROOMS

| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| C-25 | Public Restrooms (Lobby) - Install automated soap dispensers at each sink and automated faucets. | 30-Apr-2023 |
| C-26 | Public Restrooms (Main Tower) - Public restrooms must be renovated to the same level of quality and appearance as the main lobby public restrooms. All toilets and urinals must have automated flush valves. | 30-Apr-2023 |
| C-27 | Public Restrooms (Lobby) - Disable the dead bolt lock at the entry door. | Pre Conversion |
| C-28 | Public Restrooms (South Tower) - Public restrooms must be renovated to the same level of quality and appearance as the main lobby public restrooms. All toilets and urinals must have automated flush valves. | 30-Apr-2024 |

### RECREATION FACILITIES

| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| C-29 | Fitness Center (Main Tower) - The facility must be fully renovated, furnished and equipped to comply with an approved Hilton fitness solution. All finishes and equipment must be replaced. This must include a locker facility. See fitness.hilton.com for specifications and standards. | Pre Conversion |

Appendix B

US_Active\118580889\V-9

Hilton

| C-30 | Pool – Provide a complete renovation of pool area including: Stain the "pink" deck tile to create a consistent color and appearance. Install new depth and "no diving" makers in 4" tile. Depth markers must be in imperial and metric units. | 30-Apr-2023 |
| C-31 | Pool Area – Install an emergency telephone. | Pre Conversion |
| C-32 | Spa – Provide a complete renovation of the SPA | 30-Apr-2023 |

## FOOD & BEVERAGE

### EXECUTIVE LOUNGE/COMP FACILITIES

| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| F-1 | Club Signia – A 2500 SF facility must be constructed, finished, furnished and equipped to meet the Club Signia standards. This facility must include a pantry, unisex restroom and guest seating zones. The facility must be constructed in a prominent area. Proposed location on level 20, North Tower (currently occupied by board room and two connecting king rooms) | 30-Apr-2023 |

### KITCHENS

| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| F-2 | Kitchens – Ensure that all kitchen equipment is properly operating. | Pre Conversion |

### LOUNGE FACILITIES

| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| F-3 | Destination Bar – The hotel must have a destination bar. The Lobby bar meets this requirement. | Per Brand Standards |
| F-4 | Pool Bar – A full renovation is required. A new concept must be developed and a comprehensive design is required to create an upscale rooftop beverage and food facility. | 30-Apr-2023 |

### MEETING/PRE-FUNCTION SERVICES AND FACILITIES

| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| F-5 | Meeting Areas (South Towers) – Restore damaged doors and door hardware. Include back-of-house areas. Install RFID locks on the meeting room entry doors. | 30-Apr-2024 |
| F-6 | Club Regent – A full renovation is required. All finishes must be replaced. | 30-Apr-2023 |
| F-7 | Meeting Rooms – (Signature Meeting Space) – A minimum of three (3) break out meeting rooms must be renovated to create a Signature meeting space using unique artwork, lighting or feature walls. | 30-Apr-2024 |
| F-8 | Meeting Areas (North Towers) – Restore damaged doors and door hardware. Include back-of-house areas. Install RFID locks on the meeting room entry doors. | 30-Apr-2023 |
| F-9 | Meeting Room Pre-Function (South Tower) – Remove the abandoned telephone banks. Repair and finish the walls to match adjacent finishes. | 30-Apr-2024 |
| F-10 | Meeting Areas (Both Towers) – Install new electronic signage. | 30-Apr-2023 |

### RESTAURANT/DINING FACILITIES

| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| F-11 | Restaurant (Fountain Restaurant) – A renovation is required. The floor must be refinished. The "stage" area must be restored to create a dining space that is consistent in appearance with the main floor dining area. | Pre Conversion |
| F-12 | Restaurant (Signature Restaurant – The Grill) – A signature restaurant is required. The Grill meets this requirement. There are no other requirements for this facility at this time. | Per Brand Standards |

## GUEST ROOMS/SUITES

### GUEST BATHROOMS

| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| R-1 | Bathrooms (Main Tower) – A complete renovation is required. "Replace all finishes, fixtures and | 30-Apr-2023 |

