IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| HILTON WORLDWIDE HOLDINGS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:25-cv-2104-LMB-IDD |
| | ) | |
| SAM HIRBOD, FMT SJ HOLDINGS LLC, AND | ) | |
| EAGLE CANYON HOLDINGS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PROTECTIVE
ORDER REGARDING THE DEPOSITION OF KEVIN JACOBS**

Defendants Sam Hirbod, FMT SJ Holdings LLC, and Eagle Canyon Holdings, LLC (collectively, "Defendants") hereby submit their opposition to Plaintiff's motion for a protective order regarding the deposition of Kevin Jacobs.

**INTRODUCTION**

Plaintiff Hilton Worldwide Holdings Inc. ("Hilton") seeks the extraordinary remedy of prohibiting Defendants from taking the narrowly tailored deposition of Hilton's Chief Financial Officer, Kevin Jacobs, concerning factual issues that Hilton itself placed directly at issue during the parties' refinancing efforts and the events immediately preceding foreclosure of the Signia by Hilton San Jose Hotel. Hilton attempts to recast this case as a purely mechanical guaranty enforcement action divorced from the surrounding refinancing process, operational conduct, and post-default dealings among the parties. But Hilton's own motion repeatedly acknowledges extensive refinancing-related negotiations, approvals, communications, and involvement of Hilton executives concerning a time-sensitive refinancing transaction intended to prevent foreclosure of the Hotel, events that are at the core of this litigation.

Defendants contend that Hilton's failure to timely execute and deliver indispensable refinancing documents by the May 9, 2025 closing date caused the contemplated $110 million refinancing to collapse immediately before foreclosure of the approximately $315 million Hotel three days later. According to Hilton representatives, the required documents were not timely executed because Hilton CFO Kevin Jacobs, whom Hilton executives identified as the necessary authorized signatory, was allegedly out of the country. *See* Declaration of Sam Hirbod, ¶¶ 9-13. Defendants therefore seek limited testimony and targeted documents concerning Mr. Jacobs's authority, availability, execution capability, approval role, and communications during the critical refinancing window immediately preceding foreclosure.

The requested deposition is neither abusive nor disproportionate. Defendants do not seek broad testimony concerning Hilton's overall business operations or generalized corporate strategy. Rather, Defendants seek narrowly tailored discovery concerning discrete factual issues directly relevant to Defendants' affirmative defenses and factual contentions, including prevention of performance, waiver by conduct, equitable estoppel, commercially unreasonable conduct, causation, and Hilton's own conduct relating to the refinancing process and resulting foreclosure. Defendants have noticed only four depositions in a case involving approximately $29.3 million in claimed damages and the foreclosure of a hotel asset allegedly valued at more than $315 million.

Hilton's motion improperly attempts to transform both Rule 408 and the parties' Pre-Negotiation Agreement ("PNA") into sweeping discovery shields purportedly insulating all refinancing-related conduct, communications, approvals, and operational actions from inquiry. Neither Rule 408 nor the PNA goes nearly that far. The PNA principally concerns negotiations relating to the borrower's loan obligations and Hilton's creditor remedies; it does not immunize Hilton's later operational conduct during the active May 2025 refinancing process itself. Nor does

2

Rule 408 bar discovery into underlying facts, execution timing, approval authority, signatory availability, foreclosure awareness, or other non-privileged factual matters directly relevant to Defendants' defenses.

The apex doctrine likewise provides no basis for relief. Courts routinely permit depositions of senior executives where, as here, the executive possesses unique first-hand knowledge concerning disputed factual issues central to the litigation. Hilton itself placed Mr. Jacobs's role, availability, and execution authority directly at issue by representing that required refinancing documents could not be timely executed because he was unavailable. No other witness can testify concerning Mr. Jacobs's own travel, authority, execution capability, or personal involvement in the approval and signing process during the critical refinancing period.

Ultimately, Hilton seeks to use a protective order to foreclose discovery relevant to affirmative defenses that remain pending and have not been stricken. Rule 26 does not permit a party to obtain such extraordinary relief merely by asserting that it will ultimately prevail on its preferred interpretation of the governing agreements. Because Hilton has failed to demonstrate the extraordinary circumstances or particularized prejudice necessary to prohibit the deposition altogether, its Motion for Protective Order should be denied.

