**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA – ALEXANDRIA DIVISION**

|  |  |
|---|---|
| HILTON WORLDWIDE HOLDINGS INC., <br><br> Plaintiff, <br><br> v. <br><br> SAM HIRBOD, FMT SJ HOLDINGS LLC, AND EAGLE CANYON HOLDINGS, LLC, <br><br> Defendants. | Case No. 1:25-cv-02104 |

**PLAINTIFF HILTON WORLDWIDE HOLDINGS INC.'S REPLY IN SUPPORT OF ITS**
**MOTION FOR A PROTECTIVE ORDER**

**INTRODUCTION**

Defendants' opposition confirms there is good cause to issue a protective order precluding Defendants from deposing Hilton's Chief Financial Officer Kevin Jacobs.

Defendants admit that Mr. Jacobs had no direct involvement in negotiating, executing, or administering the four guarantees Defendants breached.  Dkt. 54-1 ("Hirbod Decl.") ¶ 10.  On the contrary, Defendants concede their sole basis for deposing Mr. Jacobs is his purported role in an unconsummated rescue refinancing that Defendants (and their affiliates) sought to obtain from a third party (the "Third-Party Refinancing") one year after they defaulted.  Dkt. 54 ("Opp.") at 16.  Defendants try to evade the Pre-Negotiation Agreement by ignoring or misconstruing its clear and unambiguous language, but these arguments are meritless.  The Pre-Negotiation Agreement alone demonstrates there is good cause to preclude Mr. Jacobs's deposition.

On the apex doctrine, Defendants concede Mr. Jacobs is an apex executive but argue they are nonetheless entitled to depose him because he has "unique" and "non-duplicative" knowledge about the Third-Party Refinancing negotiations.  Defendants have made no such factual showing.  The "evidence" Defendants cite—a vague declaration from Hirbod—only underscores the speciousness of Defendants' position.  Hirbod's declaration does not (and cannot) cite any evidence that Mr. Jacobs had direct, first-hand involvement in the Third-Party Refinancing negotiations.  And **the Hirbod declaration makes clear that not one of the Defendants ever talked to or interacted with Mr. Jacobs**.  The declaration cites statements from *other* Hilton executives—all of whom Defendants will depose, making it entirely unnecessary to depose Mr. Jacobs.

Moreover, Defendants never mention that this proposed deposition is part of a broader effort to harass Hilton.  **After Hilton filed this action in this Court, Defendants sued Hilton in California state court to assert tort claims against Hilton based on the same theory they**

**advance in their opposition—that Hilton caused them more than $200 million in damages by failing to execute refinancing documents**.  *See Eagle Canyon Holdings, LLC v. Bridge Investment Grp. Holdings Inc.*, No. 25-CV-476407 (Cal. Sup. Ct. Apr. 1, 2026).  Those claims are frivolous and will be addressed in the California action, but it is obvious that Defendants are using *this* proceeding to get early discovery for their California gambit—which this Court should not permit.

Indeed, precisely because Defendants cannot defend their request to depose Mr. Jacobs in this action, Defendants devote most of their brief to criticizing Hilton's conduct in the Third-Party Refinancing negotiations and saying that Defendants have not waived their affirmative defenses. **But what they never explain is <u>why</u> negotiations in 2025 about the unconsummated Third-Party Refinancing are relevant to their breach of the Reimbursement Contracts in 2024 or to any defense they assert**.[1]  Nor does Defendants' answer explain this purported relevance, which pleads only boilerplate defenses with no factual allegations.  Answer ¶¶ 121–134.  And even if they had explained the purported relevance of the refinancing negotiations, Defendants have not remotely established justification to depose Hilton's CFO about them.  A protective order should issue.