Appendix B

US_Active\118580889\V-9

Hilton

| | | | |
|---|---|---|---|
| | decorative accessories. The back-lit mirror and bath tub may remain. Shower supply stems must be raised to a height where the shower head is at least 6'6" above the shower floor. | | |
| R-2 | Bathrooms (Main Tower) – Grab bars must be installed at each shower and bath tub. | 30-Apr-2023 |
| R-3 | Bathrooms (Main Tower) - Flush valves must be replaced by tank-type toilets. | 30-Apr-2023 |
| R-4 | Bathrooms (South Tower) - A complete renovation is required. *Replace all finishes, and decorative accessories. | 30-Apr-2024 |
| R-5 | Bathrooms (South Tower) - Grab bars must be installed at each shower and bath tub. | 30-Apr-2024 |

## GUEST BEDROOMS

| ITEM # | SCOPE OF WORK | DUE DATE |
|---|---|---|
| R-6 | Guestrooms (Main Tower) - A complete renovation is required. *All finishes, fixtures, furnishings and decorative accessories must be replaced. This includes items such as cover plates and switches. There may be specific items in the room that have been replaced within the past few years. If these specific items are in excellent condition, fit the new design, and are approved in writing by Hilton Global Design Services, they may remain. | 30-Apr-2023 |
| R-7 | Guestrooms (South Tower) - A complete renovation is required. *All finishes, fixtures, furnishings and decorative accessories must be replaced. This includes items such as cover plates and switches. There may be specific items in the room that have been replaced within the past few years. If these specific items are in excellent condition, fit the new design, and are approved in writing by Hilton Global Design Services, they may remain. | 30-Apr-2024 |
| R-8 | Guestrooms (South Tower) - Install viewer covers on all entry doors. Install a one-piece auxiliary lock on all entry doors and connecting doors. | Pre Conversion |
| R-9 | Guestrooms (North Tower) - Install viewer covers on all entry doors. Install a one-piece auxiliary lock on all entry doors and connecting doors. | 30-Apr-2023 |

**End of Report**

Appendix B

US_Active\118580889\V-9

**APPENDIX C – TECHNICAL SERVICES**

*In each case, as applicable to the PIP (rather than new construction of a hotel):*

1.    **GENERAL**

1.1    Providing details of firms of consultants for certain disciplines of the Professional Team. Manager does not guarantee, or have responsibility for, any consultant firm, their availability, performance, fees or otherwise.

1.2    Periodic on-site inspections during construction and at the completion of the Hotel.

1.3    Coordinating input and comments from relevant in-house disciplines of Manager during the performance of the PIP.

2.    **ARCHITECTURE**

2.1    Design direction to Owner's architects in the development of the concept design and schematic plans for the Hotel, including layout suggestions.

2.2    Review of the concept design and final set of architectural plans and final specifications, including suggestions on how to improve the plans.

3.    **INTERIOR DESIGN AND FF&E**

3.1    Design direction to Owner's interior designers on the interior design concept and functional layout of guest rooms, suites, corridors, public areas, restaurants, bars, ballrooms and other public areas.

3.2    Review of preliminary interior design concepts from Owner's interior designers and guidance, if required, until approval of the preliminary presentation for interiors, including layout plans, elevations, materials and color schemes.

3.3    Design direction on FF&E items, including carpeting, furniture, draperies, fabrics, etc.

3.4    Review of working drawings for interiors and purchase specifications for FF&E.

3.5    Review of the FF&E budget prepared by Owner's representatives.

4.    **MECHANICAL, ELECTRICAL AND PLUMBING (MEP) SYSTEMS**

4.1    Review of systems design and performance criteria for:

(a)    heating, ventilating and air conditioning;

(b)    plumbing, drainage and sewage disposal;

(c)    electrical power supply and distribution, general lighting, radio, public address and communication systems, CCTV, intruder alarms, intercom, access control and other security systems, television systems and fire alarm systems

(d)    elevators and escalators;

(e)    voice and data systems;

(f)    hardware and keying, including electronic door locking systems; and

(g)    miscellaneous services.

4.2    Guidance to Owner's MEP consultants during the plan development of all MEP systems.

4.3    Review and suggestions concerning preliminary and final system plans and specifications prepared by Owner's MEP consultants, including review of the designs and performance criteria for lifts, elevators, hoists and escalators.