## STATEMENT OF RELEVANT FACTS

The Complaint alleges that on June 21, 2024, Hilton purchased the mezzanine loan from JPMorgan for $29,859,178.81. Doc. 1 [Complaint], ¶ 40.  Four days later, Hilton allegedly sent Defendants a demand for reimbursement under the Reimbursement Agreement and guaranties on June 25, 2024, and a default notice on July 11, 2024.  *Id.*, ¶¶ 43-44, 47-48, 51-52, 55.  Although Hilton now contends that the reimbursement obligations and guaranty liabilities were triggered no later than July 2024, Hilton did not initiate this action until November 19, 2025, approximately

3

seventeen months later. *See id.* During that intervening period, Hilton repeatedly represented through its executives and representatives that it was not seeking enforcement of the Reimbursement Agreement or guaranties and instead was actively working with Defendants to refinance, restructure, extend, replace, or otherwise resolve the mezzanine debt through a broader recapitalization of the Hotel. Defendants relied extensively on those representations and Hilton's ongoing participation in refinancing efforts.

During the many months following Hilton's alleged June and July 2024 default notices, Hilton representatives continued participating in ongoing refinancing and recapitalization efforts relating to the Hotel. Throughout 2024 and 2025, Hilton representatives engaged in discussions and communications concerning potential refinancing structures, replacement financing sources, modification or replacement of the mezzanine financing, payoff structures, required approvals, and documentation necessary to complete a refinancing transaction intended to avoid foreclosure of the Hotel.  Hilton's participation in those efforts continued into 2025. Hilton representatives circulated and reviewed proposed refinancing-related documents, including drafts relating to the contemplated refinancing transaction and related hotel-management matters. Hilton also participated in discussions concerning the refinancing structure, timing, required approvals, and documentation necessary to close the transaction.

These events are central to Defendants' defenses and factual contentions because they demonstrate that Hilton was not acting merely as a passive guaranty holder pursuing a fixed reimbursement obligation. Rather, Defendants contend that Hilton actively participated in and exercised approval authority relating to the refinancing process during the many months following the alleged default.

4

By May 2025, the refinancing transaction had become urgent and time-sensitive because foreclosure of the Hotel was scheduled for May 12, 2025. By that point, Bridge had approved and was prepared to fund a $110 million senior refinancing loan, replacement subordinate financing exceeding $52 million had been secured and wired into escrow, refinancing documentation was substantially complete, and Defendants understood that timely execution and delivery of the remaining Hilton-controlled documents was necessary to close the refinancing before foreclosure.

Defendants further contend that Hilton exercised exclusive or practical control over execution and delivery of critical refinancing documents, including the SNDA and amendments relating to the Hotel's Branding and Management Agreement ("BAMA"), both of which were required for the refinancing to close. Nevertheless, despite May 9, 2025 being the scheduled closing date for the refinancing transaction immediately preceding the foreclosure sale, Hilton failed to timely execute and deliver the required Hilton-controlled documents to escrow, preventing the refinancing from funding before the scheduled foreclosure.

In the days leading up to the scheduled closing, Hilton representatives explained that execution could not occur because Hilton CFO Kevin Jacobs, whom Hilton identified as the necessary authorized signatory, was out of the country. *See* Declaration of Sam Hirbod, ¶ 10. Defendants contend that Hilton's failure to timely execute and deliver the required refinancing documents by the May 9, 2025 closing date caused Bridge to terminate funding of the contemplated $110 million refinancing transaction, which in turn resulted in foreclosure of the approximately $315 million Hotel on May 12, 2025.

Defendants seek Mr. Jacobs' deposition concerning, among other things, his travel during the relevant period, his authority to execute the refinancing documents, Hilton's internal approval process, remote execution capability, and the circumstances surrounding Hilton's failure to timely

5

execute and deliver the required documents before foreclosure occurred three days later. These issues bear directly on Defendants' asserted defenses and claims, including prevention of performance, waiver by conduct, equitable estoppel, commercially unreasonable conduct, impairment of refinancing efforts, causation, foreclosure-related damages, and Hilton's alleged bad-faith exercise of discretionary approval authority. They also directly concern the reimbursement relationship and post-default conduct that Hilton itself placed at issue by filing this action.

### LEGAL STANDARD

Under the Federal Rules of Civil Procedure, discovery is broad, and "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Relevance for discovery purposes is construed broadly. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350-51 (1978).