---

[1]  The Pre-Negotiation Agreement makes abundantly clear that Hilton had no obligation whatsoever to engage in any refinancing negotiations.  Dkt. 50-5 ("Ex. 5 to Mot.") § 6 ("[N]o Party has any obligation whatsoever to commence in or continue the Negotiations, . . . [and] [a]ny Party, in its sole and absolute discretion, may terminate the Negotiations, without prior notice, at any time and for any reason . . . .").  Defendants never explain how discussions about a refinancing— which no party was obligated to even discuss—are a defense to the ironclad contractual guarantees in the Reimbursement Contracts triggered by Defendants' undisputed default in June 2024.  Dkt. 39 ("Answer") ¶¶ 45, 49, 53, 71, 84, 98, 114 (Defendants admitting that they have not paid Hilton).

**ARGUMENT**

**I.      Defendants' Arguments on the Pre-Negotiation Agreement Fail.**

Hilton's motion established that (1) Defendants seek to depose Mr. Jacobs solely on his alleged role in the Third-Party Refinancing negotiations, and (2) the Pre-Negotiation Agreement forecloses Defendants' attempt to depose Mr. Jacobs on that issue. *See* Dkt. 50 ("Mot.") at 7–8. Defendants admit they seek to depose Mr. Jacobs only on his alleged role in the Third-Party Refinancing negotiations. *See* Opp. at 16 (arguing Defendants seek "narrowly tailored testimony" from Mr. Jacobs on the "critical refinancing period"). Defendants nevertheless argue the Pre-Negotiation Agreement does not preclude deposing Mr. Jacobs on the Third-Party Refinancing negotiations for three reasons. Each is meritless.

*First*, Defendants contend the Pre-Negotiation Agreement "does not bar discovery" into the Third-Party Refinancing negotiations because the Pre-Negotiation Agreement "references Federal Rule of Evidence 408," and "Rule 408 governs admissibility, not discoverability." Opp. at 14 (emphasis removed). This argument ignores the text of the Pre-Negotiation Agreement. Section 1 expressly states that the "Negotiations[] shall be protected and shall not be admissible as evidence **or otherwise referred to by any Party on any issue that is or may be before any court or administrative body or in any other proceeding or hearing**, including, but not limited to, under Rule 408 of the Federal Rules of Evidence." Ex. 5 to Mot. § 1 (emphasis added). Defendants' argument focuses solely on the references to "admissible" evidence and Federal Rule of Evidence 408—but the Pre-Negotiation Agreement goes far beyond that. Opp. at 14. Defendants do not address the plain language in the Pre-Negotiation Agreement that bars "*referr[ing] to*" the Negotiations on "any issue that is or may be before any court." *See* Mot. 7–8. This provision is a categorical ban on injecting any fact arising from the Third-Party Refinancing into this proceeding.

4

Defendants do not and cannot dispute that deposing Mr. Jacobs on the Third-Party Refinancing negotiations would "refer[] to" those negotiations on an issue that "is or may be before any court." Ex. 5 to Mot. § 1. The Pre-Negotiation Agreement thus squarely precludes deposing Mr. Jacobs on the Third-Party Refinancing negotiations. *See Crow-Crimmins-Wolff & Munier v. Westchester Cnty.*, 511 N.Y.S.2d 117, 118 (2d Dep't 1987) ("It is well settled that if discussions are had between parties pursuant to an agreement that those discussions are off the record, 'then no discovery with respect to those discussions may be had.'" (quoting *Paine, Webber, Jackson & Curtis v. Alanthus Corp.*, 440 N.Y.S.2d 317 (2d Dep't 1981))).

*Second*, Defendants suggest that the Pre-Negotiation Agreement applies only to the "Borrower"—Hirbod's affiliate "RDNWD LLC, a non-party borrower entity"—and not to all Defendants. Opp. at 14. That is wrong. Section 1 of the Pre-Negotiation Agreement applies to the "Parties," which are defined to include the "Borrower Parties and Hilton." Ex. 5 to Mot. at 1. The "Borrower Parties," in turn, are defined to include each Defendant here—FMT (the "Obligor"), and ECH and Hirbod (the "Guarantors"). The Pre-Negotiation Agreement's prohibition on "referring to" the Negotiations thus applies to each Defendant here.