5.    **FOOD AND BEVERAGE**

US_Active\118580889\V-9

5.1 Assistance to Owner in the selection of food and beverage concepts and recommended layout planning.

**6. KITCHEN AND LAUNDRY EQUIPMENT**

6.1 Guidance to Owner's consultants in the concept design for kitchens and laundry.

6.2 Review of the layouts for equipment showing the locations and size of necessary MEP connections prepared by Owner's consultants.

6.3 Review of the specifications for equipment shown on layout drawings prepared by Owner's consultants.

6.4 Guidance to Owner's consultants on the analysis of bids with respect to specifications and comparative costs.

6.5 Review of the design for kitchens and laundry and subsequent detailed "shop" drawings submitted by successful bidder.

**7. HOTEL OPERATING EQUIPMENT (HOE)**

7.1 Providing HOE schedules and specification sheets (excluding budgets).

7.2 Submission of details of any relevant HOE purchase agreements available to Manager.

7.3 Review of detailed HOE schedules provided by Owner's procurement agent, including quantities, budgets and programs.

7.4 Review Owner's purchase requests for HOE.

7.5 Review of any alternatives to approved HOE items following tender.

**8. LIGHTING**

8.1 Guidance to Owner's lighting designer on the preliminary and final lighting in guest rooms and public areas.

8.2 Review of electrical lighting plans and specifications as prepared by Owner's lighting designer.

**9. INFORMATION TECHNOLOGY (IT)**

9.1 Providing IT schedules and specification sheets (excluding budgets).

9.2 Submission of details of any relevant IT purchase agreements available to Manager.

9.3 Review of systems design prepared by Owner's IT consultant

9.4 Review of detailed IT schedules provided by Owner's procurement agent, including quantities, budgets and programs.

9.5 Review Owner's purchase requests for IT.

9.6 Review of any alternatives to approved IT items following tender.

**10. REVIEW RESPONSIBILITY**

10.1 The review by Operator and/or its Affiliates of the design and planning of any layouts or systems does not include responsibility for structural, mechanical or electrical design loads or system component sizing as determined by Owner's Professional Team.

10.2 The provision by Manager of the Technical Services, the review by Manager of the PIP and the approval by Manager of the financing plan does not include any advice on or any responsibility for project management services, the cost of the PIP, the time taken to complete the PIP or initiating any aspect of the design of the PIP for any disciplines within the Professional Team.

| Consultant | Full Service Brand Hotels |
|---|---|

| Role | Mark |
|---|---|
| Project Manager | ● |
| Architect – Design | ● |
| Local Architect Authority Approvals | ⌘ |
| Interior Designer | ● |
| F&B Designer | ● |
| Mechanical, Electrical and Plumbing Engineer | ● |
| Civil Engineer | ⌘ |
| Structural Engineer | ● |
| Landscape Designer | ○ |
| Kitchen Designer | ● |
| Laundry Designer | ⌘ |
| Lighting Designer | ● |
| Quantity Surveyor/Cost Consultant | ● |
| Graphics and Signage Designer | ○ |
| Building Signage Designer | ○ |
| Spa Consultant | ⌘ |
| Fitness Consultant | ⌘ |
| Acoustic Consultant | ○ |
| Audio Visual Consultant | ○ |
| Code Compliance Consultant | ⌘ |
| Fire and Life Safety Consultant/Engineer | ● |
| Artworks and Artefacts Advisor | ⌘ |
| FF&E/HOE Procurement Manager | ● |
| Heritage Advisor | ⌘ |
| Geotechnical Consultant | ⌘ |

Appendix C – page 3

| | |
|---|---|
| **Environmental Consultant** | ⌘ |
| **Façade Engineer** | ⌘ |
| **Uniform Designer** | ⌘ |
| **Swimming Pool Designer** | ⌘ |
| **IT Systems Designer** | ● |
| **Traffic Consultant** | ⌘ |

●      Mandatory Consultant

○      Recommended Consultant

⌘      As required by the PIP (for example, if the PIP includes a Spa or Spa improvements, Owner will engage and retain a Spa Consultant)

Appendix C – page 4

**APPENDIX D – OWNERSHIP STRUCTURE**



US_Active\118580889\V-9

**APPENDIX E – EXCLUSION TO RESTRICTIVE TERRITORY**



Appendix E – page 1