A party seeking a protective order bears the burden of establishing "good cause" under Rule 26(c). Specifically, Rule 26(c) provides that a court may, "for good cause," issue an order protecting a party or person from "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Because protective orders limiting otherwise relevant discovery are disfavored, however, Rule 26(c) "should be sparingly and cautiously used." *Medlin v. Andrew*, 113 F.R.D. 650, 652 (M.D.N.C. 1987).

Courts in this Circuit recognize that "[i]t is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error." *S.E.C. v. Dowdell*, No. CIV.A.3:01CV00116, 2002 WL 1969664, at *3 (W.D. Va. Aug. 21, 2002) (quoting *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979)). Accordingly, "the party seeking a protective order bears the weighty burden of showing the existence of good cause

for the issuance of a protective order." *Big Ernie's, Inc. v. United States*, No. 1:09-CV00122(LO/IDD), 2009 WL 3166839, at *1 (E.D. Va. Aug. 13, 2009).

The movant must make a "specific demonstration of fact" showing clearly defined prejudice or harm that will result absent protection "as opposed to conclusory or speculative statements." *United States ex rel. Davis v. Prince*, 753 F. Supp. 2d 561, 565 (E.D. Va. 2010). Although district courts possess broad discretion in deciding when a protective order is appropriate and what degree of protection is required, *see Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984), that discretion must be exercised consistent with Rule 26's liberal discovery standards and the strong presumption in favor of obtaining relevant evidence.

While discovery is broad under the Federal Rules of Civil Procedure, courts may apply the "apex doctrine" to "protect high-ranking officials from discovery abuses when they have 'no particular direct knowledge of the facts pertaining to the lawsuit …'" *Intelligent Verification Sys., LLC v. Microsoft Corp.,* No. 2:12CV525, 2014 WL 12544827, at *2 (E.D. Va. Jan. 9, 2014) (internal citation omitted). However, courts in this circuit have refused to prevent a deposition where it was "undisputed that [the deponent] has personal knowledge of facts … at issue," as this plainly constitutes a "legitimate purpose" for seeking discovery. *Id.*

## ARGUMENT

**I.      Because Hilton Seeks Recovery Under the Reimbursement Agreement Itself, Discovery Relating to Hilton's Conduct and FMT's Asserted Defenses Is Proper Regardless of the Guaranty Waivers.**

### A.      Hilton Seeks Recovery Under Four Integrated Agreements Arising from the Same Underlying Reimbursement Agreement.

Hilton's claims do not arise from a standalone guaranty divorced from the surrounding contractual relationship or subsequent events. Rather, Hilton seeks recovery under four integrated and interdependent agreements executed as part of the same underlying mezzanine financing and

7

reimbursement structure for the Signia by Hilton San Jose Hotel: (1) the Reimbursement Agreement between Hilton and FMT SJ Holdings LLC ("FMT"); (2) the Guaranty of Reimbursement Agreement Obligations executed by Eagle Canyon Holdings, LLC ("ECH"); (3) the Springing Guaranty executed by Sam Hirbod; and (4) the later Personal Guaranty executed by Mr. Hirbod in connection with the mezzanine loan upsizing and reaffirmation transactions. Each guaranty expressly states that it was executed "in connection with" the Reimbursement Agreement and to induce Hilton to enter into, reaffirm, or continue the underlying reimbursement arrangement.

Under the Reimbursement Agreement, Hilton agreed to provide a mezzanine guaranty supporting the Hotel's financing structure in exchange for FMT's agreement to reimburse Hilton for specified "Reimbursement Amounts" in the event Hilton paid amounts under the mezzanine guaranty or exercised certain mezzanine loan purchase rights. *See* Doc. 50-1 [Reimbursement Agreement] at 5. The Reimbursement Agreement also granted Hilton discretionary rights concerning any purchase of the mezzanine loan and expressly contemplated Hilton's continuing involvement in matters relating to the mezzanine financing, loan enforcement, restructurings, and related transactions. *See generally id.*