*Third*, Defendants contend the Pre-Negotiation Agreement's definition of "Negotiations" does not cover the Third-Party Refinancing negotiations. This argument fails. "Negotiations" is defined to include "the obligations of Borrower under the [Mezzanine] Loan and Reimbursement Documents **and other issues relating to the [Mezzanine] Loan** and the Reimbursement Agreement." Ex. 5 to Mot. § 1 (emphasis added). Defendants concede that the Third-Party Refinancing negotiations involved discussions on "modification or replacement of the mezzanine financing"—that is, the Mezzanine Loan—and a refinancing **necessarily would affect that loan**. Opp. at 4. Discussions on "modification or replacement" of the Mezzanine Loan during the Third-

5

Party Refinancing negotiations, *id.*, is an "issue[] relating to the [Mezzanine] Loan, Ex. 5 to Mot. § 1. The Third-Party Refinancing negotiations are thus covered by the Pre-Negotiation Agreement's definition of "Negotiations."[2]

Defendants say that the Pre-Negotiation Agreement does not cover Hilton's "operational" conduct during the refinancing discussions and applies only to discussions about Defendants' "loan obligations and Hilton's creditor remedies." Opp. at 14. This argument is specious. The "operational conduct" Defendants challenge is Hilton's alleged "failure to timely execute and deliver indispensable refinancing documents," which Defendants say caused the "refinancing to collapse immediately before foreclosure of the approximately $315 million Hotel." Opp. at 2. The purported "operational conduct" Defendants cite is thus directly tied to the refinancing of the "borrower's loan obligations" for the Hotel. Indeed, that is the whole point of Defendants' theory—that Hilton's failure to execute certain documents prevented a refinancing that then precipitated a foreclosure by Defendants' lenders.

The Pre-Negotiation Agreement puts this all beyond reach. Hilton required Defendants to execute the Pre-Negotiation Agreement to avoid precisely this scenario. Defaulted debtors frequently claim that "everything would have been fine" if only various other parties had offered

---

[2] Other provisions underscore this conclusion. Section 16 of the Pre-Negotiation Agreement acknowledges that "Hilton has had and continues to have the right to engage in discussions with … parties who now hold … or in the future may acquire a direct or indirect interest in the Loan or the Collateral or the Property or the Mortgage Loan." Ex. 5 to Mot. § 16. Section 16 further states that the definition of "Negotiations" includes "discussions" that "relate to … the Property, its operations, performance, capital structure and financing and/or any transaction or potential transaction relating to the foregoing." *Id.* The Third-Party Refinancing negotiations covered these same topics—as Defendants themselves state. *See* Opp. at 4 ("Throughout 2024 and 2025, Hilton representatives engaged in discussions and communications concerning potential refinancing structures, replacement financing sources, modification or replacement of the mezzanine financing, payoff structures, required approvals, and documentation necessary to complete a refinancing transaction intended to avoid foreclosure of the Hotel.").

rescue refinancing to them.  Even if the refinancing issues were relevant to Defendants' breach of the Reimbursement Contracts and default in 2024, they could not be invoked against Hilton here.

## II.    Defendants' Arguments on the Apex Doctrine Fail.

Defendants do not dispute that Mr. Jacobs is a quintessential "apex" executive as Hilton's Chief Financial Officer.  Opp. 15–17; *see* Mot. 8 (establishing Mr. Jacobs's role as a senior executive).  Nor do Defendants dispute that the apex doctrine requires precluding depositions of apex executives (1) who lack "unique or special knowledge of the facts at issue" and (2) when "less burdensome avenues" for obtaining allegedly relevant information have not "been exhausted."  Mot. 8–9 (collecting cases).  Defendants instead argue there is not good cause for applying the apex doctrine here because Mr. Jacobs has "unique first-hand knowledge" of relevant facts that is "non-duplicative" of knowledge possessed by other witnesses.  Opp. 15–17.  That is incorrect.

Defendants do not and cannot dispute that Mr. Jacobs (i) did not sign or negotiate the Reimbursement Contracts, (ii) did not have day-to-day involvement in the administration of the Reimbursement Contracts, and (iii) was not directly involved in the Third-Party Refinancing negotiations.  *See* Mot. 8–9.  And Defendants cite no documents showing Mr. Jacobs played any direct role in the Third-Party Refinancing negotiations.  *See* Opp. 15–17.  These concessions alone foreclose Defendants' argument that Mr. Jacobs has "unique first-hand knowledge" that justifies an apex deposition.  *See* Mot. 8–9.