The guaranties do not create independent obligations untethered from the Reimbursement Agreement. Rather, each guaranty defines the "Guaranteed Obligation" principally by direct reference to FMT's obligations under the Reimbursement Agreement, including payment of all "Reimbursement Amounts" allegedly owed thereunder. The ECH Guaranty guarantees "payment and performance of all obligations of the 'Obligor' under the Reimbursement Agreement," including alleged losses arising from Hilton's exercise of mezzanine loan purchase rights. *See* Doc. 50-2 [ECH Guaranty] at 2. The Springing Guaranty likewise guarantees obligations arising

under the Reimbursement Agreement, although its recourse provisions become fully operative only upon specified triggering events. *See* Doc. 50-3 [Hirbod Springing Guaranty] at 3-5.  The later Personal Guaranty executed in connection with the mezzanine loan upsizing and reaffirmation transactions similarly incorporates and reaffirms the underlying reimbursement obligations and was expressly executed to induce Hilton's reaffirmation of the reimbursement structure and mezzanine guaranty obligations.  *See* Doc. 50-4 [Hirbod Personal Guaranty] at 2-4.

Accordingly, Hilton's attempt to characterize this action as a purely mechanical guaranty enforcement case improperly ignores the integrated contractual structure upon which its own claims are based. Because the guaranties repeatedly define the "Guaranteed Obligation" by direct reference to the underlying Reimbursement Agreement and the alleged "Reimbursement Amounts" arising thereunder, factual and legal issues affecting the existence, scope, enforceability, causation, or alleged enlargement of the underlying reimbursement obligations necessarily bear directly on Hilton's claims against all Defendants.

### B.      Unlike the Guaranties, the Reimbursement Agreement Does Not Contain Sweeping Waivers of "Any and All Defenses."

Critically, unlike the guaranties, the Reimbursement Agreement itself does not contain a sweeping waiver of "any and all defenses," nor does it purport to categorically insulate Hilton's own subsequent conduct from scrutiny. The agreement contains no broad waiver barring defenses arising from Hilton's conduct relating to refinancing efforts, operational approvals, execution timing, foreclosure-related conduct, impairment of collateral value, or the exercise of discretionary approval authority during the post-default refinancing process. *See generally* Doc. 50-1 [Reimbursement Agreement].

Instead, the Reimbursement Agreement contains substantially narrower provisions directed principally to enforcement mechanics, exhaustion of remedies, offsets, and mitigation.

For example, Section 5 provides that Hilton's exercise of mezzanine loan purchase rights or other remedies shall not "in any way create any right of offset, impair, reduce, act as a waiver or extinguish the Reimbursement Obligation," and further states that Hilton generally shall not be required to "mitigate damages or take any other action to reduce, collect or enforce the Reimbursement Obligations." *Id.* at 6. Those provisions are materially different from the sweeping guaranty language relied upon in the cases cited by Hilton purporting to waive "any and all defenses" or absolutely bar reliance on a lender's subsequent conduct.

The distinction is critical here because FMT, the primary obligor under the Reimbursement Agreement itself, asserts defenses and seeks discovery directly relating to Hilton's own post-default conduct during the failed refinancing process, including Hilton's alleged role in approvals, execution timing, signatory availability, foreclosure-related communications, and conduct contributing to the collapse of the refinancing and resulting foreclosure. The Reimbursement Agreement nowhere expressly waives defenses based on prevention of performance, waiver by conduct, equitable estoppel, commercially unreasonable conduct, impairment of collateral, breach of the implied covenant of good faith and fair dealing, or bad-faith exercise of discretionary contractual authority.

New York courts recognize that the existence and scope of waiver language matters.[1] Where the operative agreement does not contain sweeping and unconditional waivers of defenses, equitable and conduct-based defenses remain viable notwithstanding related guaranty provisions. *See, e.g., Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, No. 03 Civ. 8554 (DCP), 2008 WL 465169, at *6 (S.D.N.Y. Feb. 6, 2008), *aff'd*, 347 F. App'x 672 (2d Cir. 2009) (applying New York law and recognizing viability of equitable estoppel defense where underlying loan

---

[1] As Plaintiff notes in its Motion (Doc. 50 at 2 n.1), New York law governs the agreements at issue.

agreements "did not contain the unconditional guarantees and waivers of defenses" found in related guaranties, and therefore examining lender's post-default restructuring negotiations and conduct on the merits); *Wells Fargo Bank, N.A. v. Bivona & Cohen, P.C.,* No. 12-CV-5212 RA, 2015 WL 5752595, at \*6 (S.D.N.Y. Sept. 30, 2015) ("While the waivers contained in the guarantees are indisputably broad, they are not so broad as to prevent Bivona from raising any affirmative defenses or counterclaims . . . including, as relevant here, the commercial reasonableness of the disposition of the firm's collateral").