Defendants argue that they "seek narrowly tailored testimony concerning discrete factual issues involving execution authority, approvals, timing, availability, and communications during the critical refinancing period immediately preceding foreclosure," and "[n]o other witness can testify concerning Mr. Jacobs's own availability, travel, authority, execution capability, or personal involvement in the approval and signing process during the critical refinancing window."

Opp. at 16.  But the Hirbod Declaration refutes these conclusory assertions.  Hirbod contends Mr. Jacobs was the "authorized signatory for" refinancing documents and "was unavailable or out of the country" based on information he received from "*Hilton representatives*" and "communications relayed" to him "through counsel, including communications *from Hilton's attorneys* to my attorneys." Hirbod Decl. ¶ 10 (emphases added).  Thus, by Hirbod's own account, Mr. Jacobs's alleged role as an "authorized signatory" on documents, his availability, and his travel schedule were known by the Hilton representatives that were directly interfacing with Mr. Hirbod and his advisors.  *Id.*  Defendants are deposing those Hilton representatives—John Shults, Hilton's Vice President and Senior Counsel for Development (and a Hilton attorney) and Charlie Ruehr, Hilton's Vice President of Corporate Finance and Investor Relations—and can question them on those issues.  Defendants are thus wrong to suggest, at Opp. at 16–17, that Mr. Jacobs somehow possesses "unique" or "non-duplicative" knowledge to which "no other" deponent can testify.  Defendants are already scheduled to depose the relevant Hilton executives other than Mr. Jacobs.

For similar reasons, Defendants' argument that "Hilton itself placed Mr. Jacobs's executive approval and signatory availability directly at issue by repeatedly representing that the required refinancing documents were not timely executed because Mr. Jacobs was allegedly out of the country," Opp. at 16 (citing Hirbod Decl. ¶ 10), supports Hilton.  Defendants are challenging statements that Hilton representatives—*i.e.*, Mr. Ruehr or Mr. Shults—allegedly made to Hirbod. Defendants contend they are "entitled to inquire into the factual basis for those representations," Opp. at 16, but Defendants can do so through the depositions of Mr. Ruehr and Mr. Shults.  Again, Defendants' arguments demonstrate Mr. Jacobs's lack of unique and non-duplicative knowledge.

Defendants (Opp. at 16) cite *JTH Tax, Inc. v. Aime*, No. 2:16CV279, 2016 WL 9223926, at *6 (E.D. Va. Dec. 13, 2016), but this case supports Hilton.  There, the court declined to apply

8

the apex doctrine because a senior executive had "unique" knowledge of relevant statements he personally "made on a shareholders conference call." *Id.* Here, in contrast, Defendants do not and cannot cite any statement from Mr. Jacobs and instead cite only alleged statements from other deponents. Opp. at 16–17. **Indeed, the Hirbod declaration makes clear that not one of the Defendants ever talked to or interacted with Mr. Jacobs.** *JTH Tax* thus reinforces the apex doctrine's applicability here.

### III.    Defendants' Other Arguments Are Non-Responsive and Meritless.

Unable to refute Hilton's argument that there is good cause to preclude the deposition of Mr. Jacobs, Defendants resort to obfuscation. Defendants' lead arguments are that Hilton seeks recovery under four allegedly "integrated and interdependent agreements," Opp. 7–8; that Defendants did not waive defenses, *id.* 9–12; and that there are allegedly relevant "defenses and factual issues," *id.* 12–13. All of this is a complete sideshow. Hilton does not seek a protective order blocking Mr. Jacobs's deposition because Defendants have waived all defenses. *See* Mot. at 6–9. Hilton has instead established that good cause exists to issue a protective order to preclude Defendants from deposing Mr. Jacobs based on the Pre-Negotiation Agreement and the apex doctrine. *Id.* Defendants have not refuted these arguments. Defendants' detour into these side issues is irrelevant.