New York law also rejects Hilton's attempt to use broad guaranty waivers as a categorical shield against inquiry into its own conduct affecting the underlying collateral and refinancing process. In *Weinstein v. Fleet Factors Corp.*, 210 A.D.2d 74 (1st Dep't 1994), the First Department reversed summary judgment on personal guaranties because triable issues existed concerning the lender's allegedly commercially unreasonable conduct relating to preservation of collateral, expressly holding that "a lender's obligation to deal in a commercially reasonable manner with collateral securing a loan may not be waived by a guarantor as a matter of law." *Id.* at 74. Likewise, in *Marine Midland Bank v. CMR Industries, Inc.*, 159 A.D.2d 94, 104-07 (2d Dep't 1990), the court held that broad guaranty waivers did not preclude inquiry into lender conduct because enforcing such waivers "would allow a creditor to shield itself from its own tortious conduct." *See also Canterbury Realty & Equip. Corp. v. Poughkeepsie Sav. Bank*, 135 A.D.2d 102, 106 (3d Dep't 1988) (summary judgment was improper on the bank's action to enforce a guaranty because, despite the unconditional language of the guaranty, issues of fact existed as to whether a bank employee had orally modified the terms of the original underlying debt and whether the primary obligor had relied on that modification to its detriment, thus precipitating the default upon which the bank sought to enforce the guaranty); *Bank of China v. Chan*, 937 F.2d

11

780, 785 (2d Cir. 1991) (applying New York law and holding it would be inequitable to enforce an absolute guaranty where the creditor failed to act in a commercially reasonable manner); *MCC Funding LLC v. Diamond Point Enters., LLC*, 36 Misc. 3d 1206(A), 954 N.Y.S.2d 760 (Sup. Ct. 2012) ("where the mortgagee is alleged to have wrongfully caused the mortgagor's default or some other condition that led to the foreclosure action, this constitutes a viable defense and/or counterclaim").

Hilton seeks to characterize this matter as a simple guaranty enforcement action while simultaneously insulating its own conduct from scrutiny. But New York law does not permit a lender to foreclose inquiry into conduct allegedly affecting collateral preservation, refinancing efforts, causation, or the circumstances giving rise to the claimed losses themselves, particularly where, as here, the underlying Reimbursement Agreement does not contain sweeping waivers of "any and all defenses." At minimum, Defendants are entitled to targeted discovery concerning Hilton's post-default conduct and the refinancing events directly bearing on the underlying reimbursement relationship and Hilton's claimed damages.

### C.    Defenses and Factual Issues Affecting the Underlying Reimbursement Obligation Necessarily Bear on Hilton's Guaranty Claims.

Hilton's motion improperly attempts to sever the guaranties from the underlying Reimbursement Agreement and recast this case as a purely mechanical guaranty enforcement action. But Hilton is not suing solely on standalone guaranties divorced from the underlying reimbursement relationship. Rather, Hilton seeks recovery under four integrated agreements, including the Reimbursement Agreement itself, which forms the foundation for all alleged obligations asserted against Defendants.

As noted above, the Reimbursement Agreement does not contain sweeping waivers of defenses arising from Hilton's own conduct. Accordingly, factual and legal issues affecting the

12

existence, scope, enforceability, amount, causation, or alleged enlargement of the underlying Reimbursement Obligation necessarily bear directly on FMT's pending defenses. The guaranties, moreover, repeatedly define the "Guaranteed Obligation" by direct reference to FMT's obligations under the Reimbursement Agreement, including payment of all alleged "Reimbursement Amounts" arising thereunder. These same factual and legal issues are therefore also potentially relevant to Hilton's related guaranty claims.

Those principles are directly implicated here. Defendants contend that Hilton's own post-default conduct materially contributed to the collapse of the May 2025 refinancing transaction, the resulting foreclosure of the Hotel, and the losses Hilton now seeks to recover in this action. At minimum, discovery concerning Hilton's conduct relating to the refinancing process, operational approvals, execution timing, signatory availability, and foreclosure-related events is plainly relevant to FMT's pending defenses and potentially relevant to Hilton's related guaranty claims, all of which arise from the same underlying reimbursement relationship Hilton placed at issue by filing this action.