### IV.    Defendants Are Improperly Trying to Depose Mr. Jacobs to Support Their Separate California Action.

Finally, Defendants' attempt to seek the deposition of Mr. Jacobs here is part of a meritless campaign to evade accountability. **After Hilton filed this action in this Court, Defendants sued Hilton in California state court to assert tort claims against Hilton based on the theory they advance in their opposition—that Hilton caused them $300 million in damages by failing to execute refinancing documents**. *See Eagle Canyon Holdings, LLC v. Bridge Investment Grp.*

*Holdings Inc.*, No. 25-CV-476407 (Cal. Sup. Ct. Apr. 1, 2026). Hilton submits those claims are frivolous. And in any event it is clear that Defendants are trying to use this case as a vehicle for free discovery on their affirmative California tort claims. The Court should not permit gamesmanship and harassment in this proceeding for discovery that is aimed at a different proceeding.[3]

## CONCLUSION

Defendants' demand to depose Mr. Jacobs is a transparent attempt to leverage and harass Hilton. The Pre-Negotiation Agreement bars Defendants from deposing Mr. Jacobs on the single topic they seek to question him on—the Third-Party Refinancing negotiations. And the apex doctrine applies to Mr. Jacobs because he is a senior executive with no unique and non-duplicative knowledge that cannot be obtained from the other Hilton executives Defendants are deposing. The Court should thus grant Hilton's motion for a protective order precluding Mr. Jacobs's deposition.

---

[3] Litigation gamesmanship is standard fare for these Defendants. Hirbod and his affiliates have filed multiple suits in multiple jurisdictions trying to evade accountability for their defaults and foreclosure. Defendants have filed a California action seeking an (unsuccessful) injunction to stop the foreclosure by their mortgage lender, *NEX SJ LLC & SC SJ Holdings, LLC v. BrightSpire Credit 1, LLC*, No. 25-CV-458403 (Cal. Sup. Ct.); filed an (unsuccessful) bankruptcy proceeding in California to circumvent a plan implemented in a prior Delaware bankruptcy proceeding, and were found to have filed the California bankruptcy action in bad faith, *see In re SC SJ Holdings LLC*, No. 5:24-bk-51685 (Bankr. N.D. Cal.), ECF No. 1; *In re NEX SJ LLC*, No. 5:24-bk-051683 (Bankr. N.D. Cal.), ECF No. 1; *In re SC SJ Holdings LLC et al.*, No. 21-10549 (Bankr. D. Del.), ECF No. 1312 ("Accordingly, I find that the Second Bankruptcy Case must be dismissed as a filing made in bad faith . . . ."); sued their original lenders and various parties involved in their failed rescue refinancing in California state court, *see Eagle Canyon Holdings, LLC v. Bridge Investment Grp. Holdings Inc.*, No. 25-CV-476407 (Cal. Sup. Ct.); opposed their mortgage lender's action to recover the difference between the mortgage loan debt and the proceeds from the foreclosure, *see BRSP Market SJ, LLC v. Hirbod et al.*, No. 653379/2025 (N.Y. Sup. Ct.), NYSCEF No. 157; and on and on. This proceeding and the request for the Hilton CFO deposition is just the latest tactic to harass creditors and evade accountability for their own default.

Dated: May 29, 2026

Respectfully submitted,

By: */s/ Luke Sullivan*

Andrew S. Tulumello (*pro hac vice*)
Chantale Fiebig (*pro hac vice*)
Luke Sullivan
VSB 92553
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone:  (202) 682-7000
Facsimile:  (202) 857-0940
Email:  drew.tulumello@weil.com
Email:  chantale.fiebig@weil.com
Email:  luke.sullivan@weil.com

Craig C. Reilly
VSB # 20942
429 N. St. Asaph Street
Alexandria, VA 22314
Telephone:  (703) 549-5354
Fax:  (703) 549-5355
Email:  craig.reilly@ccreillylaw.com

*Counsel for Plaintiff*
*Hilton Worldwide Holdings Inc.*

11