## II. The Pre-Negotiation Agreement Does Not Immunize Hilton's Subsequent Conduct From Discovery Scrutiny.

Hilton's reliance on the June 18, 2024 PNA is overstated and misplaced.  Three days before Hilton allegedly purchased the mezzanine loan from JPMorgan, the parties entered into the PNA acknowledging ongoing discussions concerning the mezzanine loan, the Reimbursement Agreement, and potential refinancing, restructuring, or recapitalization alternatives relating to the Hotel. *See* Doc. 50-5 [PNA]. The PNA generally provided that any ultimate modification of the parties' contractual obligations would require a subsequently executed written agreement and that settlement or compromise communications would receive Rule 408-type protections. *See id.* at 4-5.

13

Nothing in the PNA, however, prohibited the parties from continuing to pursue refinancing transactions, communicate with lenders and transaction participants, negotiate transaction structure, circulate financing terms or approvals, or otherwise engage in operational and transactional conduct relating to the Hotel and its financing. To the contrary, the agreement expressly contemplated continuing discussions concerning the Hotel's financing and related transactions. *See id.* at 3-4.

Critically, the PNA's negotiation and release provisions are expressly limited to the defined "Negotiations," namely discussions and communications concerning "the obligations of Borrower" under the Loan and Reimbursement Documents and Hilton's rights and remedies thereunder. *Id.* at 4. "Borrower" is separately defined in the PNA as RDNWD LLC, a non-party borrower entity. *Id.* at 2. Thus, by its own terms, the PNA principally addresses discussions relating to the borrower's loan obligations and Hilton's creditor remedies, not Hilton's later operational conduct relating to the May 2025 refinancing process itself. Nor does the PNA purport to bar Defendants from relying on subsequent communications, representations, approvals, execution decisions, or course of conduct directed to or involving the Guarantor and Obligor, the Defendants in this action, concerning the active refinancing transaction, execution of required documents, timing of approvals, or actions allegedly affecting the ability of the refinancing to close before foreclosure.

Likewise, although the PNA references Federal Rule of Evidence 408 and settlement protections, ***Rule 408 governs admissibility, not discoverability***, and does not bar discovery into underlying facts, operational conduct, approvals, execution timing, signatory availability, communications with third parties, or other non-privileged factual matters relevant to Defendants' defenses and claims.

14

Defendants do not contend that Hilton was contractually obligated to consummate a restructuring or refinancing transaction absent a signed agreement. Rather, Defendants contend that Hilton exercised discretionary control over operationally indispensable approvals and execution timing while representing that it was cooperating in the refinancing process and understanding that failure to timely perform would foreseeably collapse the refinancing and trigger imminent foreclosure. Defendants further contend that Hilton deliberately, unreasonably, or in bad faith delayed or withheld approvals and execution of required refinancing documents, including the SNDA and BAMA amendment, resulting in the failure of the scheduled May 9, 2025 refinancing closing and foreclosure of the Hotel three days later. The PNA does not insulate such conduct from discovery scrutiny or place it beyond the reach of otherwise applicable defenses grounded in prevention, waiver by conduct, equitable estoppel, impairment of collateral, commercially unreasonable conduct, or breach of the implied covenant of good faith and fair dealing.

This is therefore not a case in which Defendants seek discovery merely into privileged settlement positions or failed compromise proposals. Defendants instead seek discovery concerning Hilton's alleged intentional and bad-faith conduct during the active refinancing process, which resulted in the collapse of the refinancing transaction immediately preceding foreclosure of the Hotel.

**III.    The Apex Doctrine Does Not Apply.**

Hilton's apex doctrine argument likewise fails. The apex doctrine does not categorically bar depositions of senior executives. Rather, courts routinely permit such depositions where the executive possesses unique or first-hand knowledge concerning disputed issues relevant to the litigation. *See, e.g., Boeing Co. v. Virgin Galactic LLC*, No. 1:24-CV-0456 (CMH/LRV), 2024

15

WL 4101825, at *2 (E.D. Va. Aug. 23, 2024) (denying protective order seeking to bar deposition of CFO where executive possessed at least some unique personal knowledge concerning disputed financial and operational decisions, and holding that apex status alone did not justify precluding deposition altogether); *JTH Tax, Inc. v. Aime*, No. 2:16CV279, 2016 WL 9223926, at *6 (E.D. Va. Dec. 13, 2016) (denying protective order and compelling deposition of company CEO where executive possessed unique personal knowledge concerning disputed communications and corporate decisions central to defendants' claims and defenses).

Defendants are not seeking broad testimony from Mr. Jacobs concerning Hilton's overall business operations or generalized corporate strategy. Rather, Defendants seek narrowly tailored testimony concerning discrete factual issues involving execution authority, approvals, timing, availability, and communications during the critical refinancing period immediately preceding foreclosure—matters as to which Mr. Jacobs possesses unique first-hand knowledge. No other witness can testify concerning Mr. Jacobs's own availability, travel, authority, execution capability, or personal involvement in the approval and signing process during the critical refinancing window.

Importantly, Hilton itself placed Mr. Jacobs's executive approval and signatory availability directly at issue by repeatedly representing that the required refinancing documents were not timely executed because Mr. Jacobs was allegedly out of the country. *See* Declaration of Sam Hirbod, ¶ 10. Defendants are therefore entitled to inquire into the factual basis for those representations, including the extent of Mr. Jacobs's involvement in approvals, execution capability, timing decisions, and the circumstances surrounding Hilton's failure to timely execute and deliver the required documents before foreclosure occurred.

Nor is the requested discovery duplicative. Hilton argues that Defendants should instead rely on testimony from other executives. But the apex doctrine does not shield an executive who possesses direct or unique knowledge concerning the specific factual issues in dispute. Defendants seek testimony uniquely relating to Mr. Jacobs's own availability, authority, participation in approvals, communications, and execution capability during the relevant period, including to test and evaluate the representations made to Defendants by other Hilton representatives concerning the reasons the refinancing failed to close on May 9, 2025.

Moreover, the document requests directed to Mr. Jacobs are narrow in both scope and time. They are principally limited to execution and approval issues relating to the SNDA and BAMA amendment; Mr. Jacobs's availability and execution capability during the critical refinancing period; and related communications concerning approvals, execution timing, and foreclosure awareness. Under these circumstances, Hilton has failed to demonstrate the extraordinary circumstances or particularized burden necessary to justify the extraordinary remedy of prohibiting the deposition altogether, requiring denial of its Motion for Protective Order.

## IV.    Hilton Cannot Use Merits Arguments to Foreclose Otherwise Relevant and Proportional Discovery.

The discovery directed to Mr. Jacobs is narrowly tailored, proportional, and plainly relevant under Rule 26. Defendants do not seek broad discovery into all negotiations or settlement communications. Rather, the requests are confined to a narrow timeframe and discrete factual subjects directly relevant to Defendants' pending affirmative defenses and factual contentions, including execution authority, approvals, timing, signatory availability, and communications during the critical refinancing period, and Hilton's conduct relating to the failed refinancing and resulting foreclosure, and the deposition testimony Defendants seek will be similarly narrow. *See* Doc. 50-7 [Jacobs's Notice of Depo. and Request for Production of Docs.].

Hilton's motion repeatedly attempts to characterize this case as a "straightforward" guaranty enforcement action that "begins and ends" with the language of the Reimbursement Agreement and guaranties. But Hilton's merits characterization does not justify a protective order foreclosing otherwise relevant discovery. Defendants have timely asserted affirmative defenses that remain part of this case and have not been stricken. Hilton has not moved to strike those defenses. Courts within this Circuit recognize that affirmative defenses that remain pending constitute proper subjects of discovery. *See Nat'l Credit Union Admin. v. First Union Cap. Markets Corp.*, 189 F.R.D. 158, 161 (D. Md. 1999).

The issue presently before the Court is therefore not whether Hilton will ultimately prevail on its interpretation of the guaranties or waiver provisions, but whether Defendants are entitled under Rule 26 to discovery relevant to their pending defenses and factual contentions. They plainly are. Courts routinely recognize that discovery relevance under Rule 26 is broader than ultimate admissibility or merits viability. Hilton's authorities concerning enforcement of "absolute and unconditional" guaranties address ultimate liability, not whether discovery relevant to pending affirmative defenses may be foreclosed at the outset of discovery. Even assuming Hilton ultimately prevails on some or all of its waiver arguments, that would not justify foreclosing discovery now. The existence, scope, applicability, applicability, and enforceability of the asserted waivers, including whether they reach the particular defenses and conduct at issue here, are merits questions. Rule 26 does not permit a party to obtain a protective order merely by asserting that its interpretation of the contracts will ultimately prevail. *See Branch Banking & Tr. Co. v. Iny*, No. 2:11-CV-1777-MMD-VCF, 2014 WL 12785312, at *2 (D. Nev. July 18, 2014) ("A motion for a protective order is not the proper vehicle for the court to adjudicate the merits of a party's claims

18

or defenses and determine which affirmative defenses are available to Defendants for discovery purposes.").

The requested discovery bears directly on Defendants' pending defenses and factual contentions, including defenses grounded in prevention, waiver by conduct, equitable estoppel, impairment of collateral, commercially unreasonable conduct, and breach of the implied covenant of good faith and fair dealing. Defendants contend that Hilton personnel represented during the critical refinancing period that the required refinancing documents could not be timely executed because Kevin Jacobs, whom Hilton executives identified as the necessary authorized signatory, was allegedly unavailable or out of the country, and that the resulting delay directly affected the ability of the refinancing to close before foreclosure. *See* Declaration of Sam Hirbod, ¶¶ 10-13. Defendants are entitled to test the factual basis for those representations.

The requested discovery is particularly relevant because the refinancing transaction was active, time-sensitive, and materially advanced. Defendants contend that Hilton's failure to timely execute and deliver the requisite refinancing documents by the May 9, 2025 closing date caused the contemplated $110 million refinancing to collapse immediately before foreclosure of the approximately $315 million Hotel three days later. Defendants further contend that Hilton personnel understood that failure to timely execute and deliver the required documents would foreseeably jeopardize closing and result in foreclosure.

Moreover, the requested discovery is proportional to the needs of the case. Hilton seeks approximately $29.3 million in damages in this action. The requested deposition concerns factual issues central to Defendants' defenses relating to the collapse of a refinancing transaction intended to prevent foreclosure of a hotel asset allegedly valued at more than $315 million. Defendants have noticed only four depositions in this case, including the deposition of Mr. Jacobs. The requests

19

directed to Mr. Jacobs are narrowly limited in time and subject matter and focus principally on execution authority, approvals, timing, signatory availability, and related communications during the critical refinancing period immediately preceding foreclosure. Hilton's attempt to foreclose inquiry into post-December 2024 refinancing conduct would improperly shield potentially critical factual information concerning operational approvals, execution timing, foreclosure awareness, and Hilton's own conduct relating to the refinancing process. The Federal Rules do not permit such a sweeping discovery blackout.

## CONCLUSION

Hilton seeks the extraordinary remedy of entirely precluding a narrowly tailored deposition directed to factual issues that Hilton itself placed squarely at issue during the failed refinancing process immediately preceding foreclosure. Because Hilton has failed to demonstrate the extraordinary circumstances and particularized prejudice required under Rule 26(c), the motion should be denied in its entirety.

Dated: May 27, 2026

Respectfully submitted,

**ORRICK, HERRINGTON & SUTCLIFFE LLP**

_/s/ Daniel Bellovin_
Daniel Bellovin (VSB No. 87309)
Edward H. Williams II (VSB No. 88102)
John B. Williams III (*pro hac vice*)
dbellovin@orrick.com
edward.williams@orrick.com
jwilliams@orrick.com
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 339-8400
Facsimile: (202) 339-8500

**GERAGOS & GERAGOS, APC**

20

Mark Geragos (*pro hac vice*)
mark@geragos.com
644 South Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 625-3900
Facsimile: (213) 232-3255

Tina Glandian (*pro hac vice*)
tina@geragos.com
256 5th Avenue
New York, NY 10001
Telephone: (213) 625-3900
Facsimile: (213) 232-3255

*Attorneys for Defendants Sam Hirbod,*
*FMT SJ Holdings LLC, and*
*Eagle Canyon Holdings, LLC*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on May 27, 2026, I electronically filed the foregoing

Defendants' Opposition to Plaintiff's Motion for a Protective Order Regarding the Deposition of

Kevin Jacobs using the CM/ECF system and served electronically on all registered users.

Dated: May 27, 2026

_____*/s/ Daniel Bellovin*_____
Daniel Bellovin (VSB No. 87309)
dbellovin@orrick.com
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 339-8400
Facsimile: (202) 339-8500